1                 IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4     _____
                                            )
5     UNITED STATES OF AMERICA,             )
                                            )
6                  Plaintiff,               )
                                            )
7         -vs-                              )    2:11-CR-501 DN
                                            )
8     JEREMY JOHNSON, SCOTT LEAVITT         )
      and RYAN RIDDLE,                      )
9                                           )
                   Defendants.              )
10    _____)

11

12

13

14              BEFORE THE HONORABLE DAVID NUFFER

15                 DATE:   FEBRUARY 10, 2016

16              REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                        JURY TRIAL

18              TESTIMONY OF PAUL PAOLUCCI

19                        VOLUME II

20

21

22

23

24

25              Reporter:   REBECCA JANKE, CSR, RPR, RMR

32

```
 1

 2                         A P P E A R A N C E S

 3

 4    FOR THE UNITED STATES: UNITED STATE'S ATTORNEY'S OFFICE
                             BY:  MICHAEL P. KENNEDY, ESQ.
 5                                KARIN FOJTIK, ESQ.
                                  ROBERT C. LUNNEN, ESQ.
 6                                JASON R. BURT, ESQ.
                             185 SOUTH STATE STREET, SUITE 400
 7                           SALT LAKE CITY, UTAH  84111

 8

 9
      FOR MR. JOHNSON:        PRO SE
10
      STANDBY COUNSEL:        SKORDAS & HYDE
11                            BY:  GREGORY G. SKORDAS, ESQ.
                              560 SOUTH 300 EAST, SUITE 225
12                            SALT LAKE CITY, UTAH 84111

13
      FOR MR. LEAVITT:        MUMFORD PC
14                            BY:  MARCUS R. MUMFORD, ESQ.
                                   BRADLEY N. MUMFORD, ESQ.
15                            405 SOUTH MAIN STREET, SUITE 975
                              SALT LAKE CITY, UTAH 84111
16

17

18    FOR MR. RIDDLE:        PRO SE

19    STANDBY COUNSEL:        STEVEN B. KILLPACK, ESQ.
                              43 EAST 400 SOUTH
20                            SALT LAKE CITY, UTAH 84111

21

22

23

24

25
```

33

INDEX

WITNESSES                EXAMINATION                    PAGE

PAUL PAOLUCCI            Direct by Mr. Burt               5




E X H I B I T S

PLAINTIFF'S                                          RECEIVED

   927                                                  89

```
 1    FEBRUARY 10, 2016                    SALT LAKE CITY, UTAH

 2                       P R O C E E D I N G S

 3                              *  *  *

 4           THE COURT:  Good morning.  We're convened in the

 5    United States vs. Johnson, Leavitt and Riddle.  I am formed

 6    that the entire jury is present, sitting out in the hall, and

 7    I heard one of them say to the last one who arrived, "You're

 8    late."  So, they are disciplining each other.  It's

 9    remarkable especially given the weather and the time of day.

10           We have had some issues about exhibits used by the

11    defendants.  I would like to ask counsel to stay after the

12    jury is excused today so we can examine this in some detail.

13    I'm reviewing the cases which were cited by the government

14    and cited by Mr. Mumford in a memorandum filed last night.

15           So, do you have any problem staying after,

16    prosecution?

17           MR. BURT:  No, Your Honor.

18           THE COURT:  Mr. Johnson?

19           MR. JOHNSON:  No, Your Honor.

20           THE COURT:  Mr. Mumford?

21           MR. MARCUS MUMFORD:  No, Your Honor.  Thank you.

22           THE COURT:  Mr. Riddle?

23           MR. RIDDLE:  No, Your Honor.

24           THE COURT:  Okay.  Is there anything else we need to

25    handle before we have the jury come in?  All right, then,
```

1    let's bring the jury in.

2              (Jury enters the courtroom.)

3         THE COURT:  Good morning.  We're convened with the

4    jury in the United States vs. Johnson, Leavitt and Riddle.

5    We were in the middle of the examination of Mr. Paolucci, as

6    I recall.

7         MR. BURT:  That's correct, Judge.

8         THE COURT:  Let's resume.

9         MR. BURT:  Thank you, Your Honor.

10        THE COURT:  Go ahead, Mr. Burt.

11        MR. BURT:  Thank you, Judge.

12             If we could pull up, please, Exhibit 902 and go to

13   page 88.  And if we could expand 5.2.3, please, Mr. Proctor.

14                  DIRECT EXAMINATION (Continued.)

15   BY MR. BURT:

16     Q.   Mr. Paolucci, do you recall that, yesterday, right

17   as we were ending, we were discussing this section of the

18   MasterCard rules?

19     A.   Yes, I do.

20     Q.   And remind the jury what this section provides.

21     A.   So, this section provides an overview of what

22   acquirers are required to provide to MasterCard with the

23   transaction records and what they need to ensure that they

24   have in the merchant file.

25     Q.   Okay.  And are acquirers expected to know who the

1    actual merchant and actual owner is?

2    A.   Yes, they are.   Okay.   Now, I'm going to present

3    this chart that we have been working with.   And let's talk a

4    little bit about independent sales organizations or ISO's,

5    and if we could go, please, to page 115.

6          And let's expand, Mr. Proctor, from 7.2 down to the

7    bottom.

8          Okay.   At the top it says MSP categories, what is

9    MSP, Mr. Paolucci?

10   A.   It stands for member service provider.

11   Q.   Is that just a MasterCard term for an ISO?

12   A.   Basically, yes.

13   Q.   And does MasterCard also use the term ISO?

14   A.   We do.

15   Q.   Okay.   Looking at 7.2.1, could you please read that

16   section?

17   A.   The first MSP category is independent sales

18   organization, ISO.   An ISO is an MSP that provides ISO

19   program service.   ISO program service includes, by way of

20   example and not limitation, merchant solicitation, cardholder

21   solicitation and customer service.   An ISO must promptly

22   provide such information applicable to its MSP registration

23   and provision of the program service as the corporation may

24   request at any time.

25   Q.   So, Mr. Paolucci, what types of services does an ISO

1    provide to an acquiring bank?

2       A.   So they provide a number of services.  As stated in

3    the rule, merchant solicitation.  If they are issuers, they

4    handle are cardholder solicitation and, at times, they manage

5    customer service.

6       Q.   So there can be an ISO even on the issuing side; is

7    that right?

8       A.   That is correct.

9       Q.   And how about on the merchant acquiring side?  Can

10   ISO's provide, for example, underwriting services?

11      A.   They can assist with the underwriting, but at the

12   end of the day, the acquirers are responsible for making the

13   final determination.

14      Q.   Okay.  Looking at third-party processor, I'm not

15   going to have you read that whole thing, but describe for the

16   jury what a third-party processor is referring to.

17      A.   A third-party processor or a TPP is an entity.  It

18   could be all the services that an ISO provides, in addition

19   to assisting with the transaction processing -- process with

20   MasterCard.

21      Q.   Okay.  So what does that mean?  Let's break that

22   down.  Transaction processing.  Describe what you mean by

23   that.

24      A.   So they could set up the file that comes from the

25   merchant and send it through the acquirer's ICA into

1    MasterCard, so that the service they are providing for the

2    acquirer, they will set the file up to be processed.

3        Q.   So is that like essentially the accounting for the

4    merchant?

5        A.   Not so much the accounting, it's the transaction

6    processing.

7        Q.   Okay.  There is one provision I do want to highlight

8    here.  Let's look at what the third-party processor is not

9    allowed to do.

10        Mr. Proctor, do you see -- okay.  I want to expand

11    7.2.2.

12        And, Mr. Paolucci, what I would like you to do,

13    please, is to read, beginning in the second line that begins

14    with "TPP program service," through the end of that sentence.

15        A.   TPP program service includes, by way of example and

16    not limitation, terminal operation, authorization routing,

17    voice authorization, call referral processing, electronic

18    data capture, clearing file preparation and submission,

19    settlement processing, excluding possession, ownership or

20    control of settlement funds, which are prohibited, cardholder

21    and merchant statement preparation, and chargeback

22    processing.

23        Q.   Okay.  So let's talk about what a third-party

24    processor cannot do.  What can't they do?

25        A.   So they cannot have access to any settlement funds

1    of the merchant.

2        Q.    So is that the money coming from the issuing bank

3    over to the acquiring bank?

4        A.    That is correct.

5        Q.    And this third-party processor ISO cannot touch

6    those funds?

7        A.    That is correct.

8        Q.    So do they go directly from the acquiring bank to

9    the merchant bank account?

10       A.    That is correct.

11       Q.    But it says something that the processors can do.

12   They can do merchant statement preparation.  So what is that

13   referring to?

14       A.    So they can manage -- since they may be -- a TPP may

15   be handling the transactions, they see what merchants are due

16   funds, so they can prepare the statement for the acquiring

17   bank to pay out to the merchant.

18       Q.    Okay.  So this level, the ISO level, can tell the

19   merchant acquiring bank:  Hey, pay the merchant X amount of

20   dollars for its processing.

21       A.    That is correct.

22       Q.    But the money never hits here?

23       A.    It should not be you hitting the ISO or the TPP.

24       Q.    Okay.  So if a merchant is receiving settlement

25   funds from its processing, what do we know?

1       A.   That the the acquirer knows who the merchant is or

2   should know who the merchant is and knows who they are paying

3   those funds out to.

4       Q.   And do we know that money is going through the

5   bank?

6       A.   Yes.  The money should be going from the bank to the

7   merchant.

8       Q.   Okay.  Now, how, if at all, does the fact that

9   acquiring banks can use these third parties to assist them

10   affect their responsibilities?

11       A.   It doesn't impact their responsibilities at all

12   towards MasterCard.  They have the same responsibilities as

13   they always have.

14       Q.   So who is it that always must sponsor a merchant

15   into the MasterCard payment system?

16       A.   It's the acquiring bank.

17       Q.   Who is it that is always ultimately liable for the

18   merchant?

19       A.   It's the acquirer.

20       Q.   And who is it that MasterCard deals with?

21       A.   The acquirer.

22       Q.   Let's go to page 116, please.  And if we could

23   expand 7.3.1 at the bottom.

24            If you could read slowly the first line.

25       A.   The member must at all times be entirely responsible

1   for and must itself manage and direct all aspects of program

2   service performed by the MSP and establish and enforce all

3   management and operating policies applicable to program

4   service in accordance with the standards.

5       Q.   Who is the member that's being referred to here?

6       A.   The member would be the acquiring bank.

7       Q.   Okay.  And what is it saying about their

8   responsibilities with respect to those third parties?

9       A.   That they are responsible for third parties'

10  actions.

11      Q.   Okay.  Even if the ISO is doing the underwriting and

12  opening the account?

13      A.   That is correct.

14      Q.   Okay.  I think you said yesterday you're familiar

15  with what a chargeback is?

16      A.   That's right.

17      Q.   And are you familiar with MasterCard's programs to

18  deal with chargebacks?

19      A.   I am.

20      Q.   How are you familiar with those programs?

21      A.   I developed them.

22      Q.   And when did you develop them, Mr. Paolucci?

23      A.   Probably back when I started about 19 years ago.

24      Q.   Why is MasterCard concerned with chargebacks?

25      A.   So, chargebacks in themselves are not necessarily a

1    bad thing unless they are at an excessive level and are

2    impacting issuers and cardholders, and that's why we came up

3    with the excessive chargeback program.

4        Q.   When you put this together, did you look at the

5    rates of chargeback throughout the MasterCard system?

6        A.   We did.

7        Q.   Did you look at it on a worldwide basis?

8        A.   A global basis.

9        Q.   And what was the average rate of chargeback for a

10   merchant?

11       A.   The average rate was actually 18.7 based --

12   percent.

13       Q.   18?

14       A.   I'm sorry.  18.7 basis points, which is .187

15   percent.

16       Q.   Okay.  So, essentially, 2/10 of one percent?

17       A.   That is correct.

18       Q.   And that was for worldwide merchants?

19       A.   Global.

20       Q.   So, in developing the mastercard system, did you

21   come to set thresholds?

22       A.   Yes.

23       Q.   Describe for the jury what those thresholds are.

24       A.   So, we -- when we implemented the program, we looked

25   at how many chargebacks were acceptable, and when we looked

1    at an average merchant account, we determined that 50,

2    minimal, would be where we would start from an acceptable

3    level of chargebacks per merchant.

4         Q.   So 50 or less?

5         A.   50 or less would be acceptable.

6         Q.   And is that per month?

7         A.   That is per month.

8         Q.   Okay.  And did you look at any sort of ratio?

9         A.   We did.  So we looked at how many above the average,

10   system average we would look at, so we did it on a tier

11   structure.  We did a first tier, which is basically like a

12   warning level, right, and that tier was at 50 basis points or

13   .5 percent.

14        Q.   So half of one percent?

15        A.   That is correct.

16        Q.   Okay.  And that's the first warning level?

17        A.   That's right.

18        Q.   And if a merchant is at half of one percent, and 50

19   chargebacks, what happens?

20        A.   The acquirer must report to MasterCard, they must

21   acknowledge that they are monitoring the merchant, and they

22   report to MasterCard that this merchant has exceeded that

23   threshold.

24        Q.   So the acquirers have to monitor at .5 percent and

25   50 chargebacks --

1    A.    That is correct.

2    Q.    -- per month?  How is the ratio calculated?

3    A.    So the ratio is calculated by taking this month's

4  chargebacks versus the previous month's sales.

5    Q.    Okay.  So let's say I have ten chargebacks in

6  February and in January I had a hundred sales.  What would my

7  chargeback ratio be?

8    A.    It would be 10 percent.

9    Q.    Okay.  Now that's the first tier, I think you said?

10   A.    That is.  That's the warning.

11   Q.    And do you have a name for that tier?

12   A.    It's called the chargeback monitor merchant.  CMM.

13   Q.    CMM.  Okay.  And what's the next tier?

14   A.    The next tier is called the excessive chargeback

15 merchant tier, and that tier is over a hundred basis points

16 or 1 percent for two consecutive months.

17   Q.    Okay.  So -- and is there a level of chargebacks, a

18 total number of chargebacks?

19   A.    Minimum 50 chargebacks.

20   Q.    Okay.  So describe to the jury how this works in

21 practicality.  What does an acquiring bank have to notice in

22 order for its merchant to be an excessive chargeback

23 merchant?

24   A.    So, the acquiring bank receives the chargeback, so

25 they know what is coming in for a specific merchant, so they

1    must ensure that they have proper reporting in place to

2    identify these tiers.  Once these tiers are identified, they

3    must report it into MasterCard and then we notify them if

4    there's any type of assessments that are applied.

5           And the way we calculate that for an excessive

6    chargeback merchant is usually the first month is considered

7    the chargeback monitoring merchant tier, so that's the

8    warning.  So that month could be over 50 basis points or a

9    hundred basis points, right?  So that is what we consider,

10   like, that's your warning month.  All right?  So, if the

11   second month they are over a hundred basis points again, then

12   they are considered an excessive chargeback merchant, and

13   that's the period where MasterCard would reach out to the

14   acquirer and advise them of applicable assessments that go

15   along with that violation.

16        Q.    Okay.  So I have two questions based on that answer.

17   First.  What is an assessment?

18        A.    And assessment is a financial fee that is applied if

19   one of the MasterCard rules are being violated or program

20   thresholds are being violated.

21        Q.    Okay.  And that's a fee to whom?

22        A.    To the acquiring bank.

23        Q.    All right.  And you said -- you mentioned a couple

24   of times basis points.  Does a hundred basis points equal 1

25   percent?

1     A.    It does.

2     Q.    Okay.  And 50 basis points would equal .5 percent?

3     A.    That is correct.

4     Q.    What's the purpose, Mr. Paolucci, of assessing the

5   acquiring bank a fee?

6     A.    There's a couple of reasons why.  The first one is

7   the negative impact that the chargebacks have impacted

8   MasterCard and the cardholders.  Financially it impacts the

9   issuing banks because the issuer has to reissue those cards,

10  and there's a cost associated with that, and it's anywhere --

11  to manage a chargeback, issuers have advised us that it's

12  anywhere between $25 and $35.  That's their operating expense

13  as well as reissuing the cards.

14    Q.    And so do those assessments flow through MasterCard

15  to the issuing banks?

16    A.    They do.

17    Q.    Mr. Paolucci, are you familiar with the MATCH list?

18    A.    I am.

19    Q.    What's the MATCH list?

20    A.    It's MasterCard Alert Control High Risk Merchants.

21  And basically it's a system that I've managed since I've been

22  at MasterCard, and it's a system that basically has been put

23  into place for acquirers to manage their risks when they are

24  signing merchants.  And it basically is almost like a

25  bulletin board.  An acquirer that's looking to sign a

1    merchant must -- we call it inquire into the system, right?

2    So must put the merchant information in that's applying for

3    processing through this system.  The system will return a

4    response advising them that this merchant either had

5    processing before and was terminated for a specific reason or

6    there was no result.

7            So it's -- you know, it gives them a level of

8    security that that merchant is good to go, and they will

9    process for him.

10           On the other hand, when a merchant is terminated by

11   an acquirer, MasterCard rules mandate that if, at the time of

12   termination, that merchant meets one of the 13 reason codes,

13   they must be added into the system so any other subsequent

14   acquirers checking on that merchant will know that risk

15   information.

16   Q.   So does MasterCard require their acquiring banks to

17   check the MATCH when deciding to accept the merchant?

18   A.   Yes.  It is mandated.

19   Q.   And why is that?

20   A.   It's just to protect the integrity of the MasterCard

21   system and network, and it protects our members as well, our

22   acquirers, issuers and cardholders.

23   Q.   Mr. Paolucci, how important is it to this system

24   that the merchant account applications contain truthful

25   information about the merchant and its principal?

         A.    Just for MATCH alone, it's very important because if

false information is provided or if it's changed or altered,

the MATCH system will not work because it won't have accurate

data to MATCH on.

         Q.    You mentioned at the back end that the acquiring

banks are required to place a merchant on the MATCH list for

certain criteria; is that right?

         A.    That is correct.

         Q.    How many different reasons does MasterCard specify

for placing a merchant on the MATCH?

         A.    We have 13.

         Q.    Is excessive chargebacks one of those?

         A.    It is.

         Q.    And is that reason code 04?

         A.    That is correct.

         Q.    How is the MATCH list actually maintained at

MasterCard?

         A.    So, it's maintained in our St. Louis technical

headquarters.  It has its independent server.

         Q.    So it's like a big electronic database?

         A.    Exactly.

         Q.    And who can gain access to this database?

         A.    Only acquirers and Loren Fosner.

         Q.    The New York accent has the R instead of the W.

         A.    And I apologize.

1      Q.    Let's pull up Exhibit 522.

2            You're out here in the West now, Mr. Paolucci.

3      Okay.  Describe for the jury --

4            This has been received, Judge, as a MasterCard

5      certified record.

6            Describe for the jury what we're looking at here.

7      A.    So, what we're looking at here is a MATCH inquiry

8      results record.

9      Q.    And looking at the --

10           If we could expand the top third, Mr. Proctor.

11           Do you see your name on this one?

12     A.    I do.

13     Q.    And what does that mean?

14     A.    It means that I was the one that conducted the

15     inquiry into the system.

16     Q.    Okay.  So let's take a look at some of the

17     information that we find on this -- this document.  Starting

18     with reference number row.

19           Can you highlight that row, please, Mr. Proctor.

20           So looking at reference number, describe for the

21     jury what information that is.

22     A.    So the first four digits of the reference number is

23     what we consider the acquiring ICA.  In this case, 1966 is

24     MasterCard's internal number that we use.  The next four

25     digits is the year, 2010 and then the next two digits is the

50

1    month and then the next two digits are the day.

2       Q.   Okay.  And let's look at this added by 102 on

3    4/19/09.  What does that mean?

4       A.   So 102 is the ICA that was assigned to American

5    Express to access the MasterCard system.

6       Q.   What is ICA?

7       A.   So an ICA -- you're testing my memory now.  It goes

8    back a long way.  International Card Association is what it

9    stood for when the networks first started, and that includes

10   MasterCard, Visa and American Express.  Now it is used as an

11   identification for an acquiring bank when MasterCard applies

12   a license or grants a license to an acquirer.  We assign them

13   an ICA number.

