IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>RYAN RIDDLE,<br>Defendant. | **MEMORANDUM DECISION AND ORDER RE SENTENCING**<br>Case No. 2:11-501 CR DN PMW<br>District Judge David Nuffer |

This order contains some decisions made with regard to Mr. Riddle's sentencing set at 9:00 a.m. on Friday, July 29, 2016.


BACKGROUND FACTS ..... 1
OTHER BACKGROUND ..... 10
Convictions ..... 10
Offense Level in Presentence Report ..... 10
Criminal History ..... 10
Base Offense Level ..... 10
DECISIONS ON DISPUTED ISSUES ..... 10
Sixth Amendment Objection ..... 10
Sophisticated Means ..... 11
Manager or Supervisor ..... 13
CONCLUSION: ..... 15


## BACKGROUND FACTS[1]

iWorks was started by Jeremy Johnson in St. George Utah, and grew rapidly over the first decade of this millennium. Its business involved marketing (subject of a federal court action in

[1] These facts and others in this order are found by a preponderance of the evidence, from the trial record. This order also finds true the facts from the Presentence Investigation Report by the same standard. Declarations submitted by Mr. Riddle have been accepted as direct testimony of the declarants.

the District of Nevada[2]) and always involved processing credit card payments for products sold on the internet. A merchant like iWorks must have a "merchant account" to process credit card sales. A buyer who uses a credit card for payment may, if dissatisfied with the merchant's refund or return process, "chargeback" their sales transaction, reversing their payment to the selling merchant. If chargebacks exceed 100 per month or if 1% of sales result in chargebacks, fines begin to accrue. These fines are assessed against the merchant acquiring bank and passed on to the merchant, usually collected from security reserves the bank system holds back from merchant payments. In 2008 and 2009 the level of chargebacks (and associated fees charged to iWorks by the credit card processing system) became financially significant. The financial levies were unparalleled in the credit card industry. In the period July 2008 to August 2009 over three million dollars in fees was levied on iWorks merchant accounts.[3]

| TOTAL MERCHANT ACCOUNT FEES JULY 2008 – AUGUST 2009 | |
|---|---|
| Wells Fargo Merchant Account Fees | $1,368,703.43 |
| Harris Bank Merchant Account Fees | $1,390,002.44 |
| HSBC Merchant Account Fees | $201,891.13 |
| Israel Credit Card Merchant Account Fees | $38,832.70 |
| Synovus Bank Merchant Account Fees | $6,227.49 |
| **TOTAL** | **$3,005,657.19** |

These fines reduced iWorks income, but not in a significant way. Mr. Riddle testified that at its height in March of 2009, iWorks took in $34 million in one month.[4] and that iWorks' revenue in 2008 was $165 million to $168 million.[5] In late 2008, an iWorks merchant account

---

[2] Case No. 2:10-cv-2203-MMD-GWF (D. Nev.)

[3] Exhibit 927.

[4] Trial Tr. vol. XXVI, 5778:7-13, docket no. 1522, filed June 6, 2016.

[5] *Id*. at 5783:22 – 5784:8.

was placed on the Member Alert to Control High Risk (MATCH) list. [6] This list alerts banks participating in the credit card payment network (and their representatives) that a merchant has serious problems. Usually, it means a merchant cannot acquire a new credit card processing account. Placement on the MATCH list usually occurs after three months of fines, if a merchant fails to remediate chargebacks after repeated notices. As early as February 2009, iWorks was laying plans for establishing many merchant accounts.[7]

In April 2009, managing chargebacks on merchant accounts was a major priority. An April 14, 2009 email from Loyd Johnston to Jeremy Johnson, Ryan Riddle and others describes the efforts needed to manage accounts.[8] At that time the strategy was to terminate processing on accounts with chargeback trouble and move processing to other accounts. [9]