14      Q.   Okay.  So 102 means who?

15      A.   102 we assigned to American Express.

16      Q.   Okay.  So American Express did something on April

17   19, 2009?

18      A.   They added a merchant on April 19, 2009.

19      Q.   Now let's look at merchant data.  What merchant did

20   American Express add on April 19, 2009 to the MATCH list?

21      A.   Market Funding Solutions.

22      Q.   It was associated with what -- with what merchant?

23      A.   So the inquiry was conducted on the merchant

24   IWorks.

25      Q.   Okay.

51

```
 1              And scroll -- and let's come back out of that,
 2    please.
 3              And let's look at the reason.
 4              If we could -- what I'd actually like to do,
 5    Mr. Proctor is look -- is expand maybe from the half --
 6    halfway point down.  A little lower.
 7              Okay.  Date opened row.  Do you see that?
 8         A.   Yes.
 9         Q.   What is that referring to?
10         A.   So that's the date the first transaction was
11    processed by the merchant.
12         Q.   Okay.  So January 9, 2009.  And date closed means
13    what?
14         A.   The last transaction date or termination of the
15    merchant agreement date.
16         Q.   Okay.  And reason code, what does that refer to?
17         A.   Reason code is one of the MATCH reason codes that
18    should be applicable for the merchant that is in MATCH.
19         Q.   Okay.  And what was the reason that American Express
20    placed IWorks and Market Funding Solutions on that MATCH?
21         A.   04 for excessive chargebacks.
22    And who was the principal associated with that?
23         A.   Jeremy Johnson.
24         Q.   Why is it important, Mr. Paolucci, that principals
25    are included on the MATCH list?
```

1        A.    Because the system actually checks on the principal

2   name as well as the merchant name and merchant address.

3        Q.    Have you heard the term minimum required fields?

4        A.    Yes.

5        Q.    What does that refer to?

6        A.    So, in the MATCH system, as you see along the

7   left-hand side, there are a number of fields that the MATCH

8   system can accommodate.  MasterCard mandates that there's a

9   minimum number of fields that you must -- or mandatory fields

10  that you must populate when you're submitting a record or

11  inquiring into the system.

12       Q.    Okay.  And tell the jury what some of those minimum

13  required fields are.

14       A.    It's business address, country, postal code,

15  principal, first and last name, country of the principal.  So

16  that's on the inquiry side.

17       Q.    So, with this in mind, how important is it that the

18  merchant account application contain truthful information?

19       A.    It's critical.

20       Q.    All right.  Let's switch topics a little bit.

21             We can pull that down.

22             Are you familiar with a company that was called

23  IWorks?

24       A.    I am familiar with it.

25       Q.    How did you become familiar with this company?

1        A.   Through the excessive chargeback program.

2        Q.   Describe for the jury how you learned about it

3 through the excessive chargeback program.

4        A.   The acquiring banks were reporting it into the

5 excessive chargeback program, and me and my team were

6 managing those cases.

7        Q.   Put a time period on when this was happening.

8        A.   It started back in 2009, I believe we started seeing

9 an uptick in the number of cases being reported through the

10 excessive chargeback program for that company.

11        Q.   Did it go back to 2008 as well?

12        A.   I believe so.

13        Q.   Okay.  Now, in the course of learning about this

14 merchant through the excessive chargeback program, did you

15 ever come to hear the name Jeremy Johnson?

16        A.   Yes.

17        Q.   And what did you hear about that name?

18        A.   Basically he was the principal that was being

19 reported through the excessive chargeback program and then

20 the MATCH listings we were seeing once the acquiring banks

21 were listing them, and Jeremy Johnson was the principal.

22        Q.   Were there a number of acquiring banks that were

23 reporting IWorks and Jeremy Johnson?

24        A.   Yes, there were.

25        Q.   Was one of those banks Wells Fargo?

54

1    A.   Yes.

2    Q.   What I'd like to do now, Mr. Paolucci, is look at

3 some documents from MasterCard and work on this PowerPoint.

4 Are you familiar with this power point that's up here?

5    A.   There's nothing there.

6    Q.   Are you familiar with this white page that I have up

7 here?

8    A.   No, I am not.

9    Q.   Okay.  I'm not either.

10        THE COURT:  Is that going to go through the evidence

11 system as well or not?

12        MR. BURT:  No, Judge.  The evidence system will run

13 through Mr. Proctor, and the PowerPoint will run off my

14 computer.

15        THE COURT:  Okay.

16        MR. BURT:  That's what we did with Mr. Elliott.

17        THE COURT:  Okay.

18        MR. BURT:  And it's all to build Exhibit 927, which

19 we will move to admit at the end.

20        THE COURT:  Okay.

21    Q.   BY MR. BURT:  Okay, now, Mr. Paolucci, viewing this,

22 have you seen this power point before?

23    A.   I have.

24    Q.   And does it contain data regarding MasterCard

25 assessments?

```
 1        A.    I can't see it from here.

 2        Q.    Well, it doesn't yet, but will it?

 3        A.    Oh.  I can't see it from here, but, no, I will take

 4   your word for it.  It's not on there.

 5              MR. BURT:  Your Honor, may I approach?

 6              THE COURT:  Well, what -- can we put up for the

 7   witness Exhibit 927?

 8              MR. BURT:  That's what I'm going to give him, Judge.

 9              THE COURT:  Oh.  Okay.

10              MR. BURT:  So he can see it.

11              THE COURT:  Okay.

12        Q.    BY MR. BURT:  The angles are difficult.  Okay.

13              So with that in hand --

14              Let's pull up Exhibit 571, which has been received,

15   Your Honor.

16              And, Mr. Proctor, if you could expand the top third

17   of this.

18              Are you familiar, Mr. Paolucci, with this document?

19        A.    I am.

20        Q.    Describe for the jury what this document is.

21        A.    So, this is a summary report from the excessive

22   chargeback program on audit number 11988 Internet Economy

23   Easy Grant Success.

24        Q.    Okay.  And what does audit number mean?

25        A.    So an audit number is just a case, an ECP case,
```

```
 1   excessive chargeback program case that has been reported by

 2   the acquirer or initiated by MasterCard.

 3        Q.   Okay.  So it's a MasterCard audit of the merchant?

 4        A.   That's correct.

 5        Q.   All right.  And looking at the top box that has two

 6   rows, it states violation info.  Do you see that?

 7        A.   I do.

 8        Q.   Tell the jury what information is in that box.

 9        A.   So, in that -- those rows it shows the number of

10   months that case has been open, the number of violating

11   months, the number of CMM months, chargeback monitor merchant

12   months and the number of months that the merchant has been

13   deemed excessive -- an excessive chargeback merchant.

14        Q.   Okay.  And that number is two; is that right?

15        A.   For an excessive chargeback merchant, they were

16   violating for two months.

17        Q.   Okay.  Now looking at the bottom of what has been

18   expanded, there's some merchant data.  Do you see that?

19        A.   I do.

20        Q.   And what does that refer to?

21        A.   So that refers to the merchant that was reported by

22   the acquiring institution.

23        Q.   Okay.  And who was that merchant?

24        A.   Internet Economy, Easy Grant Success.

25        Q.   And what was its doing business as, or d/b/a?
```

57

1        A.    Grant Search 8004790979.

2        Q.    Okay.  Now that sheet I just gave you, are you on

3    the Wells Fargo sheet?

4        A.    Yes.

5        Q.    Looking at the top left box, is that the same

6    merchant and d/b/a?

7        A.    That is.

8        Q.    And in the course of working with Wells Fargo, were

9    you able to identify this as an IWorks merchant?

10       A.    Yes.

11       Q.    Okay.

12             Now, if we could pull out of that, Mr. Proctor, and

13   expand, please, right below where you were down to where the

14   chart starts at the bottom.

15             Okay.  Let's look at a few of the rows here.  Do you

16   see the row that states contract open date?

17       A.    Yes.

18       Q.    Okay.  And what does that refer to?

19       A.    That's the date that they either signed the merchant

20   agreement or processed the first transaction.

21       Q.    And what was the date here?

22       A.    May 6, 2008.

23       Q.    And contract terminated date, what does that date

24   refer to?

25       A.    That's either the date the acquiring bank terminated

1    the contract or the last transaction date of the merchant.

2        Q.    Okay.  Looking at acquirer info, what information do

3    we see about who the acquiring bank is?

4        A.    We see that the acquiring ID or ICA number is 5432.

5    The acquiring bank was Wells Fargo Bank NA.  The region,

6    which was they are located in the United States.  The

7    security contact that Wells Fargo assigned to that ICA was

8    Mr. James Bibles.  The address of Wells Fargo Bank NA is

9    Walnut Creek, California, 94598 in the United States.

10       Q.    That's good.

11       A.    That's good?

12       Q.    Yep.  Thank you.  Okay, so this was a Wells Fargo

13   acquired merchant; that is right?

14       A.    That is correct.

15       Q.    And to be specific, a Wells Fargo Bank NA acquired

16   merchant?

17       A.    That is correct.

18       Q.    All right.  Now let's look at the second page of

19   this document.

20            And if we could expand this box, Mr. Proctor, the

21   billing data box, the one right below that.  There we go.

22            Okay.  This looks like a lot of numbers.  Let's

23   break it down a little bit.  What I'd like to do --

24            Can you use the yellow highlighter on this,

25   Mr. Proctor?  And I'd like you to highlight, please, the

1    December 1, 2008 violation row and the row directly above

2    that.

3          All right.  Let's break this down a little bit,

4    Mr. Paolucci, what we're seeing here.  First, let's look at

5    that violation row.  Tell the jury what we're looking at.

6    A.   So that violation row is basically the calculation

7    MasterCard has applied to calculate what the merchant -- or

8    how excessive the merchant exceeded the excessive chargeback

9    merchant threshold.

10   Q.   Okay.  And is there a billing amount associated with

11   that?

12   A.   There is.

13   Q.   And what is that billing amount?

14   A.   So the billing amount is $13,500.

15   Q.   Is that part of the assessment that MasterCard

16   assesses the acquiring bank?

17   A.   That is correct.

18   Q.   All right.  Let's look at the row directly above it,

19   issuer recovery.  What does that row tell us?

20   A.   So that row tells us, given the excessive nature of

21   the chargebacks in that given month, what the issuers will be

22   reimbursed for that excessive nature.

23   Q.   Okay.  And how much will the issuers be reimbursed

24   for the December, 2008 violation?

25   A.   $26,397.25.

60

1    Q.   So is it right that there's two components to the
2    assessment for each month?

3    A.   That is correct.

4    Q.   All right.  Now let's look at the January, 2009
5    violation and issue recovery rows.

6         If you could also highlight those, please,
7    Mr. Proctor.

8         Okay.  Now, for January, 2009, walk through the
9    two-part component to the assessments for the jury.

10   A.   So the violation assessment for exceeding the
11   thresholds of an excessive chargeback merchant were
12   $12,300.

13   Q.   Okay.  How about the issuer recovery?

14   A.   The issuer recovery for the same period was
15   $36,899.

16   Q.   Okay.  Now go back to that sheet that I gave you
17   that says Wells Fargo on it.  And you see that there's a row
18   for MasterCard assessments?

19   A.   I do.

20   Q.   And does it list an audit number?

21   A.   It does.

22   Q.   Is that the audit document we have been looking at?

23   A.   It is.

24   Q.   Okay.  And did we see a violation for December,
25   2008?

1    A.    That is correct.

2    Q.    All right.  So I want you to do -- have you got a

3    calculater there?  I'd like you to add the 13,500 and the

4    26,397 and 25 cents, and let's see what number that is.

5    A.    It comes out to 39,897 and 25 cents.

6    Q.    And is that on the sheet you have for the December

7    violation?

8    A.    It is.

9    Q.    Okay.  Now let's do the same thing for January and

10   tell us what number the total is there.

11   A.    It is 49 -- oh, bad fingers -- 49,199.90.

12   Q.    Okay.  And is that on the sheet, the Wells Fargo

13   sheet there?

14   A.    It is.

15   Q.    Okay.  Now, going back to page one --

16         If we could pull out of that, Mr. Proctor, and go

17   back to page 1.

18         -- we talked about a contract termination date.

19         If you would expand that, Mr. Proctor, right in the

20   middle.

21         What was the contract termination date?

22   A.    The termination date was January 29, 2009.

23   Q.    And do you see there is a row on the Wells Fargo

24   sheet for contract terminated?

25   A.    Yes.

1        Q.    And is that date listed there?

2        A.    Yes.  January 29, 2009.

3        Q.    Okay.  And this is Exhibit 571, correct?

4        A.    Correct.

5        Q.    All right.  Testing math skills seriously now,

6   Mr. Paolucci, what I'd like you to do is add up all of the

7   numbers in that row.  Do you see there's two that were above

8   the MasterCard?

9        A.    Yes.

10        Q.    And then there's two from MasterCard.  Could you add

11   those all together, please.

12        A.    It comes out to $417,896.25.

13        Q.    Okay.  And that's listed on our blue sheet I'll call

14   it?

15        A.    It is.

16        Q.    Okay.  So for Internet Economy d/b/a Grant Search,

17   those were the total fees and assessments that we've added

18   up; is that right?

19        A.    That is correct.

20        Q.    Okay.  We are going to do this for others, but now

21   we can move a little bit more quickly knowing what these

22   documents are.  Let's go to Exhibit 572, please.

23             Which has been received, Judge.

24             And tell the jury what this is.

25        A.    So, this is an excessive chargeback program summary

1    of audit 11973 for Internet Economy Fit Factor.

2         Q.   Okay.

3              And if we could expand the acquiring bank portion,

4    merchant data acquiring bank.

5              Who is the acquiring bank on this?

6         A.   Wells Fargo Bank NA.

7         Q.   And working with Wells Fargo Bank NA, were you able

8    to tie this merchant into IWorks?

9         A.   Yes.

10        Q.   Okay.  And were there assessments associated with

11   this merchant as well?  We can go to page 2.

12        A.   Yes.

13        Q.   If we can go to page 2, please.  And are those

14   located in the billing data section?

15        A.   Yes.

16        Q.   Okay.

17             Now, Mr. Proctor, just like we did before, I'd like

18   you to highlight the violation and issue recovery rows for

19   December, 2008 and the violation and issue recovery rows for

20   January, 2009.

21             Okay.  So let's talk about December.  Could you add

22   up, please, the 20,100 and the 49,716.50.

23        A.   That equates to $69,816.50.

24        Q.   And is that on our blue sheet?

25        A.   Yes.

64

1      Q.    Okay.  And could you do the same for January,

2    2009?

3      A.    It comes out to $146,806.25.

4      Q.    And is that on our blue sheet?

5      A.    Yes.

6      Q.    Okay.  Let's go back to page 1.  Is there a contract

7    terminated date for this merchant?

8      A.    Yes.

9      Q.    If you could expand, please, Mr. Proctor, that

10   portion?

11     A.    Yes, there is.

12     Q.    And what is that date?

13     A.    The termination date was January 29, 2009.

14     Q.    Does that appear on our blue sheet for that

15   merchant?

16     A.    It does.

17     Q.    Okay.  Now, again, let's test math skills.  If you

18   could add up all of the numbers in that row, and let's see

19   what the total is.

20     A.    It comes out to $434,587.75 and I must have

21   calculated --

22     Q.    Let's be sure we get the right one.

23     A.    The 497,422.75.

24     Q.    Okay.  And that's what's on our blue sheet?

25     A.    That's what's on our blue sheet.

1       Q.    Let's go to Exhibit 570, please.

2             Which has also been received, Judge.

3             And is this another MasterCard audit document?

4       A.    That is correct.

5       Q.    And who is the merchant here?

6       A.    Internet Economy.

7       Q.    Now, if we could expand the violation info portion

8    at top, Mr. Proctor.

9             How many months has this merchant been an excessive

10   chargeback merchant?

11      A.    Seventeen months.

12      Q.    Okay.

13            Now pull back out, Mr. Proctor, of that.  If we

14   could expand the merchant data and the acquirer info.

15            Okay.  So what is the merchant name and the d/b/a?

16      A.    The merchant name and the d/b/a is Internet

17   Economy.

18      Q.    And the d/b/a?

19      A.    Same.  Internet Economy.

20      Q.    And do you see that merchant on our blue sheet?

21      A.    I do.

22      Q.    Were you able, working with the acquirer, to tie

23   this merchant into IWorks?

24      A.    Yes, I was.

25      Q.    Who was the acquiring bank on this one?

1      A.    It's Wells Fargo Bank NA.

2      Q.    And what I'd like to do is not go through all 17

3  months of the excessive chargeback program fees and

4  assessments but let's just look at the fees and assessments

5  from August, 2008, forward.  So go to page 2.

6            And, Mr. Proctor, if you could expand the billing

7  data there at the bottom.  All right.

8            Do you see at the bottom it begins -- there's two

9  rows for August, 2008.

10            If we could highlight those.

11            Do you see that, Mr. Paolucci?

12      A.    I do.

13      Q.    And what I'd like you to do is add those two numbers

14  and let's see what the August 2008 assessments were.

15      A.    $39,952.57.

16      Q.    39 or 32?

17      A.    32,925 (as spoken).

18      Q.    Okay.  All right.  Now let's look at September,

19  2008, and if you could add those two numbers together?

20      A.    $72,811.14.

21      Q.    Perfect.  You're going to be a calculator pro.

22      A.    I can use the calculater.

23      Q.    And if we could go to October, 2008 and identify

24  those assessments.

25      A.    So they come out to $21,377.45.

1     Q.   Okay.  And, Mr. Paolucci, if you could sum up those

2   three numbers for us.

3     A.   It comes out to $127,141.16.

4     Q.   And is that on the blue sheet?

5     A.   That is.

6     Q.   Okay.  Let's identify one final Wells Fargo

7   merchant.  If you can go to Exhibit 573, please.

8          Which has been received, Your Honor.

9          And who is the merchant here, Mr. Paolucci?

10    A.   The merchant is -- the merchant name is Internet

11   Economy, Live Life Lean.

12    Q.   And who was the acquiring bank?

13    A.   Wells Fargo Bank NA.

14    Q.   And working with Wells Fargo Bank NA, were you able

15   to tie this merchant to IWorks?

16    A.   Yes, we were.

17    Q.   Okay.  And are they located on our blue sheet on the

18   final -- the second-to-the-last row?

19    A.   They are.

20    Q.   Okay.

21         And if we could pull back out and identify the audit

22   number.  Sorry.  Just the audit number at the top.

23         What audit number is that?

24    A.   The audit number is 11989.

25    Q.   Okay.

1           And go to page 2, please, Mr. Proctor.  And if you

2    could expand billing data.

3           And let's do the same exercise, Mr. Paolucci,

4    December, 2008 and January, 2009 MasterCard assessments.

5       A.   The December issue recovery and violations comes out

6    to $3,075.21.

7       Q.   Okay.  And if we could do January, 2009.

8       A.   January came out to be $1,518.06.

9       Q.   Now let's go back to page one and see if there's a

10   contract terminated date.

11      A.   Contract termination date is January 29, 2009.

12      Q.   Okay.  Now if you could just sum up those two

13   numbers for us?

14      A.   It comes out to be $4,593.27.

15      Q.   All right.  Now let's get the total, Mr. Paolucci.

16   What I'd like you to do is, all of those numbers in yellow,

17   total those up for us.

18      A.   It comes out to $1,258,703.80.

19      Q.   Okay.  I got a little bit different number.

20      A.   Okay, I'll start over.

21      Q.   Your Honor, if the defense would stipulate that our

22   arithmetic is correct, we can move through without

23   Mr. Paolucci having to use the calculator, having now gone

24   through this exercise.