> Pivotal has raised some concerns over the last couple of weeks regarding the number of Life Style Fitness chargebacks. I have asked them "if we need to close the account down based on the number of chargebacks, will there be any repercussions"; they have stated quite pragmatically that if we both decide that it is in the best interests of the account to shut it down, there will be no problem to just "shut it down". We would then move the processing to one of the other accounts.
> Swipe is currently processing several programs that are in various stages of chargeback concerns. We have repeatedly asked about the concerns in being over the thresholds . . . .
>
> Swipe Discover Card for SelfHelpFF has been cancelled due to high chargebacks and the iWorks American Express account (the big one …644) will not add any additional programs to that existing account. They stated that there are already too many programs running through that account. We have an old iWorks Amex account that has been inactive for several months that we will use going forward on any programs that are set up at Swipe and/or RDK

---

[6] The MATCH list maintained by MasterCard is similar to and often referred to interchangeably with the Terminated Merchant File (TMF) maintained by Visa.

[7] Exhibit 693.

[8] Exhibit 700.

[9] The strategy of moving accounts was conceived sometime before late March 2009. In a March 25, 2009 email Johnson told Johnston "I always want accounts with different banks so if one gets shut down we have someplace else to put the volume imediatly [sic] without having to get new descriptors set up etc."

> Any new programs that are set up at Swipe are being processed through "JET Processing" in an effort to move away from the iWorks name.
>
> RDK, which we typically refer to as HSBC (the acquiring bank) has been processing for about 2 months now. They appeared to be a little more bullet proof than the others and were willing to take more risk.
>
> As of yesterday at 1:00 (MDT) we terminated the Natures Acai account because of high chargebacks and the potential for fines that can be mitigated for May by closing the account now. This will more than likely lead to a [MATCH listing]. The fine for March Processing from Master Card will be around $300,000.00 and if we continue to track chargebacks to the 11,000 mark (which is what PowerPay is predicting) the fine will be in excess of $650,000.00. for April.

By the end of May 2009, four separate banks had placed 16 iWorks merchant accounts on the MATCH list. Each of these accounts listed Jeremy Johnson as the principal.[10]

Credit card payments were iWorks' lifeblood. Inability to process credit card payments would be fatal to the business. On June 10, 2009, Ryan Riddle wrote an email[11] to Jeremy Johnson outlining "the proposed processing plan moving forward for Iworks.[sic]" The four page document provided specific direction to Loyd Johnston about monitoring processing to make sure "that nothing slips through the cracks" to "[give] us the best opportunity to process long term, make the most money, and keep risks to a minimum." Riddle reflected his familiarity with the need to keep chargebacks at a low level.

> The Grant account that has been at Pivitol ended up last month being .04 tenths of a percent :) I think that you will also understand our reasoning for not wanting to run anything too risky (knowing it will blow) after you've read the email, as it will really affect the upsell biling [sic] and complaints.

[10] Exhibit 929.

[11] Exhibit 722.

The first step in the new plan was a new set of merchant accounts, "set up in iWorks name with Jeremy as the guarantor and corp president. We want this account to be obvious to Visa so they can see what we are processing."[12]

But the core of the plan included a network of corporations, each with multiple merchant accounts, in names of nominees *other than* Jeremy Johnson, using corporations established in neighboring states:

> Each of these accounts will have their own corporation and each of these corporations will have two MID's to support that coprs [sic] program. The 5 corporations are being set up in names *other* than Jeremy's (We will be using these three people.. Scott Muir, Andy Johnson, and Lacy Holm – 2 corps for Andy, 2 corps for Scott, and 1 corp for Lacy) we have 2 of these corps in progress as CA companies and the others will be set up in Nevada. We will be setting up additional corporations to be available for additional accounts/programs as they come up for Iworks Core processing needs. These "additional" corps will be set up under any of the three names previously mentioned unless Jeremy provides any new names. (emphasis, capitalization, and spelling in original)[13]

Many accounts were needed to carefully thread the requirements of the credit card system. So long as chargebacks did not exceed 1% of sales, and 100 per month, no fees would be assessed. And so long as fees were not charged for more than three months, the account – and its principal – would not appear on the MATCH list. Accounts had to be watched carefully to avoid fees and certainly to avoid MATCH listing. Any account in danger would be left behind and a new account used.