25           MR. JOHNSON:  Gladly stipulate, Your Honor.

```
 1              THE COURT:  Mr. Mumford?

 2              MR. MARCUS MUMFORD:  I haven't -- I haven't double

 3    checked, so -- but I'm fine.

 4              THE COURT:  Mr. Riddle?

 5              MR. RIDDLE:  I'm completely fine with that.

 6              THE COURT:  Okay.

 7              MR. BURT:  Great.  I'm fine with it, too.

 8              THE WITNESS:  Okay.  The last number, then, is

 9    $1,368,703.43.

10        Q.    BY MR. BURT:  Okay.  Now my question for you,

11    Mr. Paolucci, let's look at the first date that we see here

12    on this blue sheet.  I believe it's August of 2008, but

13    double-check me.

14        A.    Okay.  Which one are you referring to?

15        Q.    The first -- what is the first -- in our date

16    column, what's the earliest date we see?

17        A.    It looks like August, 2008.

18        Q.    Okay.  And what's the latest date that we see?

19        A.    It looks like January, 2009.

20        Q.    All right.  So that's a five-to-six-month period; is

21    that right?

22        A.    That is correct.

23        Q.    Now, Mr. Paolucci, here is my question.  In a

24    five-to-six-month period, when, if ever, have you seen a

25    merchant with fees and assessments at one acquiring bank of
```

1    over $1.3 million?

2         A.    I hadn't.  This is the only one.

3         Q.    And how many years have you been running this

4    program at MasterCard?

5         A.    For 19 years.

6         Q.    Let's go to Harris Bank.  Let's go to our next sheet

7    on the blue sheet.  I believe you said earlier there were a

8    number of acquiring banks you identified.  Was Harris Bank

9    one of them?

10        A.    They were.

11        Q.    Okay.

12              If we could go to Exhibit 524, please.

13              This has been received, Judge.

14              What is this, Mr. Paolucci?

15        A.    This is a MATCH inquiry results record.

16        Q.    Okay.

17              And if we could expand, Mr. Proctor, I would just

18   like to expand the text portion.

19              Who is the merchant here that's been identified as

20   having been matched?

21        A.    Having been matched is -- the merchant name is

22   8882551241 Grant.

23        Q.    And are they associated with IWorks?

24        A.    They are.

25        Q.    And who was the principal?

1      A.    Jeremy Johnson.

2      Q.    And what was the date that it was matched looking up

3 at the top?

4      A.    May 20, 2009.

5      Q.    Okay.  And do you know who 1113 is?  Is that Harris

6 Bank?

7      A.    That is Harris Bank.

8      Q.    Okay.  So looking at your blue sheet, the second

9 row, do you see 8882551241 Grant?

10     A.    I do.

11     Q.    And the MATCH List date is May 20, 2009, correct?

12     A.    Correct.

13     Q.    Okay.

14           Let's go, please, to Exhibit 585.

15           Which has been received, Judge.

16           Is this a MasterCard audit document?

17     A.    Correct.  It's a MasterCard excessive chargeback

18 program audit document.

19     Q.    And all I'd like to do on this document is to

20 identify the merchant, the contract terminated date and the

21 acquirer.

22     A.    The merchant name is www.getfitandslim.com, and the

23 termination date was June 24, 2009.  The acquiring bank is

24 BMO Harris Bank NA.

25     Q.    Okay.  And looking at the third row on the blue

1    sheet, is that information presented?

2        A.    It is.

3        Q.    Okay.

4              Let's go to Exhibit 535, please.

5              Which has been received, Your Honor.

6              And if we could just expanded text.

7              And, Mr. Paolucci, identify, please, the merchant,

8    the principal, the date of the MATCH and the reason for the

9    MATCH.

10       A.    The merchant name is www.mygrantste.net.   The

11   addition date by Harris Bank was May 20, 2009, and the

12   principal was Jeremy Johnson.

13       Q.    Okay.  Looking at the fourth row on our blue sheet,

14   is that information presented?

15       A.    It is.

16       Q.    Okay.  Oh, and the reason for the MATCH?

17       A.    Is reason code 04 for excessive chargebacks.

18       Q.    Let's go to Exhibit 587, please.

19             Which has been received, Your Honor.

20             Identify, please, the merchant, the contract

21   terminated date and the acquiring bank.

22       A.    The merchant name is www.fedgrantusa.   The

23   termination date was July 18, 2009.   The acquiring bank is

24   Harris National Association.

25       Q.    Okay.  And let's go to page 2.  And do you see that

1    there are assessments for June and July of 2009?

2         If you could expand the billing data.

3    A.   Yes.

4    Q.   Do you see that?

5    A.   Yes, I do.

6    Q.   And with the stipulation of our arithmetic, go to

7    the blue sheet.  In June the total was 16,598.50.  In July

8    the total was 28,302.75.  The contract termination date, as

9    you said, was July 18, 2009, and the total assessment was

10   44,901 and 25 cents.  Do you see that on the blue sheet?

11   A.   I do.

12   Q.   And all of that information comes from this Exhibit

13   587, correct?

14   A.   Correct.

15   Q.   Let's go to Exhibit 588.  Is this a MasterCard audit

16   document?

17   A.   It is.

18   Q.   Who is the merchant?

19   A.   Www.lifestylefit.com.

20   Q.   What's the contract terminated date?

21   A.   May 30, 2009.

22   Q.   Who is the acquirer?

23   A.   Harris National Association.

24   Q.   Were you able, working with Harris, to tie this to

25   IWorks?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Now let's look at page 2.  Do we have assessments |

3   shown here, Mr. Paolucci?

| | | |
|---|---|---|
| 4 | A. | We do. |
| 5 | Q. | And are those for April and May of 2009? |
| 6 | A. | Yes. |
| 7 | Q. | And do we have April assessments of $47,498.25? |
| 8 | A. | Yes. |
| 9 | Q. | And May assessments of $38,646.50? |
| 10 | A. | Yes. |
| 11 | Q. | And he we saw a contract terminated day of May 30, |

12   2009?

| | | |
|---|---|---|
| 13 | A. | Correct. |
| 14 | Q. | For a total assessment of $86,144.75, correct? |
| 15 | A. | Correct. |
| 16 | Q. | And that's from Exhibit 588; is that right? |
| 17 | A. | That's right. |
| 18 | Q. | Let's look, please, at Exhibit 558. |
| 19 | | Which has been received, Judge. |
| 20 | | Who is the merchant? |
| 21 | A. | DJM Cost and Save. |
| 22 | Q. | Who was the acquirer? |
| 23 | A. | The acquirer was Harris National Association. |
| 24 | Q. | What was the contract terminated date? |
| 25 | A. | May 30, 2009. |

1    Q.   Working with Harris, were you able to tie this to

2    IWorks?

3    A.   Yes.

4    Q.   Looking at page 2, are there assessments for May of

5    2009?

6    A.   Yes.

7    Q.   And do those assessments total $400?

8    A.   They do.

9    Q.   You don't need a calculator for that one?

10   A.   No, I do don't.

11   Q.   Okay.  And the contract terminated date was May 30,

12   2009, correct?

13   A.   Yes.

14   Q.   And all of that is from Exhibit 558; is that

15   right?

16   A.   That is correct.

17   Q.   Your Honor, moving on to Exhibit 576, which has been

18   received.

19        Who is the merchant?

20   A.   Www.spacewebsafeclub, 00 of 00.

21   Q.   Who was the acquirer?

22   A.   The acquirer was BMO Harris Bank NA.

23   Q.   What was the contract terminated date?

24   A.   May 3, 2009.

25   Q.   And were you able to tie this to IWorks?

1    A.   Yes.

2    Q.   All right.  Let's go to page 2.  Do you see that

3  there are assessments here for February, March, April and May

4  of 2009?

5    A.   Yes.

6    Q.   And for February are those assessments $3,169.75?

7    A.   Yes.

8    Q.   For March, are they $5,478?

9    A.   Yes.

10   Q.   For April, are they $7,821.50?

11   A.   Yes.

12   Q.   For May, are they $5,445.50 ?

13   A.   Yes.

14   Q.   And we saw a contract terminated date of May 3,

15  2009, correct?

16   A.   Correct.

17   Q.   All right.  We'll get to that.  And the total

18  assessments was $21,914.75; is that right?

19   A.   That is correct.

20   Q.   All from Exhibit 576; is that right?

21   A.   That is correct?

22   Q.   Let's go to Exhibit 532, which has also been

23  received.  What is this, Mr. Paolucci?

24   A.   This is a MATCH inquiry results record.

25   Q.   Okay.  And let's identify who the merchant is.

1     A.   The merchant name is Web Safe Club.

2     Q.   Is that the merchant we were just looking at in the

3     audit document?

4     A.   That is correct.

5     Q.   Who is the principal associated with this merchant?

6     A.   This is Jeremy Johnson.

7     Q.   What was the reason it was placed on the MATCH list?

8     A.   04 for excessive chargebacks.

9     Q.   And if we could scroll up, Mr. Proctor.

10         I would like to identify who matched them.

11    A.   It was added by ICA 1113 on May 20, 2009.

12    Q.   And is that ICA Harris Bank?

13    A.   That is correct.

14    Q.   Okay.  And that information is on our blue sheet; is

15    that right?

16    A.   That is correct.

17    Q.   Okay.

18         If we could go, please, to Exhibit 577.

19         Is this a MasterCard audit document?

20    A.   It is.

21    Q.   Who is the merchant?

22    A.   Www.selfhelp.

23    Q.   Who is the acquirer?

24    A.   BMO Harris Bank NA.

25    Q.   Who was -- what was the date of the contract

1     termination?

2          A.     May 3, 2009.

3          Q.     Were you able to tie this to IWorks working with

4     Harris?

5          A.     Yes, I was.

6          Q.     Let's go to page 2.

7                 And if we could expand the billing data.  Do we see

8     assessments for April and May of 2009?

9          A.     Yes.

10         Q.     And are the April assessments $57,236.25?

11         A.     They are.

12         Q.     And are the May assessments $56,411.75?

13         A.     Correct.

14         Q.     And we saw that the contract was terminated on May

15    3, 2009?

16         A.     That is correct.

17         Q.     All right.

18                Let's go, please, to Exhibit 536, which has been

19    received.

20                Mr. Paolucci was this same merchant placed on the

21    MATCH list?

22         A.     Yes, it was.

23         Q.     What was the date of the MATCH listing?

24         A.     It was May 20, 2009.

25         Q.     Who was the principal?

1      A.    The principal was Jeremy Johnson.

2      Q.    What was the reason?

3      A.    04 for excessive chargebacks.

4      Q.    And who matched them?

5      A.    ICA 1113, which is Harris Bank.

6      Q.    And is that information on our blue sheet?

7      A.    It is.

8      Q.    Okay.  And so totaling our assessments for that

9   merchant, do we get $113,648?

10     A.    That is correct.

11     Q.    If we could go, please, to Exhibit 586, which has

12   been received.

13           Is this a MasterCard audit document, Mr. Paolucci?

14     A.    It is.

15     Q.    Who is the merchant?

16     A.    Www.cost S-M-A-S-H-C-O, 00 of 00.

17     Q.    Who is the acquirer?

18     A.    The acquirer is Harris National Association.

19     Q.    Was there a MATCH -- or a contract termination date

20   here?

21     A.    There was.  May 3, 2009.

22     Q.    Let's go to page 2.  Do we see assessments for May

23   of 2009 with this merchant?

24     A.    Yes, we do.

25     Q.    And do those total $6,193.69?

1      A.    They do.

2      Q.    And the contract termination date was May 3, 2009,

3   correct?

4      A.    Correct.

5      Q.    All right.  Let's go to Exhibit 526, please, which

6   has been received.

7            If you could expand the text, please, Mr. Proctor.

8            Cost Smash Co., is that matched?

9      A.    It is.

10     Q.    Who matched them?

11     A.    ICA 1113, which is Harris Bank.  They added it on

12  May 20, 2009.

13     Q.    What was the reason for the MATCH?

14     A.    It was for reason code 04, excessive chargebacks.

15     Q.    Who was the principal?

16     A.    Jeremy Johnson.

17     Q.    Okay.  And we see that information on our blue

18  sheet, correct?

19     A.    Correct.

20           MR. JOHNSON:  Your Honor, I think -- I think we

21  would stipulate to most of this if the government wants to

22  make a proffer and save some time today.

23           THE COURT:  Let's have a little huddle.

24           Mr. Burt, why don't you talk to Mr. Johnson and

25  Mr. Mumford and Mr. Riddle, and see if you can do that.

1          MR. BURT:  Your Honor, if I might.  We're through

2     the tough part.  I would like the jury to see each of these

3     exhibits if that's okay.

4          THE COURT:  How many more do you have?

5          MR. BURT:  A number of MATCH listings, which will go

6     very quickly.

7          THE COURT:  How many?

8          MR. BURT:  I'll have to count them.

9          THE COURT:  Ten?  Fifty?  Or a hundred?

10          MR. BURT:  Not a hundred.  About ten.

11          THE COURT:  Okay.

12          MR. BURT:  And maybe four or five additional audit

13     documents.

14          THE COURT:  Okay.  I'm going to let him run his

15     course, Mr. Johnson, but it's a good idea.  Thank you.

16          MR. JOHNSON:  You bet.

17     Q.    BY MR. BURT:  All right.  Last row for Harris Bank,

18     Mr. Paolucci.  Let's go to Exhibit 525.  And what we're going

19     to do in this row is simply identify MATCH listings.  Exhibit

20     525 --

21          Mr. Proctor, if you could always get that reference

22     number row, please.

23          Who is the merchant who was matched?

24     A.    The merchant name was Business Fund, 8004101682.

25     Q.    By whom and on what date?

1      A.    It was added by ICA 1113, Harris Bank on May 20,

2   2009.

3      Q.    What was the reason?

4      A.    The reason code was 04 for excessive chargebacks.

5      Q.    Who was the principal?

6      A.    Jeremy Johnson.

7      Q.    And does that information appear on our blue sheet?

8      A.    It does.

9      Q.    Exhibit 527, please.  And, again, just tell us on

10   each one of these who was matched, the date, the reason, the

11   principal.

12      A.    The merchant name was Easy Grant.  It was added by

13   ICA 1113, Harris Bank on May 20, 2009.  It was listed for

14   reason code 04 for excessive chargebacks.  And the principal

15   is Jeremy Johnson.

16      Q.    If we could go to Exhibit 528 and do the same thing.

17      A.    The merchant added to MATCH was GMP 8007102564.  It

18   was added by a ICA 1113, Harris Bank on May 20, 2009.  They

19   listed the merchant for reason code 04 for excessive

20   chargebacks.  The principal of the merchant was Jeremy

21   Johnson.

22      Q.    Exhibit 529, please.

23      A.    The merchant name was Grant Creator 8005462919.  It

24   was added to MATCH by ICA 1113, Harris Bank on May 20, 2009.

25   Harris listed this merchant to MATCH for reason code 04 for

1    excessive chargebacks.  And the principal of the merchant was

2    Jeremy Johnson.

3         Q.    Exhibit 530, please.

4         A.    The merchant name was Quick Grant Pro.  It was added

5    to MATCH by ICA 111 -- I'm sorry -- 1113, Harris Bank on May

6    20, 2009.  Harris listed the merchant for reason code 04 for

7    excessive chargebacks.  And the principal was Jeremy

8    Johnson.

9         Q.    Exhibit 531, please.

10        A.    The merchant added to MATCH was View Grant -- I'm

11   sorry -- viewgrantbis.com.  It was added to MATCH by ICA

12   1113, Harris Bank on May 20, 2009.  They listed that merchant

13   for code 04, excessive chargebacks.  And the principal of the

14   merchant was Jeremy Johnson.

15        Q.    Exhibit 533, please.

16        A.    The merchant name of this MATCH listing is

17   websaveclubgold.com.  It was added to MATCH by ICA 1113,

18   Harris Bank on May 20, 2009.  Harris listed the merchant for

19   reason code 04 for excessive chargebacks.  And the principal

20   was Jeremy Johnson.

21        Q.    Exhibit 534, please.

22        A.    The merchant name is www.501c3cv.com.  It was added

23   to MATCH by ICA 1113, Harris Bank on May 20, 2009.  The

24   reason code Harris listed was 04 for excessive chargebacks.

25   The principal of the merchant was Jeremy Johnson.

1    Q.    Okay.  Now, finally, for Harris Bank, if we add all

2    the numbers in yellow, do we get $1,390,002.44?

3    A.    That is correct.

4    Q.    Let's look at another acquiring bank, HSBC.  Were

5    you aware at the time of whether IWorks was working through

6    that acquiring bank as well?

7    A.    Yes.

8    Q.    Okay.  If we could look at Exhibit 523, please.

9    Again identify, please, the merchant, the date of the MATCH

10   listing, the principal and the reason for the MATCH listing.

11   A.    The merchant name was Market Funding Solutions.  The

12   merchant doing business as was

13   naturesbestasceaandnbascea.com.  They were added to MATCH by

14   ICA 7785, HSBC Bank on April 27, 2009.  HSBC listed them to

15   MATCH for reason code 04 for excessive chargebacks.  And the

16   principal for the merchant was Jeremy Johnson.

17   Q.    Let's go to Exhibit 584, please.

18         If you could expand the merchant info and the

19   acquirer info.

20         Who is the merchant?  Who is the acquirer?

21   A.    The are merchant was www.anewleanyou.com.  The

22   acquiring bank was HSBC Bank U.S.A. National Association.

23   Q.    And working with HSBC, were you able to tie this

24   entity to IWorks?

25   A.    Yes.

85

```
 1      Q.    Okay.  And going to page 2, were there assessments

 2  issued here?

 3      A.    Yes, there were.

 4      Q.    And do we get May assessments of $905.13?

 5      A.    That is correct.

 6      Q.    June assessments of $2,082.75?

 7      A.    Correct.

 8      Q.    July assessments of $2,503.25?

 9      A.    Correct.

10      Q.    And going back to page 1, was the contract

11  terminated date October 31, 2009?

12      A.    Yes, it was.

13      Q.    So total assessments were 5,491 and 13 cents,

14  correct?

15      A.    Correct.

16      Q.    And our total, looking at the blue sheet, the total

17  HSBC assessments is 201,891 and 13 cents; is that right?

18      A.    That is correct.

19      Q.    Were there yet more acquiring banks?

20      A.    Yes.

21      Q.    Is Israel Credit Cards one of them?

22      A.    They were.

23      Q.    Okay.  Let's pull up Exhibit 578, please.

24            Who is the merchant?

25      A.    The merchant name is IWorks, Ltd. Business Funding
```

1    Source.

2        Q.   Okay.  And who was the acquirer?

3        A.   The acquirer was Israel Credit Cards, Ltd.

4        Q.   And what was the contract terminated date?

5        A.   The termination date was February 9, 2010.

6        Q.   Who was the principal?

7        A.   Jeremy Johnson.

8        Q.   And looking at page 2, were there assessments?

9        A.   There were.

10       Q.   And did those total, for July, 2008, $1,072.50?

11       A.   That is correct.

12       Q.   And for August of 2008, $7,566.65?

13       A.   Correct.

14       Q.   Contract terminated date was February 9, 2010,

15   correct?

16       A.   Correct.

17       Q.   Total assessments 8,640 and 50 cents; is that right?

18       A.   That is correct.

19       Q.   Go to Exhibit 579, which has been received.  Who is

20   this merchant?

21       A.   The merchant name is IWorks, Ltd, Google Money

22   Profit.

23       Q.   Is that Google or goggle?

24       A.   I'm sorry.  Goggle.

25       Q.   Okay.  And who is the acquiring bank?

1    A.    Israel Credit Cards, Ltd.

2    Q.    Contract terminated date and principal?

3    A.    The termination date was February 9, 2010.

4    Q.    And who is the principal?

5    A.    Jeremy Johnson.

6    Q.    Go to page 2.  Do we have here assessments in July

7  of 2008 of $3,736?

8    A.    Correct.

9    Q.    And in August of 2008, $26,456.55?

10   A.    Correct.

11   Q.    Contract terminated date February 9, 2010?

12   A.    Correct.

13   Q.    And total assessments of 30,192 and 55 cents?

14   A.    Correct.

15   Q.    Total assessments for Israel Credit Cards is 38,832

16  and 70 cents?