---

[12] *Id*.

[13] *Id*. (emphasis, capitalization and spelling in original).

While Harris Bank had been the principal bank processing iWorks transactions prior to June 2009, Wells Fargo Bank became the processor of most iWorks credit card transactions thereafter. Harris Bank and Wells Fargo Bank are denominated "Merchant Acquiring Banks" in the credit card system because they hold the merchant account, enabling the merchant to process transactions. Banks may also serve as Card Issuing Banks, issuing cards to individuals who can then make purchases.




In contrast to card issuing banks which usually deal directly with the cardholder customer, Merchant Acquiring Banks use the services of Independent Sales Organizations (ISOs) who market processing accounts to merchants. iWorks began working with various ISOs in mid 2009. Commissions and fees are paid to ISO's. These amounts and the amount of reserves a bank will hold back from each transaction to cover potential losses are all subject of negotiation between the bank and ISO, and the ISO and merchant.

Just 8 days after his June 10th email, Riddle stepped up and signed merchant account application for Diamond J Media.[14] Diamond J was previously incorporated in Nevada. Jeremy Johnson was listed as guarantor on the face page of the merchant account application.

[14] Exhibit 50.

5189870300038260

CFS1108

CardFlex

2900 Bristol Street, Suite F-206
Costa Mesa, CA 92626

**Merchant Application and Agreement**

| OFFICE: | |
|---|---|
| REP: | MATCH / MERCHANTING |
| MID: | SIC: 5999 |

Sponsor Bank: Wells Fargo Bank, N.A., Walnut Creek, CA

| | |
|---|---|
| Legal Name: Diamond J Media, Inc. | Phone #: 702. 280. 3494 |
| DBA (Doing Business As): | Statement Mailing Address: 1285 Baring Blvd., Ste. 506 |
| Location/Site Address: 1285 Baring Blvd., Ste. 506 | City: Sparks State: NV Zip: 89434 |
| City: Sparks State: NV Zip: 89434 | Federal Tax ID Number: 26-4129699 # of Employees: 200 |
| Contact Person: Loyd Johnston Number of Locations: 1 | Email: loyd@iworks.com |
| 1) Name (print): Ryan Riddle | Title: Owner Equity/Ownership: 100 % |
| Date of Birth: [redacted] Drivers License #: [redacted] State: UT | Social Security: [redacted] Home Phone: [redacted] |
| Home Address: [redacted] | City: Washington State: UT Zip: 84780 |
| 2) Name (print): Jeremy Johnson | Title: Equity/Ownership: % |
| Date of Birth: [redacted] Drivers License #: [redacted] State: UT | Social Security #: [redacted] Home Phone: [redacted] |
| Home Address: [redacted] | City: St George State: UT Zip: 84790 |

Johnson also signed as guarantor on the application form.

The undersigned guarantees to CardFlex Financial Services, LLC and Bank the performance of this Agreement and Final Data Lease, if applicable, and any addendum thereto by Client, and in the event of default, hereby waives Notice of Default and agrees to indemnify the other parties, including payment of all sums due and owing and costs associated with enforcement of the terms thereof. CardFlex Financial Services, LLC and Bank shall not be required to first proceed against Client or enforce any other remedy before proceeding against the undersigned individual. This is a continuing guarantee and shall not be discharged or affected by the death of the undersigned and shall bind the heirs, administrators, representatives and assigns and be enforced by or for the benefit of any successor of CardFlex Financial Services, LLC and Bank. The term of this guarantee shall be for the duration of the Merchant Processing Application and Agreement and any addendum thereto and shall guarantee all obligations which may arise or occur in connection with my activities during the term thereof though enforcement shall be sought subsequent to any termination.