17   A.    That is correct.

18   Q.    All right.

19         We're on our last bank, Judge.

20         So, no mistake, was this yet another acquiring bank

21  that IWorks was using?

22   A.    Yes, it was.

23   Q.    Let's go to Exhibit 580, which has been received.

24  Identify the merchant, the acquiring bank please?

25   A.    Merchant name is IWX asterisk, www.myshtmyway.com.

1      Q.    And the acquirer?

2      A.    The acquirer is Synovus Bank.

3      Q.    And what is the contract terminated date?

4      A.    Termination date is August 31, 2009.

5      Q.    Let's go to page 2.  Do we see assessments in July

6    of 6,227 and 49 cents?

7      A.    Yes, we do.

8      Q.    And contract terminated date was 8/31/09?

9      A.    Correct.

10     Q.    Okay.  For a total assessment of 6,227.49; is that

11   right?

12     A.    Correct.

13     Q.    Let's go to Exhibit 581.  Who is the merchant and

14   who is the acquirer?

15     A.    The merchant is IWX asterisk www.5mash-cost.com.

16     Q.    Okay.  We thought that was an "S," smash.

17     A.    Is it smash?  Sorry.

18     Q.    Smash or 5 mash, one of those.  Okay.  And who is

19   the acquirer?

20     A.    Synovus Bank.

21     Q.    And go to page 2.  All I want to identify here is

22   the contract terminated date.

23           Sorry, Glen.  Back to page 1.

24           What is the contract terminated date?

25     A.    October 28, 2009.

1    Q.   Okay.  Deep breath.  Last audit document.  Okay.

2    Exhibit 589, which has been received.  Identify, please, the

3    merchant, the acquirer and the contract terminated date.

4    A.   The merchant is www.mydiet-ascea.com.

5    Q.   And who is the bank?

6    A.   Synovus Bank.

7    Q.   And what's the contract terminated date?

8    A.   July 24, 2009.

9    Q.   So our total assessments for Synovus is 6,227 and 49

10   cents; is that right?

11   A.   That is correct.

12   Q.   Okay.  Let's go to the last slide here.  What I'd

13   like to do, Mr. Paolucci, is add up all of the assessments

14   that we've just gone through, which includes both MasterCard

15   and Visa.  So, looking at your Wells Fargo sheet, how much --

16   what were the assessments for Wells Fargo?

17   A.   Total assessments for Wells Fargo were

18   $1,368,703.43.

19   Q.   Harris Bank?

20   A.   $1,390,002.44.

21   Q.   HSBC?

22   A.   HSBC was $201,891.13.

23   Q.   Israel Credit Cards?

24   A.   Israel Credit Cards was $38,832.70.

25   Q.   Synovus Bank?

1      A.    Synovus Bank was $6,227.49.

2      Q.    For a total of what?

3      A.    $3,005,657.19.

4      Q.    Your Honor, with that, I move to admit Exhibit 927

5   under Rule 1006 and under Rule 611(a).

6           MR. MARCUS MUMFORD:   402 and 403 grounds.  It's

7   irrelevant.

8           THE COURT:  Mr. Johnson, any response?  Any

9   objection?

10          MR. JOHNSON:  I don't object, Your Honor.

11          THE COURT:  Mr. Riddle?

12          MR. RIDDLE: I don't object, Your Honor.

13          THE COURT:  It's received.

14      (Plaintiff's Exhibit 927 received in evidence.)

15          MR. BURT:  If we could pull up Exhibit 927, Glen --

16   Mr. Proctor.  Excuse me.

17          All right.  Now, if you could just flip through

18   those pages for the jury.  And, Mr. Paolucci, does this

19   exhibit contain all that information we just went through?

20      A.    It does.

21      Q.    Okay.  And this is the total figure, Mr. Paolucci,

22   that we just looked at?

23      A.    It is.

24      Q.    Mr. Paolucci, when, if ever, in your time at

25   MasterCard have you seen a merchant with these types of fees

1    and assessments of over $3 million?

2        A.   I have never seen a merchant with those amount of

3    fees in the excessive chargeback program.

4        Q.   How long have you been in this industry?

5        A.   Twenty years.

6        Q.   From your experience in this industry, would this be

7    a red flag for a merchant deciding whether to board or accept

8    this merchant?

9            MR. MARCUS MUMFORD:   Objection, Your Honor.   Leading

10   and irrelevant.

11           THE COURT:   Overruled.

12           THE WITNESS:   It would be a red flag of concern,

13   yes.

14       Q.   BY MR. BURT:   Okay.   I said we were done with the

15   audit documents, but there's two more MATCH documents I want

16   you to look at.   522.   We actually looked at this one before.

17           If we could pull that up.

18           Just remind the jury.   The MATCH document in 522,

19   who is the acquirer there added by 102?

20       A.   102 is American Express.   American Express listed

21   it.

22       Q.   They are not on our chart here, but that's a

23   additional MATCH, correct?

24       A.   That is correct.

25       Q.   If we could pull up 537.

```
 1              Which has been received, Judge.

 2              Who is the acquiring bank here?  Is it West America?

 3      A.    It is West America.

 4      Q.    And what did West America do on July 15, 2009?

 5      A.    They added the merchant I-Works, Inc., to MATCH for

 6   excessive chargebacks.

 7      Q.    And who is the principal?

 8      A.    Jeremy Johnson.

 9      Q.    I'd like to show the witness an exhibit that has not

10   been received yet, Ms. Bowers, Exhibit 929.

11              Mr. Paolucci, what is Exhibit 929?

12      A.    So it's a summary of all the merchants that have

13   been identified relating to IWorks and Jeremy Johnson that

14   have been added to MATCH since August 19, 2009 through July

15   15, 2009.

16      Q.    And does it include all of those MATCH list

17   documents we just went through?

18      A.    It does.

19      Q.    And does it true and accurately state the

20   information that are on those documents we just went

21   through?

22      A.    That is correct.

23              MR. BURT:  Your Honor, move to admit 929 under 1006

24   and 611(a).

25              MR. MARCUS MUMFORD:  I'm still unclear as to what
```

1    this document is.

2          THE COURT:  It's a summary of what we have gone

3    through, the MATCH reports.

4          MR. MARCUS MUMFORD:  But I guess what I would

5    suggest is maybe allow us to cross him on these exhibits and

6    then, if -- if the -- and then with some additional

7    clarification.

8          THE COURT:  What's your objection now?

9          MR. MARCUS MUMFORD:  Incomplete, and it's unclear

10   what it's a summary of, I guess.  That's -- that's the

11   objection I have.

12         THE COURT:  It's a summary of the MATCH list

13   documents which are reviewed, and the exhibit numbers are in

14   the far right column.

15         MR. MARCUS MUMFORD:  I understand that, Your Honor,

16   and he's just gone through every one of those documents, so

17   it's unclear to me why -- what purpose this -- this

18   document -- serves in that respect.

19         THE COURT:  Okay.  Other objections?

20         MR. JOHNSON:  I don't object.  I actually wish he

21   would have had this on earlier and spared us all that.

22         THE COURT:  Mr. Riddle?

23         MR. RIDDLE:  You know, I would object to the fact

24   that, I mean, it's -- due to time, I would object, Your

25   Honor, to the fact that he's been covered, but, I mean,

1   obviously it's up to you.

2          THE COURT:  It's received.  It's a summary.  You can

3   cross examine on it.

4          MR. MARCUS MUMFORD:  Okay.  Thank you.

5          MR. BURT:  All right.  Now if we could publish.

6      Q.   BY MR. BURT:  Okay.  Now that the jury is looking at

7   this, Mr. Paolucci, how many different MATCH listings do we

8   see here?

9      A.   Do you want me to count?

10      Q.   Count them up.

11      A.   I have 16.

12      Q.   Sixteen different MATCH's for IWorks entities.

13   Mr. Paolucci, when, if ever, in your time at MasterCard, have

14   you ever seen a merchant matched 16 times?

15      A.   I have not seen a merchant listed 16 times.

16      Q.   Based on your knowledge and experience in this

17   industry, Mr. Paolucci, how would this affect a merchant

18   acquiring bank's decision to accept this merchant?

19      A.   It would definitely raise --

20          MR. MARCUS MUMFORD:  Objection, Your Honor.

21   Objection.  Speculation.

22          THE COURT:  Overruled.

23          THE WITNESS:  So, if an acquirer inquired into the

24   MATCH system and received 16 matches on a single merchant,

25   it's likely that that acquiring bank would not agree to sign

1    that merchant.

2            MR. BURT:  Okay.  Your Honor, as I did with

3    Mr. Elliott, I'm going to remove a few of our timeline

4    boards.  Again, this is building summary Exhibit 9 --

5            What's the exhibit number of this for the timeline?

6            This is building Exhibit 938, which we will move to

7    admit later.  I'm removing the board that lists the American

8    Express MATCH, Exhibit 522, on April 19, 2009.  I'm now

9    removing the board that lists the HSBC MATCH that we looked

10   at in Exhibit 523, on April 27, 2009.  And, finally, I'm

11   removing the board that lists the Harris Bank MATCH.  We saw

12   there was 13 matches on May 20, 2009, as an example in

13   Exhibit 524.

14        Q.   BY MR. BURT:  Is that right, Mr. Paolucci?

15        A.   That is correct.

16             MR. BURT:  One moment, Judge.

17        Q.   BY MR. BURT:  Okay.  Mr. Paolucci, a few final

18   questions.  Based on your knowledge and experience at

19   MasterCard, are there legitimate reasons for a merchant to

20   have multiple merchant accounts?

21        A.   There are legitimate reasons, yes.

22        Q.   What are those reasons?

23        A.   An acquiring bank may not have the capability to

24   process in multi-currencies, so they would have to open up a

25   merchant account for each currency that that merchant is

```
 1    transacting
 2         Q.    What if a -- what if a merchant is having chargeback
 3    problems and they want to stay below the thresholds?   Would
 4    it be appropriate to have multiple merchant accounts then?
 5         A.    It would be inappropriate for that.
 6         Q.    It would be inappropriate?
 7         A.    Inappropriate, correct.
 8         Q.    Why is that?
 9         A.    We call that load balancing, and that is a basically
10    usually done to circumvent identification.
11         Q.    Do MasterCard rules allow for the use of shell
12    companies?
13         A.    No, we do not.
14         Q.    Let me ask you this.   Are you familiar with the
15    number of merchant accounts that large online retailers have,
16    like Amazon.com?
17         A.    I am aware.
18         Q.    How many merchant accounts does Amazon.com have for
19    its United States business?
20         A.    One.
21         Q.    One?
22         A.    One.
23         Q.    How about Wal-Mart.com?
24         A.    They also have one.
25         Q.    One?
```

1        A.    Yes.

2        Q.    How many different IWorks and Jeremy Johnson

3    merchant accounts have we looked at today?

4        A.    Numerous, 16 that were MATCH listed.

5        Q.    In your time at MasterCard, have you ever seen a

6    merchant do anything like this?

7        A.    No.

8            MR. BURT:  Pass the witness, Judge.

9            THE COURT:  Let's take a break until quarter 'til

10    ten.  All rise for the jury please.

11            (Whereupon the jury leaves the courtroom.)

12            Mr. Paolucci, you can step down until the break is

13    over.  Just come back after the break is done.

14            Anything for those of us who remain before we

15    recess?

16            MR. BURT:  No, Judge.

17            THE COURT:  Okay, We're in recess.

18                    (Short recess.)

19            THE CLERK:  All rise for the jury.

20            (Whereupon the jury enters the courtroom.)

21            THE COURT:  We have resumed with the jury present.

22    Cross examination, Mr. Johnson?

23            MR. JOHNSON:  Yes, Your Honor.  I'll go first.

24            THE COURT:  Are you ready?

25            MR. JOHNSON:  Yeah.

1        THE COURT:  Go ahead.

2        Mr. Paolucci if you would take the stand again.

3                    CROSS EXAMINATION

4   BY MR. JOHNSON:

5        Q.    Mr. Paolucci, I think the question I'm most

6   interested in is how you got the job flying the Fuji blimp.

7        A.    In between the veterinarian doctor that I used to

8   work for, I went and worked at Fujifilm in Allister, New

9   York.  So that's where they managed that from.

10        Q.    Are you still certified for lighter than air?

11        A.    Not any longer.  I didn't keep up my

12   certification.

13        Q.    That's cool.  Every kid's dream.  Now, you testified

14   here a lot about the MasterCard rules.  I think you testified

15   that -- that the bank has to agree to the rules and that

16   there's -- you know, they have to agree to accept the losses,

17   you know, that result from a merchant going haywire.  Now,

18   how important are those rules?

19        A.    It's the core of the MasterCard network, to protect

20   the MasterCard network.

21        Q.    And so, if a bank breaks those rules, what do you

22   do?

23        A.    So, there are financial assessments that are levied

24   against the acquirer or issuer if they violate any of the

25   MasterCard standards.

1    Q.    Any of them?

2    A.    Any of them.

3    Q.    Have you ever terminated any banks for violating the

4    MasterCard standards?

5    A.    We haven't terminated, but we have restricted

6    acquirers' licenses.

7    Q.    Like in what way?

8    A.    That they could not operate in e-commerce activity

9    any longer because they could not manage it properly per our

10   rules.

11   Q.    And what banks have you had to restrict for

12   e-commerce?

13   A.    There was a bank in the Philippines called Rizal

14   Bank, and they were restricted because they had an excess of

15   child pornography merchants.

16   Q.    I see.  Any banks in the United States?

17   A.    No.

18   Q.    Wells Fargo Bank hasn't been restricted?

19   A.    No, they have not.

20   Q.    To your knowledge, has Wells Fargo Bank violated any

21   of the things that it agreed to in your agreements?

22   A.    Yes, they have.

23   Q.    What are they?

24   A.    So, they violated the thresholds for the excessive

25   chargeback program.  Other rules violations could be -- that

1    I can recall -- for miscoding merchants.

2        Q.    Miscoding merchants?   What is that?

3        A.    Miscoding merchants refers to when the acquiring

4    bank sets up a merchant account, they have to apply the most

5    appropriate descriptor of what the merchant is selling, so if

6    you're selling shoes, the merchant has to be coded as selling

7    shoes.

8        Q.    Anything else on Wells?

9        A.    Not that I can recall.

10       Q.    So, is it fair to say, then, obviously, a bank that

11   is engaging in selling or allowing to be sold child

12   pornography falls into a different category than one who is

13   not doing as good of a job managing the merchants?

14       A.    So there's different tolerance levels, right.

15   For -- depends what we're talking about.  Obviously child

16   pornography is unacceptable, so we take a different view on

17   that type of activity against, maybe, you know, that they

18   didn't add a merchant to MATCH and they rectified that issue

19   and they added the merchant to MATCH after that.

20            So there's issues where they can be rectified, and

21   we take those, you know, on a case-by-case basis, and we have

22   those that are just unacceptable, as the case of child

23   pornography.

24       Q.    And I guess that could be applied to a lot of things

25   where rules apply, maybe flying air ships.  What's the useful

1    load of the Fuji blimp?

2        A.   I'm sorry.  The useful load?

3        Q.   The useful load.  How much weight can you put in the

4    Fuji blimp and still fly?

5        A.    It depends on the ballast.  And it depends on where

6    you are in the state and the sea level.

7        Q.   It does, yeah.  So, all right.  Let me ask you a

8    different question about the Fuji blimp.  What is the maximum

9    sustained wind the Fuji blimp can fly in?

10       A.   65 miles an hour.

11       Q.   65 miles per hour?  The Fuji blimp can fly in a wind

12   of 65 miles per hour?

13       A.   Correct.  We go slow, but we go.

14       Q.   I would have guessed a lot less.

15       A.   I'm sorry?

16       Q.   I would have guessed less.

17       A.   Are you saying the wind --

18           THE COURT:  Mr. Johnson, let's stay on topic.

19           MR. JOHNSON:  All right, Your Honor.  I'm trying to

20   make a point, though.

21           THE COURT:  Well, ask questions.

22       Q.   BY MR. JOHNSON:  All right.  When you're talking

23   about the rules that you have for the merchant banks, there

24   are some rules that the banks can get away with, and they

25   might be fined, or whatnot, and there are some rules that are

1    just straight terminal; is that correct?

2         A.   They all could be terminal depending on if they are

3    rectified or not.

4         Q.   So, if Wells Fargo was still engaging in the same

5    kind of conduct that you've already warned or fined them for

6    even today, from back in 2009, would you consider terminating

7    Wells Fargo because they haven't corrected that conduct?

8         A.   Yes, we would consider that.

9         Q.   Who can access the MATCH list?  I think you

10   testified that only banks, law enforcement?

11        A.   Banks and law enforcement can only access the MATCH

12   system or an agent of the acquiring bank.

13        Q.   Okay.  And so I think you also testified that the

14   bank has to maintain the merchant agreement with the

15   merchant?

16        A.   That is correct.

17        Q.   What does that mean exactly, maintain it?

18        A.   Maintain it means to make sure it's up to date, make

19   sure it's complete, make sure they have it on file if

20   MasterCard requests a copy of that.

21        Q.   Are they allowed to designate that to other

22   agents?

23        A.   Not to sign on behalf of the bank, no.

24        Q.   So, they are allowed to designate some things to an

25   agent, like looking on the MATCH list, and I think you said

1   some of the underwriting?

2       A.   Some of the underwriting.

3       Q.   What parts of the underwriting would they --

4       A.    It's up to the acquirer what they would like them to

5   do.  At the end of the day, the acquirer has the ultimate

6   responsibility to making sure that the underwriting is

7   accurate and acceptable.

8       Q.   But if they wanted to designate that to their agent

9   completely as well, that isn't necessarily against the rules

10  either?

11      A.   No.  They just have to make sure that they show that

12  the acquiring bank had reviewed that and agreed with that

13  underwriting.

14      Q.   So, if a bank designates that process to one of its

15  agents, the agent does the underwriting and approves the

16  merchant account and the application, and the bank never

17  signs the application, is it a valid merchant account?

18      A.   From a legal perspective, I'm not sure.

19      Q.   How about from MasterCard's perspective?

20      A.   From MasterCard regulations, that would be a

21  violation of our rules.

22      Q.   And you're not aware of Wells Fargo ever doing

23  that?

24      A.   I'm not aware.

25      Q.   If you were?

1      A.    If I were, that would be a violation, and there

2  would be a financial assessment imposed, and they would have

3  to correct that violation.

4      Q.    What would the financial assessment potentially be?

5      A.    It would be $25,000 per instance.

6      Q.    Per instance?

7      A.    That's right.  Actually, it's $25,000 for the first

8  occurrence, $50,000 for the second occurrence, $75,000 for

9  the third occurrence and a hundred-thousand dollars for the

10  fourth-plus occurrence in a 12-month period.

11      Q.    Wow.  And that would be assessed -- you've already

12  said that.  That would be assessed to the bank.  Okay.  So,

13  let me ask another question about the MATCH list.  And I

14  didn't catch the number, but I thought you said maybe it was

15  17 different reasons you can be put on the MATCH list?

16      A.    Thirteen.

17      Q.    Thirteen.  Can you tell me what those are?

18      A.    Offhand I can't tell you all of them, but I could go

19  down the ones that I recall.  So, we have excessive fraud,

20  excessive chargebacks, illegal activity, violation of

21  MasterCard standards, bankruptcy, identity theft.  And I

22  can't recall the others offhand.

23      Q.    Is there one that it is coded as financial loss to

24  the bank?

25      A.    No.

1    Q.    And chargebacks is -- excessive chargebacks is one?

2    A.    Excessive chargebacks is one.

3    Q.    So when a bank is making a decision whether or not

4    to board a new merchant and they go -- they check the MATCH

5    list to see if someone is on the MATCH list in determining

6    whether or not the bank decides to take that merchant, it's

7    important for the bank to know what the reason is and the

8    circumstances behind it, isn't it?