Guarantor X [signature] Date: 6/18/09 | Co-Guarantor X Date: __/__/____

Including Johnson on the application form turned out to be a mistake. In June 2009, a 160 page MATCH report showed Johnson, iWorks and various business names associated with iWorks as a flag on the Diamond J account.[15] Because the email address and name of Loyd Johnston as the contact person were not indexed in the credit card system, those fields did not raise MATCH alerts. June 2009 was the last month Diamond J processed sales transactions.[16]

Johnson concurred with Riddle's June 10th description of the new plan. In an email reply on June 24, 2009, Johnson stated:

[15] *Id*.

[16] Exhibit 272 and United States' Reply to Defendant Jeremy Johnson's Preliminary Sentencing Memorandum ("Reply") at Exhibit C, docket no. 1492, filed May 20, 2016.

> I am ok with this but I still want back up merchant accounts (even if we just use them a tiny bit to keep them open) and I want many different corps so all processing is broken out in many places and I want the ability to put shit processing in one of those corps not tied to us at all knowing full well it will blow up in a few months. But I am 100% with you on your plan but I want this stuff too even if we never use it.[17]

In early July 2009, Jeremy Johnson met with Andy Phillips, President and CEO of Cardflex, the ISO which opened the Diamond J Account. Mr. Johnson reported "I met with the owner of cardflex and he said they will open any account in any name or corp we want and I just sign this gurantee letter and send it with the app and they wont need allot of financial info from the corps owners."[18] The letter enclosed a separate guaranty form that did not require Johnson's name or signature to appear on the application form. This prevented "indexing" his name in the credit card system database as associated with the entities, but provided financial assurance to Cardflex.

In the view of Johnson and Riddle – and others in iWorks – this plan enabled facial compliance with the statement on each merchant account "Confirmation Page" which required the merchant to "[m]aintain fraud and chargebacks below Association thresholds" and to "[c]omply with Association rules."[19]

For iWorks and Cardflex, the motivation was money. iWorks maintained its flow of online sales, impossible without credit card processing. And Cardflex received significant commission from each transaction iWorks processed. The plan avoided fees against the merchant accounts, so long as processing and chargebacks were carefully monitored, and there was an endless supply of new merchant accounts.

---

[17] Exhibit 726.

[18] Exhibit 732 (capitalization, punctuation, spelling in original).

[19] Exhibit 680 at 35.

Shortly, the new accounts became troubled as well. Eventually, the new nominees were placed on the MATCH list.[20] But new nominees were found, new corporations were formed, and eventually 281 merchant account applications were completed with Cardflex assistance.[21]

After Johnson met with Visa in September 2009, Loyd Johnston circulated an email to Riddle and others reiterating the importance of staying under the radar. "We absolutely cannot have any merchant accounts go over 1%."[22] And the program worked. Exhibits show that only $5,908.75 was assessed in fees[23] meaning that in months an account was processing sales, chargebacks on that account did not exceed 1% or 100 per month and no account was in trouble through three months of monitoring. However, because closed accounts continued to receive chargebacks, the accounts in incurred 29,842 chargebacks on 745,860 sales for a chargeback rate of 4.00%, far above the acceptable 1%.

Many of these were established in the period after Mr. Riddle left iWorks. But the merchant accounts charged in Counts 2 – 7 were all opened in July or August 2009.

| **Count** | **Entity** | **DBA** | **Nominal Owner** | **Application Date** | **Application Exhibit No.** |
|---|---|---|---|---|---|
| 2 | GGL Rewards | Placing Ads Now | S.M. | 07/09/2009 | 103 |
| 3 | GGL Rewards | ClickMoneyShop.com | S.M. | 07/09/2009 | 102 |
| 5 | GGL Rewards | Advertising 4 Money | S.M. | 07/09/2009 | 101 |
| 4 | GGL Rewards | Ads 4 Profits | S.M. | 07/09/2009 | 100 |
| 6 | Business Loan Success | Alternative Funding | S.M. | 07/15/2009 | 44 |
| 7 | Business Loan Success | My Alternative Funds | S.M. | 08/18/2009 | 45 |

[20] Exhibit 930.