9    A.    That is correct.

10   Q.    So, is there -- is there notes in there?  Is there

11   some kind of explanation in there as to why this merchant was

12   put in the list or --

13   A.    So the reason code is the high level reason why, and

14   that's a required field.  There's also a comment area, free

15   form, that the acquirer that's listing the merchant can

16   populate.  It's not mandated.

17   Q.    I see.

18   A.    We also provide the ICA number and the date it was

19   added, and if you look on the MATCH records, there's a

20   hyperlink on that ICA number, and when you review that result

21   and you click on the hyperlink for the ICA, it will give you

22   the appropriate contact to call to discuss that listing.

23   Q.    And you, I think, testified I was on 16 times on the

24   MATCH list?

25   A.    Sixteen.  That is correct.

1     Q.   Were there notes in there about our -- the reasons

2  that we were put on, do you know?

3     A.   Comments?

4     Q.   Yeah.

5     A.   I don't recall.

6     Q.   We wouldn't be able to access that to see, but

7  another bank would?

8     A.   Another acquirer would, yes.

9     Q.   In 2009, were there -- were there any rules that

10  MasterCard had that prohibited the use of shell companies?

11     A.   Yes.

12     Q.   There were?

13     A.   There were.

14     Q.   Do you recall a conversation -- an interview that

15  you had with Mr. Burt and Mr. Kennedy in December, 2011 --

16  I'm sorry -- December 11, 2015 and I guess IRS Agent Jamie

17  Hipwell, Michael Kennedy, Steve Washburn and Ken Musteen?

18     A.   I don't recall offhand what we discussed, no.

19     Q.   Do you recall -- do you recall the interview?

20     A.   I don't recall all the interviews I have and

21  depositions, so I can't say I do recall.

22     Q.   Okay.  Well, this is less than two months ago, but

23  do you recall saying that in 2009 MasterCard did not have

24  rules in place that prohibited merchants from creating shell

25  corporations to load balance?

1        MR. BURT:  Objection, Judge.  He was reading from a

2   302.  That's inappropriate.

3        THE COURT:  Overruled.  Answer the question.

4        THE WITNESS:  So, I don't recall saying that, but I

5   could tell you we don't have specific rules that say shell

6   corporations, but we do have rules that say it must be a bona

7   fide merchant, and that's what I'm referring to.

8        Q.   Rules saying you must be an online merchant?

9        A.   You must be a bona fide merchant.

10       Q.   Oh, a bona fide merchant.

11       A.   And a shell corporation -- in our interpretation of

12   our rules, shell corporations don't comply with that

13   requirement.

14       Q.   Why not?

15       A.   Because then it's not valid.  They are not valid

16   corporations.

17       Q.   They are not?

18       A.   They are not.

19       Q.   What's your definition of a shell corporation, then?

20       A.   A shell corporation is a company that's set up

21   specifically to circumvent.

22       Q.   So, if you set up a company, you register it with

23   the proper registration, you file with the IRS, you get an

24   IRS number, it's MasterCard's interpretation, if it's used to

25   process transactions, that's not a valid corporation?

1     A.   That is correct.  That corporation was set up to

2   circumvent.

3     Q.   Okay.  And does being on the MATCH list prevent an

4   acquirer from accepting a merchant?

5     A.   It does not.

6     Q.   Are you aware of any directive to terminate the

7   IWorks accounts?

8     A.   Not to terminate.  Not to terminate.

9     Q.   I think you tallied up a total of $3 million in

10  fines that were assessed to IWorks-related entities; is that

11  correct?

12    A.   That is correct.

13    Q.   How much of those fines were actually assessed?

14    A.   Out of the 3 million?  I can't speak for Visa, but I

15  could speak to the MasterCard assessments, and I would say a

16  hundred percent.

17    Q.   100 percent?

18    A.   100 percent of that 3 million that was the

19  MasterCard assessments were imposed.

20    Q.   100 percent of the 3 million you're saying?

21    A.   Of the MasterCard assessments that make up the 3

22  million, that was --

23    Q.   I see.

24    A.   We imposed a hundred percent of that.

25    Q.   So, what portion of that was MasterCard's then?

1      A.   I would have to break out the calculator.

2      Q.   You can if you want to.  I definitely don't want to

3  get the calculator out again.

4      A.   Just looking at this form, I'm just going to ball

5  park it.

6      Q.   Yeah.

7      A.   It looks like a little over half a million.  That's

8  between 6 and 700,000.

9      Q.   Great.  Thank you.  In your job at MasterCard, how

10  often do you cooperate with these types of things, these type

11  of investigations, criminal law enforcement investigations?

12      A.   Whenever we are requested to do so.

13      Q.   And is that often?

14      A.   It is often.

15      Q.   Like, for example, how many did you do in 2015?

16      A.   2015, I'd say about four.

17      Q.   Four?

18      A.   Approximately four.

19      Q.   And when I say criminal, that would be different

20  than, like, the federal trade commission, which is a civil

21  investigation.

22      A.   I consider any law enforcement involvement globally,

23  so outside the U.S. also we handle those cases as well.

24      Q.   I see.  How many times have you testified like you

25  are now?

1     A.   This will be my second time.

2     Q.   Your second?

3     A.   Uh-huh.

4     Q.   What was the first time?

5     A.   The first time was early in my career, and I was

6 testifying against a criminal that was using counterfeit

7 MasterCard cards to commit financial crimes.

8     Q.   Stolen identity basically, I guess, right?

9     A.   Counterfeit cards, stolen identity, yes.

10    Q.   Did someone suffer a loss in that case?

11       MR. BURT:  Objection.  Relevance.

12       THE COURT:  Sustained.

13    Q.  BY MR. JOHNSON:  We have talked a lot about fines

14 and banks are responsible for the fines, and they are

15 responsible for any loss.  You testified a great deal about

16 that.  And, to your knowledge, has there been any

17 bank-related losses related to any of these IWorks accounts?

18     A.   I could say that -- who was impacted financially?  I

19 don't know how -- we don't get down to that level of how much

20 they have been impacted, but cardholders have been impacted.

21 Issuers have been impacted.

22    Q.   That wasn't the question.  I apologize.

23    A.   That's fine.

24    Q.   Are you -- are you aware of any banks that have lost

25 any money because of fines or excessive chargebacks?

```
 1        A.    No.  I'm not aware.

 2        Q.    Okay.  And in your business, in your experience,

 3   there are -- are there other merchants who enter the

 4   chargeback monitoring program who are also fined?

 5        A.    Yes, there are.

 6        Q.    Has there been other cases where banks have suffered

 7   a loss from those?

 8        A.    I don't know what they do after we impose the

 9   assessment.

10        Q.    All right.  I've got a question about, in 2009 --

11   and you might not know the answer to this off the top of your

12   head, but maybe you could estimate if you think you could.

13   Approximately how many different companies were exceeding the

14   chargeback thresholds?  And what I mean by that is not in

15   amounts or whatever, but do you have, like, a report that

16   shows, okay, we've got 250 merchants that are in our

17   chargeback over the chargeback limit?

18        A.    We do have access to those type of reports.

19        Q.    So, in 2009, do you recall approximately how many

20   were in that?

21        A.    I don't recall.

22        Q.    How about today?

23        A.    Today, I can tell you we have about 300.

24        Q.    300?

25        A.    Globally.
```

1       Q.   Right.

2       A.   Yeah.  And that's at both tier levels combined, not

3    just the excessive level

4       Q.   What do you mean by that?

5       A.   So there's two tiers.  There's the -- basically the

6    one level, which is chargeback monitor merchant, and then

7    when they exceed two consecutive months, it's considered

8    excessive.

9       Q.   Yeah.

10      A.   And we could say we have about ten at the excessive

11   level.

12      Q.   I understand.  Thank you.  If -- in your

13   investigation, when you were investigating the IWorks-related

14   entities, were you aware that IWorks was processing

15   transactions for other companies?

16           MR. BURT:  Objection.  Relevance.

17           THE COURT:  Overruled.

18           THE WITNESS:  I was not aware.

19      Q.   BY MR. JOHNSON:  Is that a prohibited practice?

20      A.   That is a prohibited practice.

21      Q.   Was it prohibited by MasterCard in 2009?

22      A.   It absolutely was.

23      Q.   And so, if a bank was allowing that, that would be

24   another violation?

25      A.   That would be.

1      Q.    What would the fine be for that?

2      A.    That would be $2500 a day, with a cap of $500,000.

3      Q.    I'm impressed that you know all these fine amounts

4  in that great of detail.  I guess you're the one that built

5  the program, right?

6      A.    I am the one.

7      Q.    Do you get to decide the fine amounts?

8      A.    It goes through a committee process, so I propose,

9  and it gets approved or denied.

10     Q.    Well, it seems like you should get a cut.  Do you?

11     A.    I don't.

12           MR. BURT:  Objection, Judge.  Irrelevant.

13           THE COURT:  Sustained.

14     Q.    BY MR. JOHNSON:  Does MasterCard make money from the

15  fines?

16           MR. BURT:  Objection.  Irrelevant.

17           THE COURT:  Sustained.

18           MR. JOHNSON:  Mr. Wheeler, can you pull up

19  Government Exhibit 929.

20     Q.    BY MR. JOHNSON:  So these -- the column over here

21  that says MATCH list date, is this the date that all these

22  companies were put on the MATCH list?

23     A.    I need to reference the actual MATCH listings to

24  confirm, but I believe that those are the dates that were --

25  they were entered by the acquiring bank.

1     Q.    So you didn't -- you didn't see any -- the placement

2    of IWorks on the MATCH list prior to this date that you can

3    recall?

4     A.    Not that I can recall.

5     Q.    Were you -- were you aware that IWorks was

6    processing internet transactions for ten years up and to and

7    prior to this date?

8          MR. BURT:  Objection.  Relevance.

9          THE COURT:  Overruled.

10          THE WITNESS:  I was not aware.

11     Q.  BY MR. JOHNSON:  But if IWorks had been put on -- if

12    IWorks had exceeded the chargebacks limit at any time before

13    this, they would have shown up on the MATCH list with the

14    date prior -- with the date that they were put on the MATCH

15    list I guess, correct?

16     A.    If they were terminated and they met one of the

17    MATCH listing codes, yes.

18     Q.    I have no more questions.  Thank you.

19     A.    Thank you.

20          THE COURT:  Mr. Mumford?

21          MR. MARCUS MUMFORD:  I believe Mr. Riddle is going

22    to go before me.

23          THE COURT:  Okay.  Mr. Riddle, then.

24                    CROSS EXAMINATION.

25    BY MR. RIDDLE:

1      Q.    Hello.  Excuse me.  Were you aware of the years that

2   IWorks was operational?

3      A.    Not all of them.

4      Q.    Not all of them?  What years are you aware of?

5      A.    Only from what's been reported to MasterCard through

6   the excessive chargeback program and the MATCH system.

7      Q.    So you're not aware that IWorks was in existence

8   from July of 2000 to 2009?

9      A.    I am not aware of that.

10      Q.    Okay.  I want to talk to you -- you testified about

11   acquiring banks and ISO's and you looked at some of the

12   screen shots that, Mr. Burt has shown you.  What steps has

13   MasterCard taken up in place to ensure that acquiring

14   banks -- I guess -- I guess that they ensure that their

15   acting arms, if you will, their agents, their ISO's and even

16   on forth are adhering to -- it sounds like they are give'n a

17   lot of trust, you know, out to these ISO's, these companies

18   that aren't under their roof, and even so much so that they

19   are allowed to act, you know, on their behalf in making those

20   decisions.

21          What -- what has MasterCard done to ensure that

22   those policies that you've established are met on a regular

23   basis?  Is there auditing that takes place?  If you could

24   elaborate on some of that.

25      A.    So, I don't manage the registration process, but we

1    have a registration process that the acquirer must register

2    their ISO's and TPP's.  Part of that registration process is

3    that the acquirer confirms that they understand the rules

4    regarding ISO's and TPP's and they confirm that they are

5    adhering to those standards.

6        Q.   Okay.  So they -- so basically it's -- they are

7    taking on that risk, so, you know, it sounds like they, I

8    guess, get their hands slapped, if you will, if an issue

9    comes up that's brought to MasterCard's attention.  Is there

10   anything done proactively to see if those things are in place

11   or that they are being managed properly?

12       A.   So the registration is renewed annually, so at least

13   annually the acquirer has to reconfirm.  If there are issues

14   that arise and we identify a violation, compliance will be

15   enforced against that acquirer.

16       Q.   Got ya.  Okay.  Thank you.  You also testified that

17   the acting arms, these ISO's of the acquiring banks cannot

18   receive settlement funds.  Is that -- is that an absolute?

19   Has it every -- has MasterCard ever come to the conclusion

20   that that is happening and has been taking place or has taken

21   place?

22       A.   That is an absolute.  If we identify it, the

23   acquiring bank would be found out of compliance with the

24   standards.

25       Q.   And has MasterCard found that to be happening?

1    A.    So we have found that to be happening in certain

2  situations that we investigated, yes.

3    Q.    Okay.  And is that something that you would say is

4  extremely rare or happens or that should, or --

5    A.    It's rare.

6    Q.    Rare?  But it has happened?

7    A.    It has happened.

8    Q.    Okay.  In those cases that it has happened,

9  sometimes have you found that all of those funds are being

10  passed through the ISO or some of, or --

11    A.    In our view, if it's some, it's a violation of the

12  standards, so it doesn't matter if it's all or some.

13    Q.    It's either is or it isn't?

14    A.    It is or it isn't.

15    Q.    Okay.  Have you ever found that all of those funds

16  are being passed through the ISO?

17    A.    We have in one case that I can recall.

18    Q.    Okay.  In certain circumstances, have you found that

19  reserves are being taken out of those settlement funds before

20  it being passed on?

21    A.    MasterCard has no view into the acquirer reserves on

22  a specific entity.

23    Q.    Okay.

24    A.    It's their internal policy.

25    Q.    Okay.  So it's not necessarily specific reserves, or

1     whatever, it's just if it is happening, it's happening?

2          A.    That's right.

3          Q.    Okay.   Thank you.   You testified earlier with

4     Mr. Burt about chargebacks being a bad thing, which I think

5     we all agree.   They are a bad thing.   But you testified that

6     they are only bad things to the cardholder and to the

7     issuers.   Are they never a bad thing to the merchant?

8          A.    Could be.

9          Q.    Could be in the sense that?

10         A.    Could be if they can't control the chargebacks, that

11    they could -- the acquirer could impose a termination on them

12    if he decided to.

13         Q.    So, ultimately, they could lose their merchant

14    account and not be able to process?

15         A.    That is correct.

16         Q.    Okay.   And in relation to that, in your view would a

17    merchant ever want to have chargebacks?

18         A.    I don't believe so.

19         Q.    Okay.   So you don't believe that a merchant would

20    actually want chargebacks?

21         A.    No.

22         Q.    Okay.   Thank you.   You also testified that,

23    globally, based upon the program that you had entered in --

24    created, I guess about 19 years ago, that global average on

25    chargebacks was about .18 or point two-tenths of a percent

1    roughly rounded up, percentage of overall transactions,

2    globally.  That includes all merchants, retail?

3         A.   All of them.

4         Q.   Okay.  Are you familiar with the negative renewal

5    space, the negative option, recurring --

6         A.   I've heard of it.

7         Q.   -- online?  Okay.  What are you familiar with about

8    the negative option renewal space?

9         A.   It basically is up-selling or cross-selling products

10   to consumers, where they have to opt out before they get

11   billed.

12        Q.   So they agree to purchase something and then, if

13   they don't cancel, then they are billed for those services.

14   Do you know what the average chargeback rates are as -- as

15   just considering that industry; not globally, not retail, but

16   just the online marketing of negative option or negative

17   renewal space?

18        A.   No because MasterCard does have not have a category

19   of that type of merchant.

20        Q.   That makes sense.  Okay.  Would you expect it to be

21   higher than the average globally?

22        A.   We don't condone that activity.

23        Q.   Okay.  So you don't -- so MasterCard does not do any

24   negative option?

25        A.   We don't -- we don't condone it.  We don't say it's

1    prohibited.  We don't condone negative options because it's

2    deceptive to the cardholder.

3         Q.   But you do accept it?

4         A.   We do accept it if it's done in the right way.

5         Q.   So it -- so it's not always --

6         A.   It's not always.

7         Q.   It's not always a bad thing?

8         A.   If it's done in a deceptive manner, it's a bad

9    thing.

10        Q.   Okay.  So I just want to make sure we're clear that

11   if it's done in a deceptive manner, it's not allowed, but if

12   it is done in an accepted manner, that rules are followed,

13   then it's allowed?

14        A.   That is correct.

15        Q.   Okay.  So MasterCard does accept it in that

16   circumstance?

17        A.   In that circumstance.

18        Q.   Okay.  Thank you.  As it -- as related to online

19   marketing, if you will -- and I don't know -- I mean, this

20   probably isn't your -- your, I guess, sphere, but you do deal

21   with risk and chargebacks.  You deal with -- see that side of

22   it.  Have you found that card-not-present average chargebacks

23   are higher than the retail space?

24        A.   Yes.

25        Q.   Okay.  Have have you found that it is always on

1    the -- I guess, have you ever found, in your reporting --

2    what's reported to you, that the cardholder did not make the

3    purchase?

4        A.    So, from a chargeback position, it goes through an

5    arbitration process --

6        Q.    Okay.

7        A.    -- between the acquirer, the merchant, the

8    cardholder and the issuer.  And if the acquirer has

9    substantial evidence to show that that cardholder did

10   purchase those goods, they would win the chargeback.

11       Q.    Got ya.

12       A.    So that's a whole process.  That deems if the

13   cardholder actually did conduct or knowingly conducted the

14   transaction.

15       Q.    So, in certain circumstances, obviously, it seems

16   like chargebacks can also be a bad thing for the merchant

17   itself overall as well?

18       A.    Yeah.  If they don't control what's happening,

19   yes.

20       Q.    In that space?  Okay.

21       A.    They can.

22       Q.    That's understandable.  You testified -- you

23   testified about the MATCH list.  Is there ever a circumstance

24   where an ISO or, you know, that agent acting as the acquiring

25   bank or the arm of the acquiring bank would seek out or

1   approve to work with somebody that has been TMF'd in your

2   view?

3       A.   I would not be aware of that.

4       Q.   You would not be aware of it.  Would you be

5   surprised to find that?

6       A.   Yes, I would be surprised.

7       Q.   Why -- in your view, why do you think that they

8   would do that if that happened?

9           MR. BURT:  Your Honor, I'm going to object on

10  speculation.

11          MR. RIDDLE:  Just asking his opinion about the

12  chargeback risk side of it.

13          THE COURT:  Just a minute.  Sustained.  Your next

14  question?

15      Q.   BY MR. RIDDLE:  Okay.  So TMF's have to do with

16  chargebacks?

17      A.   Not -- TMF's?

18      Q.   TMF, the terminated merchant file --

19      A.   So that's the --

20      Q.   -- that terminates.

21          THE COURT REPORTER:  Please, one at a time.  Don't

22  jump on each other and slow down a bit, please.

23          MR. RIDDLE:  Okay.  I'll take the high road.  I'll

24  be the first if we start going, so I apologize about that.

25      Q.   BY MR. RIDDLE:  So, have you -- so the terminated or

1    the MATCH list has to do with chargebacks is a result of so

2    many chargebacks that somebody gets their merchant account

3    terminated and they are put on that list; is that correct?

4         A.   So that is one of the MATCH reason codes.

5         Q.   Okay.  Okay.  And in your view, an acting arm or an

6    acquiring bank would not seek out continued working

7    relationships once somebody has been put on the MATCH list by

8    them --

9              MR. BURT:  Objection.  Asked and answered.

10        Q.   -- in your view?

11             MR. BURT:  Asked and answered.

12             THE COURT:  Overruled.

13             THE WITNESS:  I wouldn't expect them to.  I don't

14   know if they do or don't.  I wouldn't expect them to.

15        Q.   BY MR. RIDDLE:  I can appreciate that.  Just one

16   second here.  Earlier you testified about the number of fees

17   that had been assessed to the acquiring banks for IWorks and

18   Mr. Johnson.  To your knowledge, have those fees been paid?

19        A.   To MasterCard, the assessments been collected?  We

20   collect assessments, yes, so we collected a hundred percent

21   of those assessments.