[21] Exhibit 928.

[22] Exhibit 777.

[23] Exhibits 605-607. Those exhibits are for MasterCard accounts. Exhibits 608-628 show no fees assessed on Visa accounts. The chargebacks are summarized in Reply, Exhibit C and discussed in Reply at 27-34.

## OTHER BACKGROUND

### Convictions

On March 25, 2016, a jury found Mr. Riddle guilty of Counts 2 through 7 of the Indictment. These counts are violations of 18 U.S.C. § 1014, making false statements to a bank. Violations of this statute may result in a maximum penalty of up to 30 years imprisonment and a $1,000,000.00 fine.

### Offense Level in Presentence Report

The Presentence Report (with which the Mr. Riddle and the prosecution disagree) concludes the following factors arrive at an offense level of 24 for Mr. Riddle:

| **PSR Sentencing Guidelines Calculation** | |
|---|---|
| Base Offense Level under § 2B1.1 | 7 |
| Specific Offense Characteristics under § 2B1.1(b)(1)(G) (More than $250,000 in loss) | +12 |
| Sophisticated Means under § 2B1.1(b)(10)(C) | +2 |
| Manager or Supervisor under 3B1.1(b) | +3 |
| **Total Offense Level** | 24 |

### Criminal History

The parties agree Mr. Riddle's Criminal History Category is I because he has no prior convictions.

### Base Offense Level

The parties do not dispute the base offense level of 7 set in §2B1.1(a).

## DECISIONS ON DISPUTED ISSUES

### Sixth Amendment Objection

Mr. Riddle argues

> that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It may not be found by a judge. Thus

> those allegations against Mr. Riddle of which the jury found him not guilty are not material to his sentence, and such facts should not be considered.[24]

He cites cases holding that evidence that would increase a mandatory minimum sentence must be submitted to the jury. However, he cites no cases holding that a fact supporting an enhancement under the Guidelines must be submitted to a jury, and at trial he made no request that the jury consider any such facts. This order finds facts in order to arrive at a proper guideline application.

**Sophisticated Means**

Under §2B1.1(b)(10)(C) if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12." Application Note 9(B) provides a definition.

> (B) Sophisticated Means Enhancement under Subsection (b)(10)(C).—For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

While Mr. Riddle claims "[t]here was little about the offense which fits this definition,"[25] the facts developed at trial indicate otherwise. Something as simple as multi-state location may constitute "sophisticated means." As an example, Exhibit 103, the account application subject of Count 2, shows a Nevada corporation with a business address in Las Vegas, Nevada; the nominee owner's address in Alpine, Utah; and a bank account in St. George, Utah. Evidence was

---

[24] Defendant Riddle's Sentencing Memorandum at 22, docket no. 1480, filed May 10, 2016.

[25] *Id*. at 23.

clear that the use of the corporate form, nominee owner, maildrop addresses, and single purpose bank accounts was all designed to allow to process iWorks credit card transactions without detection by the card system. Detailed planning documents such as Exhibits 693, 722, 752, 777, 783, 785, 786, 791, 794, and 796 establish that merchant account establishment was a well-planned and highly coordinated activity in which Riddle was deeply involved.

Establishment of each merchant account required a nominee owner, a corporate entity, an out-of-state address using a maildrop service, an agreement to forward mail from the fictitious addresses to iWorks' address in St. George, out-of-state telephone service with a prefix number corresponding to the state of incorporation, designation of employee population on the applications, a depository bank account in the nominee's name with Scott Leavitt's signatory authority to enable fund transfer, transfer of funds from the nominee depository accounts directly to iWorks and Johnson bank accounts, a tax identification number, and tax returns in the name of the nominee owners and corporations. In many instances fictitious documents indicated the purchase and sale of corporations from one nominee owner to another, when neither owner ever exchanged property, paid or received money in the transaction. The merchant account applications, bank account documents, tax returns, bank records, and merchant account records related to Counts 2 – 7 show these features.