22        Q.   100 percent of them have been paid?

23        A.   That's right.

24        Q.   Okay.  Do you know who paid those directly?

25        A.   The acquiring bank.

1      Q.   Do you know who paid them indirectly?

2      A.   No, I do not.

3      Q.   On the descriptors that go on the bank statements,

4  who has control of those?  Who -- who enters those into the

5  system?

6      A.   It would be the acquiring bank.

7      Q.   So on the one that was Goggle Money Pro, it might

8  have been -- I just want to clarify that was on their side?

9      A.   That's what the acquiring bank reported to us,

10  yes.

11     Q.   Okay.  Okay.  I just wanted to clarify that.  It

12  seemed a little funny.  In your view, would Wells Fargo or

13  their acting arm, their agent, their ISO, be releasing large

14  amounts of reserve funds to IWorks during the heart of these

15  issues?

16     A.   I would not know if they were or were not doing

17  that.

18     Q.   Would you be surprised to find that?

19          MR. BURT:  Objection.  Evidence -- not in

20  evidence.

21          THE COURT:  Sustained.

22     Q.   BY MR. RIDDLE:  Are you aware of Wells Fargo or

23  their acting arm -- you testified of the problems from 2008

24  as it relates to chargebacks with IWorks through 2009,

25  through July of 2009, and those TMF's.  Are you aware of

1  Wells Fargo, their acting arm, going to visit IWorks to seek

2  out more business?

3          MR. BURT:  Objection.  Facts not in evidence.

4          MR. RIDDLE:  I'm just asking if he's aware, Your

5  Honor.

6          THE COURT:  Sustained.

7     Q.   BY MR. RIDDLE:  Are you aware Wells Fargo was

8  working with IWorks after these TMF's through their acting

9  arm?

10          MR. BURT:  Same objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  I was not aware at the time.

13     Q.   BY MR. RIDDLE:  Are you aware now?

14     A.   Now that I see the documentation, yes.

15     Q.   Okay.  Why do you -- why would they be working with

16  them after the TMF?

17          MR. BURT:  Calls for speculation, Judge.

18          THE COURT:  Sustained.

19     Q.   BY MR. RIDDLE:  So, earlier I had mentioned that

20  IWorks was around from 2000 to 2009 and asked you if you knew

21  about that -- or 2010, excuse me.  Are you aware -- and you

22  testified of the 13 TMF's from April or May of 2009 to July

23  of 2009.  Are you aware of issues prior to that during the

24  nine years prior?

25     A.   No, I'm not.

1        Q.    You're not aware of those?

2        A.    No.

3        Q.    Okay.  So there aren't any to your knowledge, then,

4    I guess?

5        A.    To my knowledge, I'm not aware of any.

6        Q.    Okay.  So the company in that space, when you saw --

7    and I'm assuming you saw the volume that IWorks processed for

8    sales, they had been around from 2000 to 2009 and had not

9    been TMF'd.  In your view would they be considered a

10   qualified merchant?

11            MR. BURT:  Objection, calls for speculation.

12            THE COURT:  Overruled.

13            THE WITNESS:  I don't know what that data was, so I

14   really can't comment on that.

15       Q.    BY MR. RIDDLE:  Okay.

16       A.    All right?

17       Q.    Thank you.  I'm going to ask you a hypothetical

18   question.  If a company had been around for, say, nine, ten

19   years and had -- grew successfully over those years and had

20   maintained their relationships with their processing

21   partners, their ISO's, the banks and then, overnight, lost

22   about 95 percent of those sales through unfortunate

23   circumstances, what would that do to chargeback rates?

24            MR. BURT:  Objection.  Calls for speculation.  This

25   is not a certified expert under Rule 701, 702 of the Rules of

127

1      Evidence.  Calls for speculation, it's is an improper

2      question.

3            THE COURT:  Overruled.

4            THE WITNESS:  Can you repeat the question, please.

5      Q.   BY MR. RIDDLE:  Sure.  Just a hypothetical in

6      relation to a company that had been around for nine or ten

7      years, had grew to the success in sales that IWorks had,

8      overnight lost about 95 percent of their business and, at the

9      end of that -- that time frame in that nine years, what would

10     that do in the coming months to their chargeback rates?

11           MR. BURT:  So, I'm going to object again.  He's now

12     inserted facts not in evidence regarding IWorks.

13           THE COURT:  Overruled.

14           THE WITNESS:  Okay.  So, it would flag as a -- the

15     warning level, a CMF for the first month, but that's why we

16     provide two months.  So, by the second month, those

17     thresholds would have been --

18     Q.   Sure.

19     A.   -- gone because those sales would have not been

20     relevant for the second month.

21     Q.   Okay.  Are you aware of any extenuating

22     circumstances that weren't, you know, directly caused by the

23     cardholder as far as chargebacks are concerned, in the online

24     marketing space during the previous years --

25           MR. BURT:  Objection.  Relevance.

1   Q. -- of 2009?

2     THE COURT:  Overruled.

3     THE WITNESS:  I'm not aware.

4   Q. BY MR. RIDDLE:  What sort of reason codes have to do

5 with fraud in -- with MasterCard?

6   A. So, fraud reason codes for chargebacks you're

7 referring to?  That's not managed by my team, so I can't

8 really answer to those.

9   Q. Okay.  I can respect that.

10   A. Thank you.

11   Q. I have one more question for you here.  Are you

12 aware of a company called CardFlex?

13   A. I have heard of it.

14   Q. Do you know if they are still an acting arm of Wells

15 Fargo Bank?

16   A. No.

17     MR. BURT:  Objection, relevance.

18     THE COURT:  Overruled.

19     THE WITNESS:  I am not aware if they are or are

20 not.

21     MR. RIDDLE:  Okay.  That's all the questions I have,

22 Your Honor.

23     THE COURT:  All right.  Let's just stand up while we

24 transition to Mr. Mumford.  It's at your option.  It's not

25 mandatory.  You can sit down whenever you want.

1           Tell me when you're ready, Mr. Mumford.  All right.

2    Please be seated.

3                        CROSS EXAMINATION

4    BY MR. MARCUS MUMFORD:

5        Q.   Mr. Paolucci, good morning.

6        A.   Good morning.

7        Q.   You testified yesterday, did you not, that to be an

8    acquirer, you have to be an FDIC insured bank; is that right?

9        A.   That's one of the licensing requirements, yes.

10       Q.   And is that in your rules as well?

11       A.   I believe it's in the licensing requirements, yes.

12       Q.   Okay.

13           Can we pull up 902 and 903.  Can we put them

14   side-by-side.

15           These are the -- showing you what's been marked as

16   Government's Exhibits 902 and 903, those are the rules that

17   you testified to.

18       A.   Yes.  Those are the rules, yes

19       Q.   Yes.  And those are the license requirements?

20       A.   Those are not the licensing requirements.

21       Q.   Okay.  What changed between the June 3, 2009 rule

22   and the November 6, 2009?

23       A.   Without looking at it, I can't tell you.

24       Q.   Okay.  Anything significant to your testimony today?

25       A.   Without looking at it, I can't comment.

130

1    Q.    Okay.  Well, you -- you reviewed them in advance of

2    your testimony, right?

3    A.    I didn't review the entire rules manual.

4    Q.    Okay.

5          Your Honor, if I may approach, I printed off a hard

6    copy of these documents.

7          THE COURT:  You can approach.

8          MR. MARCUS MUMFORD:  Thank you.

9    Q.    BY MR. MARCUS MUMFORD:  Showing you -- giving you a

10   hard copy of 902 and 903, sir, does that help you, assist

11   in --

12   A.    This will help me if you if give me pair of reading

13   glasses.  They are minute.

14   Q.    They aren't quite large; isn't that right?

15         MR. KENNEDY: I can -- I can help the witness with

16   that, Your Honor.

17         THE COURT:  Are you referring to specify sections,

18   Mr. Mumford, or are you asking him about all the changes?

19         MR. MARCUS MUMFORD:  No.  I'm just going to -- I'm

20   just going to ask.  I think my question was, is he aware of

21   any changes?  And then I was going to ask him which version

22   he would prefer to use, and I'll just skip to that.

23         THE COURT:  Okay.

24         THE WITNESS:  So, what is the -- can you repeat the

25   question?

1    Q.   BY MR. MARCUS MUMFORD:   Yeah.   My question is, are

2  there any relevant changes that would be relevant to your

3  testimony today as between the one version and the other one?

4  And then my question is going to be -- I'll just -- I'll just

5  tell you.   My question -- my next question is going to be,

6  which one if I'm referring to one, which one would you prefer

7  that I use so I don't keep going back and forth.

8    A.   Like I said, the rule manual is large.

9    Q.   Yes.

10   A.   I would have to go through the entire thing --

11   Q.   Okay.

12   A.   -- to see what the differences are.

13   Q.   As you sit here today, are you aware of any change

14  that would be relevant to your testimony today?

15   A.   I don't believe so.

16   Q.   Okay.   Which one would you prefer to use, then?   Can

17  we use the 902, then?

18   A.   I would prefer to use the one that was in effect at

19  the time.

20   Q.   At what time exactly?   That's what I'm getting at.

21   A.   So, at the time that this situation occurred.

22   Q.   Okay.   What is the situation?

23   A.   The situation why we're all here.

24   Q.   Okay.   And that's -- and that's a fair -- and that's

25  a fair point, but you testified to these fines that were

1    accruing in the 2000 -- resulting in the 2008 chargebacks,

2    though; isn't that right?

3         A.   That is correct.

4         Q.   And both of these rules manuals are from 2009,

5    right?

6         A.   That is correct.

7         Q.   Where is the manual from prior to 2009?

8         A.   The rules haven't changed for the excessive program

9    since 2008, 2009.  They remain the same.

10        Q.   Do you remember when they did change?

11        A.   We changed them way after this situation occurred,

12   2012.

13        Q.   Okay.  How did you change them back then?

14        A.   We re-evaluated the effectiveness of the current

15   excessive chargeback program to see if it had an impact on

16   improving chargeback levels, so it did, so we increased the

17   number of chargeback -- the minimum number of chargebacks and

18   the percentages.

19        Q.   How were those -- how were those -- so you increased

20   the -- so the threshold at the time was 1 percent; is that

21   right?

22        A.   The excessive percentage was 1 percent.

23        Q.   And what is it now?

24        A.   1.5.

25        Q.   And did you say that -- has that -- that was -- that

1    has not had an effect on the payment system overall?

2        A.   Has that had an effect?

3        Q.   The increase in the chargeback levels by .5 percent,

4    that didn't have a negative impact on the system?

5        A.   It did not.

6        Q.   Now, when you said you changed it, did you -- were

7    you referring to the reasons you changed it related to the

8    situation as you described it that you are testifying to here

9    today?

10       A.   We changed it because the current program was

11   effective and we needed to update it to reflect the current

12   trend.

13       Q.   I'm sorry.  I want to make sure that we're

14   understanding each other there.  When you said the current

15   program was effective, what are you referring to?

16       A.   It was effective.  So we implemented those

17   thresholds because, at that time, the thresholds that we

18   examined through the system, that was the appropriate level

19   to say it was an excessive level.  After that program was in

20   effect for a number of years, we noticed that that level was

21   no longer appropriate, that we should increase it now because

22   the old level is non-relevant.

23       Q.   Okay.  In fact, is there -- is there a-- is there a

24   different -- is there a different level that you apply in

25   different areas of the world?

1      A.    No.

2            MR. BURT:   Objection.   Relevance.

3            THE COURT:   Overruled.   And the answer stands.

4      Q.    BY MR. MARCUS MUMFORD:   Now, is that -- I want to

5    make sure I understand the relationship here between

6    MasterCard and Visa.   I believe you testified that MasterCard

7    is the one that applies the threshold; is that right?

8      A.    We apply the threshold for MasterCard activity --

9      Q.    Okay.

10     A.    -- transactions.

11     Q.    Is that threshold now different for -- between Visa

12   and MasterCard, then?

13     A.    We don't have an insight, no, to what -- how they

14   operate their programs or thresholds of their programs.

15     Q.    Okay.   So you do not know if they stick with the 1

16   percent threshold or 1.5?

17     A.    I do not know.

18     Q.    Are you aware that, in fact, Visa has a program

19   threshold for some -- for some areas as 2.5?

20     A.    I am not aware of that.

21     Q.    Okay.   Does Visa have an analogous -- does Visa have

22   a system that's analogous to the MATCH?

23     A.    They do not that I'm aware of.

24     Q.    And that's because they use yours, right, in that

25   regard?

1    A.    I believe they tell their customers to use our

2    system, but I'm not sure that's relevant.

3    Q.    And I think -- and I think you're being careful here

4    because you don't want to be accused of coordinating between

5    you and Visa.  Isn't that fair?  That -- that's why you're

6    being a little bit careful; is that right?

7    A.    That's incorrect.

8    Q.    Okay.  I'm sorry.  Is there -- well, you tell me.

9    Is there a reason why that you're being a little bit careful?

10   A.    So the reason is, is because I am aware that Visa

11   mentions the TMF in their rules.

12   Q.    Uh-huh?

13   A.    We, MasterCard, owns and runs MATCH.

14   Q.    And the TMF, who runs that?

15   A.    There is no TMF.

16   Q.    Okay.  Explain that.

17   A.    That's an old, outdated term.

18   Q.    Okay.  And when did it go out of favor?

19   A.    I would say when we introduced the MATCH back in, I

20   would say -- I'm guessing it was 2006.

21   Q.    Okay.  Whose term was TMF, prior to you using it?

22   A.    It was a MasterCard term.

23   Q.    Okay.  So MasterCard -- MasterCard had a TMF, then,

24   that become MATCH, then, in 2006, about, correct?

25   A.    Approximately.

1    Q.   I'll just put those.  I'll just put squiggle lines,

2    okay?  Was there a reason why you converted from the TMF to

3    the MATCH in 2006?

4            MR. BURT:  Your Honor, objection on relevance.

5            THE COURT:  Sustained.

6    Q.   BY MR. MARCUS MUMFORD:  Are -- are any of these

7    accounts that you're talking about, were they in effect in

8    2006?

9    A.   I'm not aware.

10   Q.   Okay.  Did you look for that at all?  I'm just

11   trying to determine if we're dealing exclusively with the

12   MATCH system or if we're also dealing with the TMF?

13   A.   So, when -- I guess I need the question clarified.

14   Looking at what accounts?

15   Q.   Well, the accounts that you have been testifying to

16   where you said there were the excessive chargebacks and the

17   assessments.

18   A.   Okay.

19   Q.   That's what I'm talking about.

20   A.   Okay.  So -- and the question was TMF?

21   Q.   Are we dealing with the TMF system or the MATCH?

22   A.   It's the same system.

23   Q.   Okay.  And that's what I was getting at.

24   A.   It's the same system.

25   Q.   So when you converted from TMF to MATCH, what

changed, I guess?

A.   So the MATCH system -- the TMF was a database, a
MasterCard database, right?  The introduction of MATCH was
when we introduced the online MATCH -- the online TMF system,
so it's just an evolution of the TMF.

Q.   Got ya.

A.   Prior to the TMF, there was the CTMF, and that's
when we had participants in other organizations.  So the
migration from that to the TMF was, we split --

Q.   Got ya.

A.   -- and we took ownership of the program.

Q.   Got ya.  And what were the other organizations?  Was
that the Visa and others?

A.   Visa.

Q.   Yeah.  Visa.  Okay.  And so you guys split, and
that's -- is it fair to say that was to avoid antitrust?

        MR. BURT:  Objection.  Relevance.

        THE COURT:  Sustained.

Q.   BY MR. MARCUS MUMFORD:  And you converted to the
online MATCH system.  Now explain, is that -- is that a
subscription service, then?  Who has access to the TMF?

A.   MasterCard acquirers.

Q.   MasterCard acquirers.  And do they have to pay a
fee?

A.   They do.

1    Q.    And if they -- if they -- do they have arrangements

2    where they have their ISO's access it?

3    A.    I'm not aware of what the acquirers provide in their

4    access.

5    Q.    Yeah.  And I'm just asking, so my -- the purpose of

6    my question was to say if the ISO's are accessing it, are

7    they accessing it through the acquirer's subscription or do

8    they have their own?

9    A.    No.  Through the acquirer's.

10   Q.    I'm going to take a look at that, and I'm going to

11   ask you to identify what that -- that system is, but let me

12   get back to that, if I can.  Let me stick with these -- these

13   rules for a sec.  So I'm going to use the rules from 2000 --

14   June 3, 2009, okay?

15   A.    Okay.

16   Q.    Is -- I believe you -- so your testimony was that a

17   financial institution has to be an FDIC insured bank, right?

18   A.    Correct.

19   Q.    And to get there, you referenced 1.2.1.

20        Can we -- can we figure out what page that is?

21   Sorry, Eric.  I can get it for you.  What page is that?  Is

22   that page 25 there; is that right, on the screen?

23   A.    That is correct.

24   Q.    Yeah.

25        Can you blow up the bottom part of that, please?

1    MR. WHEELER:  Just the bottom paragraph or the whole

2  thing?

3    MR. MARCUS MUMFORD:  No, the whole -- yeah, the

4  whole -- right where you were.

5    Q.   BY MR. MARCUS MUMFORD:  This is the -- this is the

6  section you were testifying to, right?  So, let me ask you,

7  where does it say FDIC insured?

8    A.   It doesn't say it here.

9    Q.   Okay.  If -- hold up the Exhibit 902 that I've got

10  in front of you.  In that whole book of rules, does it say

11  FDIC insured bank?

12    A.   It does not.  It would say it in the licensing

13  agreement.

14    Q.   Okay.  Who -- who -- first of all, who would have --

15  who would have had access to these rules at that time?

16    A.   Only licensed acquirers and issuers.

17    Q.   Okay.  So, would the merchants themselves?

18    A.   Not these rules, no.

19    Q.   So we're talking about --

20    THE COURT:  Mr. Paolucci, could you just pull the

21  mike toward you.  It will sit right there on the edge.

22    THE WITNESS:  Okay.

23    THE COURT:  Thanks.

24    Q.   BY MR. MARCUS MUMFORD:  So, would -- if we're

25  talking about this relationship here, right, with the

1    acquirers, an ISO, a sub-ISO, and the merchants, right?

2    Would the merchants have had access to these rules at the

3    time?

4    A.   No, they would not.

5    Q.   Would the sub-ISO have had access?

6    A.   I don't believe so.

7    Q.   Okay.  Would the ISO have had access?

8    A.   If the acquirer provides it to the ISO, yes.

9    Q.   Okay.  But that has to -- that has to be provided by

10    the acquirer?

11    A.   That's correct.

12    Q.   Are there such things as non-bank acquirers?

13    A.   Would you repeat the question.

14    Q.   Are there such things in the industry as non-bank

15    acquirers?

16    A.   Currently, yes.

17    Q.   Okay.  And what are those -- what's the difference

18    between those, so non-bank acquirers and the bank acquirers?

19    A.   So they would be referred to as government

20    agencies.

21    Q.   Okay.  Is that -- are those the only non-bank

22    acquirers that you have in the industry?

23    A.   The only one I'm aware of.

24    Q.   Okay.  Are there non -- are there acquirers that are

25    not FDIC insured?

1    A.    Since these rules, yes.

2    Q.    Okay.  How many?

3    A.    I don't know the number.

4    Q.    What percentage?  Can you ball park it?

5    A.    I -- I'm not on the licensing team.  I don't know.

6    Q.    What are -- are those -- are those the government

7    agencies that you're talking about?

8    A.    That is correct.

9    Q.    Are there other non-bank acquirers?

10   A.    I don't -- I can't recall.

11   Q.    Or non-FDIC insured?

12   A.    I couldn't -- wouldn't be able to tell you.

13   Q.    Is -- you -- right there, can we highlight that last

14   paragraph there.  Financial transactions means the making of

15   commercial or consumer loans, an extension of credit and the

16   effecting of transactions with payment services card.