These facts clearly fit the application note statement that sophisticated means includes "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ."

These actions were intentional on Riddle's part based on facts stated in the next section. This enhancement provides a two level increase.

**Manager or Supervisor**

The Guidelines provide an enhancement of three levels in the offense level for "a manager or supervisor" if "the criminal activity involved five or more participants or was otherwise extensive."[26] Defendant contends that he is entitled to a 2 point reduction under § 3B1.2(b) as a minor participant.

Mr. Riddle was the general manager at iWorks after working a year and a half as customer service manager.[27] Loyd Johnston, who created many of the exhibits cited in the previous section was trained in merchant account processing by Mr. Riddle. The merchant account department was under Mr. Riddle's supervision. Only Jeremy Johnson had higher authority. When Tracy Kramm was unhappy about how merchant accounts were set up for iWorks and complained to Loyd Johnston, corporate counsel Phillip Gubler, and others, Riddle fired her.[28]

Mr. Riddle's leadership role and control are shown in various emails he wrote, including Exhibit 711, an email outlining the profile of nominee owners and the need to "discuss a list of individuals that meet the criteria so that we can get this wrapped out quickly." Exhibit 722, a multi-page email he sent outlines "proposed processing plan moving forward for Iworks." He stated the email "allows us to make sure everyone is on the same page, and follow up with each item daily to ensure that nothing slips through the cracks, and that we get this done ASAP." In Exhibit 727, he reports his tight supervision of Loyd Johnston who was then managing merchant accounts.

> I absolutely am making Loyd set up the back up plan for redundancy for sure. I actually had to ride his ass for not getting with BraiIow and Paygea like I asked

[26] U.S.S.G. § 3B1.1(b).

[27] Trial Tr. vol. XXV, 5651:3, 5652:2, docket no. 1506, filed June 2, 2016.

[28] Trial Tr. February 16, 2016, 1328:3 – 1329:3, 1334:12-14, docket no. 1534, filed June 15, 2016.

> him to the day you called and he was in my office. I got off the phone with you and reiterated to Loyd that he get with BraiIow and Paygea on a conference call and understand every detail about they process for him then send me and you an email the very next day on the specifics so we could tell him to bust ass and get it done. It wasn't until I was driving home the next evening that I realized I never saw an email from him I called him and said "Where was the email?" He said "I never got a hold of either of them so I didn't have anything to send." I told him that was unacceptable, that he should have gotten me on to get Jason on the phone ... worst case scenario he at least send the email I promised you he would send saying he hadn't accomplished it yet. This is the third thing in a week Loyd has let me down on and I am going to give him a verbal warning. I am sick of people letting me down then it makes me let you down. Here I have tons more on my plate and I remember to call him about his email on my way home at 7 PM???"

As late as October 2009, he was still requiring reports from subordinates on the establishment of merchant accounts.[29]

His management role is clear.

The criminal activity, even in these seven counts alone, was extensive, by the number of accounts and the number of persons required to carry it out. His emails advise a large group of interdependent workers about interdependent plans. They also reflect that the involvement of others was necessary to carry out the plans. This enhancement provides a three level increase.

[29] Exhibit 807.

**CONCLUSION:**

The important decision about application of the specific offense characteristic for loss under § 2B1.1(b)(1)(G) remains. However, the following components of his offense level are decided.

| | |
|---|---|
| Base Offense Level under § 2B1.1 | 7 |
| Sophisticated Means under § 2B1.1(b)(10)(C) | +2 |
| Manager or Supervisor under 3B1.1(b) | +3 |

Dated July 28, 2016.

BY THE COURT:

David Nuffer
United States District Judge