17        I want to talk about that.  What is an institution

18   that effects the transactions with payment services cards?

19   Are those processors?

20   A.    So that would be the issuer and the acquirer.

21   Q.    Well, that's -- that's -- that's what you said, but

22   what does it mean to effect the transactions with payment

23   services card?

24   A.    It means submit them to MasterCard through the

25   MasterCard network.

1    Q.   Okay.  Is there anything about that, that you would

2  have to have a depository, that your institution would have

3  to have a depository institution?

4    A.   Not to MasterCard.

5    Q.   So, in other words, you could be a -- you could be a

6  financial institution under this definition without having

7  any deposits in your institution, right?

8    A.   So not into MasterCard, into their institution.

9  They have to be a financial institution.

10    Q.   Well, they have to have access to -- to one.  That's

11  what you're saying, right?

12    A.   No.  That's not what I'm saying.

13    Q.   Okay.  Where does it say you have to have -- you

14  have to be a depository institution?

15    A.   It says it in the licensing agreement.

16    Q.   Okay.  And, again, that's a -- that's a document.

17  Does -- do you -- have you reviewed that document --

18    A.   I have now.

19    Q.   -- in advance of your testimony today?

20         THE COURT REPORTER:  Excuse me.  One at a time,

21  please.  Just let him finish his question.

22    Q.   Have you reviewed that document in advance of your

23  testimony here today?

24    A.   No, I have not.

25    Q.   Okay.  Who -- does a merchant have access to that

1    document?

2         A.    No, they do not.

3         Q.    Does a sub-ISO have access to that agreement?

4         A.    No, they do not.

5         Q.    So how would they know of these -- of these things?

6         A.    Because they wouldn't be considered a MasterCard

7    member or acquirer.

8         Q.    Okay.  Is it possible they had an acquirer that was

9    just not telling their merchants about this?

10        MR. BURT:  Objection.  Argumentative.  Calls for

11   speculation.

12        THE COURT:  Sustained.

13        Q.    BY MR. MARCUS MUMFORD:  Have you ever had instances

14   of an acquirer that was not complying with these -- the FDIC

15   insurance?

16        A.    They would have never been approved.  They would

17   have never made it past the application process.

18        Q.    That wasn't quite the question I asked.  Have you?

19   Not whether you would, have you?

20        A.    I'm not aware because I don't manage the

21   licensing --

22        Q.    Okay.

23        A.    -- aspect.

24        Q.    Who -- who would I talk to?  Who would I talk to

25   there?

1        A.    It would be the license -- someone in the licensing

2    team at MasterCard.

3        A.    Do you know the head of the licensing?

4              MR. BURT:  Objection, Judge.  Irrelevant.  This

5    isn't a deposition.

6              THE COURT:  Sustained.

7        Q.    BY MR. MARCUS MUMFORD:  So, if -- if this provision

8    doesn't say FDIC insured, and the doc -- the rules that you

9    have in front of you don't say FDIC insured, is it the

10   government that told you this -- to say FDIC insured in your

11   testimony?

12             MR. BURT:  Objection.  Argumentative.  Improper.

13             THE COURT:  Mr. Mumford, Mr. Burt approach the bench

14    (Conference at the bench out of the hearing of the jury.)

15             THE COURT:  We are in the most wandering, irrelevant

16   cross examination I've every sat through.  And that approach

17   to the witness was entirely improper.  Focus and stay within

18   the boundaries of proper cross.

19             Anything you want to say, Mr. Mumford?

20             MR. MARCUS MUMFORD:  Yes, Your Honor.  I appreciate

21   the Court's guidance and admonition, and I intend to follow

22   that.  The question was, though, based on the fact that it

23   appeared that the government led this witness to use certain

24   terms at several different points in its -- in its direct

25   examination.  I understood that the Court overruled those

1    objections.  I'm certainly not going to argue them here.  I'm

2    going to respect that.  But it was based on that, Your Honor,

3    that my last question was -- was based because it does -- it

4    does appear to me that there was some -- and I -- I -- I

5    would use the word, there was some discussion in advance of

6    this witness' testimony as to the specific words.

7              For example, the instance I can recall, I was going

8    to ask this witness because of his use of the words red --

9    red flags, as the Court will recall.  That was a question

10   that the government asked him on direct.  And I was going to

11   inquire into whether that was a term that he uses that's in

12   the rules, or otherwise, as well.

13             THE COURT:  And you can ask him if it's in the rules

14   or otherwise, but don't argue the case in questioning.

15             MR. MARCUS MUMFORD:  That's fine.  Thank you.

16             (Proceedings continued in open court.)

17             THE COURT:  We're resuming cross examination.

18        Q.   BY MR. MARCUS MUMFORD:  There were other terms that

19   you used in your testimony that I was going to ask you about.

20   You used the word -- the question was, is that a red flag?

21   Is the term "red flag," is that a -- is that a term that you

22   use in your industry?

23        A.   We do use it, yes.

24        Q.   Is it in the rules?

25        A.   It is not.

1      Q.   Where do you use it, then, in your -- in your

2   industry?

3      A.   We use it when we're in the midst of conducting an

4   investigation due to a compliance issue.

5      Q.   Do you define that anywhere?  Do you define that

6   anywhere?  Do you have a list of red flags?

7      A.   We do not.

8      Q.   Okay.  Similarly, I believe there was -- there were

9   questions asked regarding shell -- shell companies, right?

10  And you said shell companies would never get a merchant

11  account, if I'm right, right?

12     A.   I did not say that.

13     Q.   Okay.  What did you say?

14     A.   I said per our rules, we do not allow shell

15  corporations.

16     Q.   Okay.  What's the distinction?

17     A.   The distinction is MasterCard does not sign

18  merchants, acquirers sign merchants.

19     Q.   Okay.  Thank you -- thank you for that

20  clarification.  Is the term "shell corporations" defined

21  here?

22     A.   It is not defined, no.

23     Q.   Is it defined elsewhere?

24     A.   Not in our rules.

25     Q.   Okay.  I believe you -- well, it wouldn't be defined

147

1     in the licensing agreement, then?

2          A.     No because that doesn't pertain to merchants.

3          Q.     Okay.  But a similar document, then, to the -- to

4     the license agreement?

5          A.     The license agreement would refer to all MasterCard

6     standards and rules.

7          Q.     And, I'm sorry.  I guess that's what I'm asking.  Is

8     there anything in the -- in all MasterCard's rules, be it

9     licensing, be it this rule document or another one that

10    defines shell -- shell -- shell corporations?

11         A.     Not specifically shell corporations.

12         Q.     Okay.  And -- and are you getting at bona fide

13    merchants, there?  Is that what you're getting at?

14         A.     When I refer to a shell corporation, I refer to, in

15    our rules, the bona fide merchant.

16         Q.     Yeah.  The non-bona fide?

17         A.     Non-bona fide merchant, correct.

18         Q.     Yeah.  You know what, let's go to that.

19                Think it's 902 page 87, please.

20                This is the -- this is where you say that the

21    merchant has to -- well, this is where you were referring to

22    when you were talking about bona fide merchants; is that

23    right.

24         A.     That is correct.

25         Q.     Where -- what provision here are you saying is

1    applicable to define a shell company?

2        A.    Can you make that larger?

3        Q.    Yeah.

4              Can we go --

5              Is it the 5.1.1?

6        A.    It is.

7        Q.    Okay.

8              5.1.1, please.  thank you.

9        A.    So, it specifically says that the acquirer must

10   verify that the merchant from which it intends to acquire a

11   transaction is a bona fide business with sufficient

12   safeguards in place to protect from unauthorized disclosure

13   or use of the cardholder transaction information.

14       Q.    Okay.  Can we -- can we highlight that portion that

15   we just called out?

16             MR. WHEELER:  Which?

17             MR. MARCUS MUMFORD:  I think start out with where

18   "acquirer must verify."

19       Q.    BY MR. MARCUS MUMFORD:  And it goes to, what, about

20   three lines down; is that right?

21       A.    (Nods)

22       Q.    That was -- that was -- I'm sorry, sir, you're going

23   to have to -- for the purposes of the court reporter, you

24   have to say yes or no.

25       A.    Yes.  That's what I am referring to.

149

1    Q.   All right.  Let me ask you this.  Is there

2    anything -- and the acquirer -- in the instance -- in the

3    circumstances that we're talking about here today, the

4    acquirer is who?

5    A.   The acquirer is the bank that processes the

6    transactions.

7    Q.   And specifically who?

8    A.   So there were several acquirers.

9    Q.   Okay.  Was one Wells Fargo?

10   A.   That is correct.

11   Q.   Did Wells Fargo not verify that the merchant is a

12   bona fide merchant?

13   A.   From this documentation I saw, it seems that they

14   did not.

15   Q.   And what specifically are you referring to there?

16   A.   So, specific addresses, principals --

17   Q.   Okay.

18   A.   -- that were not applicable.

19   Q.   Are you saying that the merchant account

20   applications, that they didn't verify them?

21   A.   I don't know if they did or did not, but it was

22   their responsibility to do so.

23   Q.   What happens if they don't?

24   A.   If they don't, then it's a violation of this rule

25   and several other rules.

150

1      Q.    Okay.  And is the consequence there, is that a

2  consequence as between Visa -- or I'm sorry -- MasterCard and

3  the acquirer, then?

4      A.    That is correct.

5      Q.    Does it also involve the -- is it between MasterCard

6  and the merchant, too?

7      A.    No, it's not.

8      Q.    Okay.  So it's just between you and the acquirer?

9      A.    Correct.

10     Q.    So you say there's evidence that Wells Fargo didn't

11  verify?

12          MR. BURT:  Your Honor, I'm going to object.  You

13  ruled pretrial on this issue that it's not relevant, and we

14  move to exclude.

15          THE COURT:  What's the docket number of the order,

16  Mr. Burt?

17          MR. BURT:  I'll have to find it quickly, Judge.

18          THE COURT:  What's that?

19          MR. BURT:  I'll have to find it quickly, Judge.

20          THE COURT:  I think I know the one you're referring

21  to.  The objection is sustained.

22     Q.  BY MR. MARCUS MUMFORD:  Let me ask you this.  Have

23  you seen evidence that Wells Fargo did not verify that any

24  merchant had sufficient safeguards in place to protect from

25  unauthorized disclosure?

```
1          A.   I am not aware if they did or did not.

2          Q.   Okay.  Are you are you aware of any -- that Wells

3     Fargo did not verify that the standards that permit that

4     information to be captured --

5               MR. BURT:  Same objection, Judge.

6               THE COURT:  Sustained.

7          Q.   BY MR. MARCUS MUMFORD:  The -- are you aware of

8     the -- any information that would indicate that Wells Fargo

9     did not verify that a merchant complied with the applicable

10    laws?

11              MR. BURT:  Same objection, Your Honor.

12              THE COURT:  Mr. Mumford Mr. Burt approach the

13    bench.

14      (Conference at the bench out of the hearing of the jury.)

15              THE COURT:  This is the ruling that the bank

16    negligence is not relevant.  Am I right, Mr. Burt?

17              MR. BURT:  That's exactly right, Judge.

18              THE COURT:  So you're just poking it and poking it

19    and poking it and poking it, so stop.

20              MR. MARCUS MUMFORD:  I didn't understand what the

21    ruling was the Court was referring to there.  I will move on.

22    I would point out this is the same paragraph that the

23    government called out in its direct examination with this

24    witness, so if that doesn't open the door to my cross

25    examination, I don't know what does.
```

1    THE COURT:  Asking him about a paragraph does not

2    supersede a prior order, and there were no questions about

3    the standards of care exercised by Wells Fargo Bank on

4    direct, so you can't ask about it on cross.  There's two

5    reasons, beyond the scope and outside the order.

6    MR. MARCUS MUMFORD:  I would ask the Court to

7    consider how this evidence is -- I think the government is

8    construing it as negligence, but I am not using it that way.

9    I am using it to actually argue that Wells Fargo was not the

10   acquirer -- that Wells Fargo Bank NA, the FDIC insured

11   institution, was not actually the acquirer here, but the

12   acquirer here was a different entity.  That is -- as Your

13   Honor knows, that is a key theory to our case here.

14   THE COURT:  Well, ask that question.

15   MR. MARCUS MUMFORD:  Okay.  Thank you.

16   MR. BURT:  And I'm going to object to that question

17   as that's well beyond the scope and well beyond this witness'

18   knowledge.

19   THE COURT:  And he's actually -- it's been asked and

20   answered, too.  You have asked him now how many times who the

21   acquirer is?  You have asked him at least four.

22   MR. BURT:  And, for the record, we will be calling

23   three Wells Fargo witnesses, and Mr. Mumford can ask them.

24   THE COURT:  From licensing?

25   MR. BURT:  The people that were in charge

1    of licensing --

2              THE COURT:  From licensing?

3              MR. BURT:  -- from Wells Fargo Bank.

4                   (Proceedings continued in open court.)

5         Q.   BY MR. MARCUS MUMFORD:  To your knowledge, did

6    anyone verify whether the merchants that you have testified

7    to today complied with these provisions in the bona fide

8    business operation?

9              MR. BURT:  Same objection, Judge.  Move to strike

10   the question.

11             THE COURT:  Well, I don't strike questions, but that

12   objection is sustained.

13             MR. MARCUS MUMFORD:  Okay.  Can I ask that yes or no

14   and then ask the follow-up?

15             THE COURT:  Ask a question.  See what happens.

16        Q.   BY MR. MARCUS MUMFORD:  Who -- who -- to your

17   knowledge, who did or did not verify that the merchants you

18   have testified to were bona fide business operations as set

19   forth here?

20             MR. BURT:  Same objection.

21             THE COURT:  Same ruling.

22             MR. MARCUS MUMFORD:  Okay.  Thank you.  Let's move

23   on then.

24             Eric, can you go to page 47, please.

25             Mr. -- oh, I'm on the wrong one.

```
1              Go to the next page.  Keep going.  Again.

2              Give me just a moment here, Your Honor.  I pulled up

3    903 instead of 902 here.

4              Okay.  Go to page 45, please.

5              MR. WHEELER:  Forty-five?

6              MR. MARCUS MUMFORD:  Yes, 45.  Thank you.  Just

7    highlight that first paragraph there.  No, no, the first

8    paragraph under where it says risk of loss.  Yeah.

9         Q.   BY MR. MARCUS MUMFORD:  You testified to this on

10   your direct examination with the government; isn't that

11   right?  And you said the -- this paragraph, this is the rule

12   that applies to show that the acquirer must bear the risk of

13   loss associated with the account, right?

14        A.   That is correct.  It's any MasterCard member.

15        Q.   And by the member, we're talking about the acquirer;

16   is that right?

17        A.   Acquirer or issuer.

18        Q.   Or issuer, okay.  And you're saying that the

19   corporation there, that means MasterCard; isn't that right?

20        A.   That is correct.

21        Q.   So what you're saying -- is there a separate

22   contract with the acquirer that says:  You, bank, must accept

23   the entire risk of loss.

24             MR. BURT:  Objection, Judge, under your ruling on

25   January 2, docket number 944.  Loss to bank is irrelevant.
```

1          THE COURT:  Sustained.

2      Q.   BY MR. MARCUS MUMFORD:  This is a contractual

3  provision between you and the acquirer; is that right?

4          MR. BURT:  Same objection.

5          THE COURT:  That objection is overruled

6          THE WITNESS:  Repeat the question.

7      Q.   BY MR. MARCUS MUMFORD:  This is a contractual

8  provision -- provision that -- that says that the acquirer

9  must -- must take all the risk of loss against -- as to

10  MasterCard?

11          THE COURT:  I've changed my view on that now that I

12  understand your question better.  The objection is

13  sustained.

14          MR. MARCUS MUMFORD:  Okay.  Can -- can I go back to

15  the prior one I -- I forgot how I phrased it, there.

16          THE COURT:  This topic is irrelevant.  We spent a

17  lot of time on that.

18          MR. MARCUS MUMFORD:  Well, I was going to -- it was

19  pointed out on direct, so I was --

20          THE COURT:  Ask a question.

21          MR. MARCUS MUMFORD:  Okay.  It was pointed out on

22  direct, so I was going to ask this.

23      Q.   BY MR. MARCUS MUMFORD:  Could a -- would an acquirer

24  pass on their risk of loss in the same contractual manner?

25          THE COURT:  That question doesn't pass either.  Next

1    question.

2    Q.    BY MR. MARCUS MUMFORD:    Okay.    In the --

3    Take that down and go to the second -- to the last

4    sentence of the next paragraph, please.

5    Mr. Paolucci -- I'm sorry, is it Paolucci?    I want

6    to make sure I'm saying it right.

7    A.    It's an easy name.    It's Paolucci.

8    Q.    Paolucci.    Okay.    Good.    Thank you.    You see that

9    last sentence there that says the fact that a member has paid

10    any portion of any amount owed to such third-party designee

11    does not discharge the member's obligation to the

12    corporation?

13    A.    I do see that.

14    Q.    What is that referring to?

15    A.    So, whatever the member -- whatever third parties

16    they have an agreement with has no bearing on their

17    responsibilities to MasterCard.

18    Q.    Okay.    So you're talking about the acquirer's

19    relationships with its ISO's or sub-ISO's or merchants?

20    A.    Any third party.

21    Q.    Okay.

22    Go to the -- pull that back down and go to the first

23    sentence in the next paragraph, please.    You see that first

24    sentence there where it says the corporation may draw on the

25    member's funds to fulfill any of the member's obligations?

1    A.    I do see that.

2    Q.    And so these would be the funds -- would -- would

3  a -- would a -- would a company like Wells Fargo have funds

4  on deposit with MasterCard?

5         MR. BURT:  Objection.  Irrelevant.

6         THE COURT:  Sustained.

7         Mr. Mumford, I think you've been mislead by my

8  liberality in permitting earlier questions.  I try to give

9  people a wide berth on cross, especially defense lawyers.

10  Move to a different topic.

11        MR. MARCUS MUMFORD:  I'll do that.  Thank you.

12   Q.    BY MR. MARCUS MUMFORD:  Mr. Paolucci, you were --

13  you spent a -- spent a great amount of time with the fines

14  assessed by MasterCard against -- against -- and, I guess,

15  who are those fines assessed against?

16   A.    So we apply assessments to any member that violates

17  one of the MasterCard standards.

18   Q.    Okay.  And you take them very seriously.  Is that

19  what you testified to, right?

20   A.    We do take them seriously.

21   Q.    And the -- you were also asked about fines that

22  should be assessed for -- against acquirers that don't sign

23  their merchant agreements; isn't that right?

24   A.    There are assessments associated with violating that

25  standard.

1      Q.   That was the 25 on the first instance, the 50 on the

2  second, the 75 on the third and the hundred on the fourth;

3  isn't that right?

4      A.   That is correct, in the twelve-month period.

5      Q.   So I'm -- I'm going to take you through a couple of

6  merchant applications here, okay?

7           Can you go to Exhibit 2, please, page 17.

8           MR. BURT:  Your Honor, I'm going to object to the

9  use of these applications with this witness.  We have never

10 shown him these applications, and I don't think he's ever

11 seen them.

12          THE COURT:  Ask a question, Mr. Mumford.

13     Q.   BY MR. MARCUS MUMFORD:  I'll ask -- I'll ask that.

14 Have you ever seen these applications, sir?

15     A.   No, I have not.

16     Q.   So --

17          Go back to the first -- go back a page or two.

18 Yeah.

19          So, are -- would these be -- would these be

20 applications to obtain both a Visa and a MasterCard

21 authorization for this merchant, though?

22          MR. BURT:  Objection.  602.  Lack of personal

23 knowledge.

24          THE COURT:  Overruled.

25          THE WITNESS:  I've never seen these, so I can't

1    comment on what they are.

2         Q.   BY MR. MARCUS MUMFORD:  Okay.  If -- if we had --

3    let me ask you this.  If we had 36 instances -- if we had 36

4    instances of unsigned merchant applications, can you -- can

5    you tell me what the total fine would be to the -- the

6    acquirer in that instance?

7              MR. BURT:  Objection.  Irrelevant.

8              THE COURT:  Overruled.

9              THE WITNESS:  I would need some additional

10   information to do that.

11        Q.   BY MR. MARCUS MUMFORD:  What additional information?

12        A.   I would need to know the licensed acquirers.

13        Q.   Okay.

14        A.   The time frame.

15        Q.   Okay.

16        A.   And then we could calculate.

17        Q.   Okay.  Let's do that.  So, from July, 2009, okay,

18   through March of 2010, 36 merchant applications and

19   agreements, none of them signed.

20        A.   Okay.

21        Q.   What would the fine be?

22        A.   One acquirer?

23        Q.   Yes.

24        A.   I'm going to use this.

25        Q.   Perfect.

1        MR. BURT:  While he's doing that, Judge, I'm going

2   to lodge an objection.  This goes to your ruling docket

3   number 946, negligence of a bank is not a defense --

4        THE COURT:  Mr. Burt, just give me the numbers.

5        MR. BURT:  946.

6        THE COURT:  If you haven't answered yet, that

7   objection is overruled to that question.

8        THE WITNESS:  If Master Card identified these

9   violations, it would have been $3,450,000.

10   Q.   BY MR. MARCUS MUMFORD:  3,450,000, you say?

11   A.   Yeah.

12   Q.   I will say 3.45 million, okay?

13   A.   Yeah.

14   Q.   You said if MasterCard would have identified.  What

15   would it have -- what would it have taken -- what would it

16   take for MasterCard to identify those violations?

17        MR. BURT:  Objection.  Irrelevant.

18        THE COURT:  Sustained.

19   Q.   BY MR. MARCUS MUMFORD:  Did MasterCard, in -- in --

20   you testified you're here to testify about your -- this

21   situation, right?  Did MasterCard ask for the merchant

22   agreements?

23        MR. BURT:  Objection.  Irrelevant.

24        THE COURT:  Overruled.

25        THE WITNESS:  I don't recall we requested those

1    documents.

2        Q.    BY MR. MARCUS MUMFORD:   Why not?

3        A.    It's not required to substantiate an excessive

4    chargeback case.

5        Q.    Have you ever seen an instance -- you testified how

6    unusual it is to have the amount of chargebacks that we had,

7    right?  Have you ever seen an instance where you had to

8    assess a fine against a bank for 36 unsigned merchant

9    accounts?

10            MR. BURT:   Objection, irrelevant.

11            THE COURT:   Sustained.   Signature is relevant,

12   Mr. Mumford.  Fines are not.

13            MR. MARCUS MUMFORD:   Okay.  Okay.  Thank you for

14   that.

15            MR. BURT:   Your Honor, with that Court's

16   clarification, I would ask that this page be removed from the

17   jury's view.  You just said it's not not relevant.

18            THE COURT:   Is the page itself a merchant account?

19            MR. BURT:   No.  Mr. Mumford's chart here which lists

20   the fine amount.

21            MR. MARCUS MUMFORD:   I'll move on, Your Honor.

22            THE COURT:   Okay.  Go ahead.

23            MR. MARCUS MUMFORD:   I don't mean to offend the --

24       Q.    BY MR. MARCUS MUMFORD:   Have you -- of all the

25   accounts that you testified to today, have you -- or

1    yesterday to, were -- have you reviewed the Indictment here

2    at all?

3        A.    No.  I have not read it.

4        Q.    Are you familiar with the 36 accounts that are at

5    issue in the Indictment?

6        A.    Just the ones that have been presented to me.

7        Q.    And that was my question.  Are those accounts that

8    have been -- that you've testified to, are they the accounts

9    at issue in the Indictment, or do you know?

10            MR. BURT:  Objection, Judge.  That's improper for

11   this witness.

12            THE COURT:  Overruled.

13            THE WITNESS:  I'm not aware.

14       Q.    BY MR. MARCUS MUMFORD:  Okay.

15       A.    I'm aware of the cases that we discussed this

16   morning.

17       Q.    And those cases happened in -- really in the 2008

18   time period, is that right?

19       A.    2008 and 2009.

20       Q.    Yeah.  Do you -- do you -- do you remember when

21   those accounts were -- were -- set -- set up?

22       A.    Set up by the acquirer?

23       Q.    Yeah.

24       A.    Only from the MATCH listings where they provide that

25   opening date.

1      Q.   Were any of those accounts set up after May of 2009?

2      A.   I would have to look at the document to make sure.

3  Again, I would only know when they have been set up from the

4  MATCH listings.

5      Q.   Okay.  But it's -- it's -- it's fair to say none of

6  them were set up after the MATCH listings though; is that

7  right?

8      A.   Well, the MATCH listings have an open and close

9  date, so I would have to look at the opening dates.

10     Q.   Got ya.

11     A.   These documents only have the close dates.

12     Q.   Okay.  Got it.

13          You know what, let's go to -- let's go to

14  document -- document you 71, page 8, please.

15          You -- you testified to MATCH -- to -- to -- you

16  know, you know, to MATCH hits, right, in your testimony,

17  right?

18     A.   I did.

19     Q.   Was this -- this was -- this wasn't one of them, am

20  I right?  This was not one of them, right, because yours had

21  your name on them as the guy who looked for it, right?

22     A.   I believe so.  I'd have to look at the earlier

23  one.

24     Q.   And this one has the name Amanda Miller at the top;

25  isn't that right?

164

1      A.    Correct.

2      Q.    Okay.  You don't -- you don't know who she is at

3   all, right?

4      A.    I absolutely know who she is.

5      Q.    Oh.   Who is she?

6      A.    She works on my team.

7      Q.    Okay.  And what does she do on your team?

8      A.    So she handles the assessment communications.

9      Q.    Okay.  How long has she worked for you?

10     A.    Not long.  A couple of years.

11     Q.    Okay.  Do you know where she worked before that?

12     A.    She worked for, I believe, a law firm.

13     Q.    Okay.  Do you recall her searching, doing a MATCH

14  list search around this time period?

15     A.    Yes.

16     Q.    And what was the purpose of her doing the MATCH

17  search listing around this time period?

18     A.    It was due to a request from our legal department.

19     Q.    Okay.  And that would have been the August 20, 2009

20  then; is that right?

21     A.    That's right.

22     Q.    And -- and explain what this document here shows,

23  then.

24     A.    So, what this document shows -- I'm sorry.  You

25  know, Amanda -- Amanda Miller?  It must be a different Amanda

165

1    Miller.

2         Q.   Have we got the wrong one ?

3         A.   It is.  We actually have an Amanda Miller, but I'm

4    just looking at the inquiry reference number.

5         Q.   Okay.

6         A.   And I see that it was conducted under ICA 1076.

7         Q.   Okay.

8         A.   So I have a feeling that's a different Amanda

9    Miller.

10        Q.   Okay.  And explain why do you have that -- that --

11   that feeling?

12        A.   So the reference number, we don't access MATCH under

13   the ICA number 1076.

14        Q.   Okay.  Got ya.  Got ya.  So -- so -- so the --

15   explain what the -- what is that https URL at the bottom of

16   the page?  What does that indicate?

17        A.   That's the MasterCard server.

18        Q.   Okay.  So this is someone accessing the MasterCard

19   server through their subscription; is that right?

20        A.   Yeah.  This is the web-based system.

21        Q.   Okay.  The -- but -- and you would -- you would go

22   through the same system when you were conducting a MATCH,

23   though, right?

24        A.   That is correct.

25        Q.   Okay.  Go to the next page.  And this is the rest of

1    that; is that right?

2         A.    That is correct.

3         Q.    Does this -- does this help you -- does this help

4    you identify, anything -- anything further as to who -- who

5    made this?

6         A.    Yes.  So as I stated earlier, that hyperlink on the

7    ICA number would give you this information, who was contacted

8    on the MATCH listing.

9         Q.    Got ya.  Go back a second.  What's the difference

10   between -- you see the column that says inquiry and the

11   column that says possible merchant MATCH?  Explain that.

12        A.    Sure.

13        Q.    Explain that.

14        A.    So the difference between the two is the inquiry

15   column is the information that was submitted into the system

16   to check up on.

17        Q.    Okay.

18        A.    The possible merchant MATCH is the matches that

19   were -- the system identified from that inquiry information

20   that was submitted.

21        Q.    Got ya.  And so here you have the merchant name

22   being Funding Search Success, Inc., and the d/b/a is Mile

23   Turner Funding.  So on the application itself, that would be

24   the information; isn't that right?  That's where they're

25   getting -- that's where this person is getting that

167

1    information?

2        A.    I don't -- I can't answer where that person is

3    getting that information.

4        Q.    Okay.  Fair enough.

5              Can you scroll down a little bit more.

6              This is the principal name here; isn't that right?

7    But the -- is it fair to say that the person doing the search

8    would only do the search with the information in the inquiry

9    column, though, right?

10       A.    That is correct.

11       Q.    And the MATCH list would match it to the information

12   on the third -- third column there, right?

13       A.    So the system would match it on any merchant that

14   has been listed by any prior acquirer.

15       Q.    Got ya.  And so here we have -- as of August 20,

16   2009, we have this individual Amanda Miller doing a search

17   for a Margaret Holm as the principal of a merchant, and it's

18   pulling up a MATCH hit against -- that is Jeremy Johnson in

19   St. George, right?

20       A.    That is correct, so the system matched on the

21   address.

22       Q.    Okay.

23             I want to get -- I want to get into -- I want to get

24   into chargebacks for just a second, Your Honor.

25             The -- you said that excessive chargebacks were one

1  reason why a merchant would be put on the MATCH list; is that

2  right?

3       A.   That is correct.

4       Q.   How -- how -- how exact or how precise is the -- is

5  the MasterCard system in terms of the reason that a merchant

6  is placed on the MATCH list?

7       A.   It's a criterion, so the definition behind the

8  excessive chargeback reason code.

9       Q.   Okay.  And so you mentioned there were, like, 13

10 different reasons why someone would get put on the MATCH

11 list; is that right?

12      A.   Correct.

13      Q.   And it wasn't -- none of these merchants that you

14 testified to today were put on because of excessive fraud,

15 right?

16      A.   That is correct.

17      Q.   And -- and -- and there's a reason why you make a

18 distinction there between excessive fraud on the one hand and

19 excessive chargebacks on the other, isn't that right?

20      A.   The acquirer would have to answer why they listed it

21 for the reason code they listed it for.

22      Q.   Well, but there's a reason why MasterCard has those

23 two categories separately, right?

24      A.   That is correct.  You only could use one.

25      Q.   Yeah.  You only could use one, and just because you

1    have a chargeback doesn't mean you have a fraud, right?

2        A.   That is correct.

3        Q.   Yeah.  Is there a way, in the MasterCard system, for

4    an acquirer to determine kind of the history of the

5    relationship that led to that merchant being placed on the

6    MATCH list?

7             MR. BURT:  Objection.  Relevance.

8             THE COURT:  Overruled.

9             THE WITNESS:  Repeat the question.

10       Q.   BY MR. MARCUS MUMFORD:  Yeah.  I think it was, is --

11   is there a reason -- I mean, is there a way in the MATCH

12   system that indicates a history for the entity doing the

13   search that would explain why -- a little bit more as to why

14   that merchant got -- got placed on the MATCH list?

15       A.   No, but we provide them the information where they

16   can obtain that information.

17       Q.   And where would they go to obtain that information?

18       A.   So exactly on the exhibit that you've presented,

19   they would click on the hyperlink on 102, where it says added

20   by.

21       Q.   Okay.

22       A.   And then the prior exhibit will show you the

23   information that the person that inquired into the system

24   will see to contact to discuss.

25       Q.   Got ya.  And so they can contact that bank or that

170

```
1    individual -- it's the acquirer, though, that's always
2    putting -- putting them on the MATCH list, right?
3         A.   Sure, the acquirer that listed them.
4         Q.   So they can -- so -- so, if I'm an ISO -- let's say
5    I'm an ISO, right, and I'm doing a search on a merchant,
6    right?  And I find -- I hit a MATCH, right?  I can -- you're
7    saying I can click on that, and I can -- I can figure out who
8    I can call to find out some more information as to the
9    history of why -- why Mr. Johnson, for example, got put on
10   the MATCH list?
11        A.   That is correct.  They can.
12        Q.   Okay.  And in your investigation, did you come
13   across any of the ISO's or the acquirers or others who had
14   done that?
15        A.   I wouldn't be aware if they did or did not.
16        Q.   Okay.  That's below you in a sense.  I'm not saying
17   below you in the sense that --
18        A.   It's information that they could use to go check for
19   whatever they wanted to use it for, so I don't know if they
20   did or did not.
21        Q.   Okay.  But if -- but an acquirer could call up and
22   say:  Hey, what was your -- how did -- how did this -- how
23   did Mr. Johnson leave things with you?
24             Right?
25        A.   They could ask whatever they would like.
```

```
1        Q.   Is it -- I want to just make -- I want to just make

2   sure I ask this.  I apologize if it's been asked before.  The

3   36 accounts, did you do anything to review those accounts in

4   preparation for your testimony here today?

5        A.   Just the ECP cases themselves.

6        Q.   The ECP cases are what?

7        A.   The excessive chargeback program cases.

8        Q.   Those are the 2008 cases?

9        A.   Those are the cases I reviewed, yes.

10       Q.   You mentioned that Amazon and Wal-Mart have one

11  account; isn't that right?

12       A.   That is correct.

13       Q.   And do they have that account directly -- they don't

14  deal with an ISO, though; isn't that right?

15       A.   I don't know because all I know is that the acquirer

16  sends us the transactions.

17       Q.   Do you know who their acquirer is?

18       A.   I do.

19       Q.   Who is it?

20       A.   It's Chase.

21       Q.   Okay.  And so it's likely that they have a --

22  whatever agreement they have, they have directly with Chase,

23  right?

24            MR. BURT:  Objection.  Personal knowledge.

25            MR. MARCUS MUMFORD:  I'll move on, Your Honor.  I
```

1    don't mean to spend any time on that.

2        Q.   BY MR. MARCUS MUMFORD:   Have you ever heard of a

3    company named First Data?

4        A.   I'm sorry?

5        Q.   First Data?

6        A.   I've heard of First Data.

7        Q.   Who are they?

8        A.   They are a large third-party processor.

9        Q.   Okay.   And third-party processor, I think in the

10   rules that referred to it as a TPP right?

11       A.   Correct.

12       Q.   And do they also act as an ISO?

13       A.   Probably.

14       Q.   Do they also act as an acquirer?

15       A.   No.

16       Q.   And what makes you say no?

17       A.   Because I have not seen them in the licensing

18   database as an acquirer.

19       Q.   Okay.   But that wasn't the question.   I wasn't

20   asking if they were signed up as an acquirer.   I was asking,

21   do they act as one?

22       A.   They do not act as an acquirer in the U.S.

23       Q.   And how do you know that?

24       A.   Because I know, for a fact, they wouldn't be

25   licensed to do so.

1    Q.    Okay.  But, again, have you reviewed their -- their

2  business, though?

3    A.    I haven't reviewed their business.

4    Q.    And when you -- when you say they haven't acted as

5  an acquirer in the U.S., outside of the U.S. do they act as

6  an acquirer?

7    A.    They may have.

8    Q.    Okay.  Is there a reason why you made that --

9    A.    The laws are different outside the U.S.

10   Q.    Well, you -- you say the laws are different, but --

11 but really there's -- there's no laws that -- that say who is

12 an acquirer and who is not; isn't that right?  It's just --

13   A.    No.  But they --

14   Q.    It's just a contract; isn't that right?

15   A.    It's a contract.

16   Q.    Yeah.  So there's -- there's a -- and there's -- in

17 a similar way, there's no -- there's no law that says what a

18 chargeback is and it's not; isn't that right?

19   A.    That is correct.

20   Q.    And in fact, even if -- even if a merchant

21 disputes -- is successful in disputing a chargeback, it still

22 counts against their threshold, isn't that right?

23   A.    That is correct.

24   Q.    And have you reviewed that part of it?  Is that

25 fair?

1     A.   Reviewed that part of what?

2     Q.   Of the chargeback program that you do?  In other

3 words, why is it -- have you asked -- has anyone at

4 MasterCard asked why it's fair to assess against the

5 threshold chargebacks that are invalid?

6          MR. BURT:  Objection.  Relevance.

7          THE COURT:  Sustained.

8     Q.   BY MR. MARCUS MUMFORD:  And in similar fashion,

9 there is no law that -- that -- that says who can and can't

10 be a merchant; isn't that right?

11     A.   I'm not aware of any law.

12     Q.   Is there any law who says who can and can't be an

13 ISO?

14     A.   I'm not aware of any law.

15     Q.   Is there any law that says who can be a sub-ISO?

16     A.   I'm not an expert in law, so --

17          MR. MARCUS MUMFORD:  Your Honor, may I just have a

18 moment here?

19          THE COURT:  Yes, you may.  Mr. Burt, while he's

20 taking a moment, I'm going to ask you to predict redirect.

21          MR. BURT:  Nothing at this time, Judge.

22     Q.   BY MR. MARCUS MUMFORD:  In all of your work on this

23 case, Mr. Paolucci, have you had any -- back in the 2008 time

24 period at all, did you have any direct contact with Mr. Scott

25 Leavitt at all?

1      A.    Sorry.   Who was that?

2      Q.    Did you have any contact with Mr. Scott Leavitt at

3  all?

4      A.    I don't recall that name.

5      Q.    Okay.  Can you even identify him in the -- in the --

6  in the courtroom if I asked you?

7      A.    I don't believe so.

8      Q.    How about Mr. Johnson or Mr. Riddle?  Before today,

9  had you had any contact?

10     A.    Jeremy, yes.

11     Q.    Okay.  When?  In what -- in what time period?

12     A.    In the news, just in the news.

13     Q.    Okay.  Just in the news.  Have you had any direct

14  contact?

15     A.    No, I have not.

16     Q.    And -- and -- and when were you contacted about

17  testifying here?

18     A.    I want to say November; October, November, I think

19  my legal team came to me.

20     Q.    Okay.  And prior to that, had you been -- been --

21  been contacted?

22     A.    I know there's a number of cases, so I'm not sure

23  when we were contacted about one or the other, so that's why

24  I'm getting confused.

25     Q.    Have you ever -- I guess the question is this.  Have

```
 1    you ever -- all this contact for you to come testify in the

 2    court, that's all from the government, right?  You're always

 3    presented as a -- as a prosecution witness; is that right?

 4        A.   That is correct.

 5        Q.   Does your -- does your company sort of rely on the

 6    government to conduct its -- its business?

 7             MR. BURT:  Objection.  Relevance.

 8             THE COURT:  Sustained.

 9             MR. MARCUS MUMFORD:  Thank you.

10             Thank you, Your Honor.

11             Thank you, Mr. Paolucci.

12             THE COURT:  Redirect, Mr. Burt?

13             MR. BURT:  None, Your Honor.

14             THE COURT:  All right.  This witness may step down.

15    We'll take a recess until 15 after, and then we'll be back.

16    All rise for the jury, please.

17             (Whereupon the jury leaves the courtroom.)

18

19

20

21

22

23

24

25             (Testimony of Mr. Paolucci concluded.)
```

1

2                      REPORTER'S CERTIFICATE

3   STATE OF UTAH              )

4                              ) ss.

5   COUNTY OF SALT LAKE        )

6

7          I, REBECCA JANKE, do hereby certify that I am a

8   Certified Court Reporter for the State of Utah;

9          That as such Reporter I attended the hearing of the

10  foregoing matter on February 10, 2016, and thereat reported

11  in Stenotype all of the testimony and proceedings had, and

12  caused said notes to be transcribed into typewriting, and the

13  foregoing pages numbered 31 through 176 constitute a full,

14  true and correct record of the proceedings transcribed.

15         That I am not of kin to any of the parties and have

16  no interest in the outcome of the matter;

17         And hereby set my hand and seal this 27th day of

18  February, 2016.

19

20

21

22

23

24         _____

25                      REBECCA JANKE, CSR, RPR, RMR