IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>JEREMY JOHNSON and RYAN RIDDLE,<br><br>　　　　　　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER RE APPLICATION OF LOSS ENHANCEMENT GUIDELINE §2B1.1(b)(1)**<br><br>Case No. 2:11-501 CR DN PMW<br><br>District Judge David Nuffer |

This order invites further argument with regard to the application of the guideline enhancement for loss under United States Sentencing Guideline §2B1.1(b)(1). This order determining many facts and principles. The ultimate sentence is not a mechanical application of guidelines but a determination of the appropriate sentence under 18 U.S.C. 3553(a).

Loss Enhancement under Sentencing Guideline §2B1.1 ................................................................2
Application of the Loss Enhancement............................................................................................3
　　　The Loss Enhancement was not Waived ..........................................................................3
　　　Relevant Conduct is Appropriately Considered................................................................4
　　　　　　Section 1B1.3(a)(1)(A)..........................................................................................5
　　　　　　Section 1B1.3(a)(2) ................................................................................................5
　　　　　　Section 1B1.3(a)(3) ................................................................................................6
　　　　　　No Violation of Fifth and Sixth Amendment Rights..............................................6
　　　No Heightened Standard of Proof Applies .......................................................................6
　　　Loss Calculation................................................................................................................7
　　　　　　Chargebacks from 281 Wells Fargo Accounts .......................................................7
　　　　　　Chargebacks from HSBC Accounts .......................................................................8
　　　　　　Diamond J Media Chargebacks ..............................................................................8
　　　　　　Chargebacks for Xcel Processing and Funding Search Success.............................9
　　　　　　The Chargeback Expense Was Reasonably Foreseeable .....................................10
　　　　　　Cost of Chargebacks.............................................................................................10
　　　　　　Cardholder Loss....................................................................................................12
　　　　　　Cardflex Loss .......................................................................................................12
　　　Gain as Alternate Measure...............................................................................................13
An Alternative Measure of Gain...................................................................................................15
Summary of Possible Application of 2B1.1(b)............................................................................15

**Loss Enhancement under Sentencing Guideline §2B1.1**

Sentencing Guideline §2B1.1 sets the Offense Level for a broad range of crimes, all falling under the title "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." The offense level and the defendant's criminal history are the two most important parameters in determining a range for sentencing under the guidelines. The guidelines' Sentencing Table (1.A.4(h)) attached to this order as Exhibit A illustrates the combined effect of the offense level and the defendant's criminal history.

Under the 24 page Sentencing Guideline §2B1.1 no single factor is more important in setting the offense level – and more debated[1] – than §2B1.1(b)(1). The loss enhancement provision is very short, but very powerful because it may add as many as 30 levels to the offense level.

(1) If the loss exceeded $6,500, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| (A) $6,500 or less | no increase |
| (B) More than $6,500 | add 2 |
| (C) More than $15,000 | add 4 |
| (D) More than $40,000 | add 6 |
| (E) More than $95,000 | add 8 |
| (F) More than $150,000 | add 10 |
| (G) More than $250,000 | add 12 |
| (H) More than $550,000 | add 14 |
| (I) More than $1,500,000 | add 16 |
| (J) More than $3,500,000 | add 18 |
| (K) More than $9,500,000 | add 20 |
| (L) More than $25,000,000 | add 22 |
| (M) More than $65,000,000 | add 24 |

---

[1] Position of Defendant Jeremy Johnson with Respect to Sentencing Factors ("Johnson Position") at 9-10, docket no. 1597, filed July 22, 2016.

2

      (N) More than $150,000,000       add 26
      (O) More than $250,000,000       add 28
      (P) More than $550,000,000       add 30

Because the base offense level under this guideline starts at 6 or 7, an increase of 30 may render a total offense level over 36, without any other enhancements, and may recommend a near life sentence.

A four page application note guides the use of the loss enhancement. In summary,

- The court need only make a reasonable estimate of the loss;
- Loss must be pecuniary and does not include emotional distress, harm to reputation, or other non-economic harm;
- Loss may be actual or intended;
- Actual loss must have been reasonably foreseeable, and result from the offense;
- The defendant must have "purposely sought to inflict" a loss for it to be intended;
- Intended loss includes "intended pecuniary harm that would have been impossible or unlikely to occur;"
- Loss shall be net of the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected;
- Loss shall be net of the value of collateral; and
- If there is a loss but it reasonably cannot be determined, "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only."[2]

**Application of the Loss Enhancement**[3]

The application of §2B1.1(b)(1) depends heavily on facts in the presentence report (which have been adopted as true by a preponderance of the evidence) and as found (by that same standard) in other orders entered regarding sentencing.

    **The Loss Enhancement was not Waived**

Defendant Johnson claims the loss enhancement was waived by prosecution statements and arguments. One statement was made orally, in hearing before a judge who did not try the case, well before trial. The statement by the Assistant U.S. Attorney began "I haven't thought

---

[2] U.S.S.G. § 2B1.1 Application Note 3(B).

[3] These facts in this order are found by a preponderance of the evidence, from the trial record. Facts from the Presentence Investigation Report are also found by the same standard.

3

about it . . . ." and the discussion ended with the instruction from the magistrate judge to "work out a stipulation . . . ."[4] That stipulation was never worked out. The other statement was made about the fees and fines assessed on accounts used *before the accounts* in this case were active[5] and is not pertinent to the period of the charges here. There was no waiver of the loss enhancement.

### Relevant Conduct is Appropriately Considered

Relevant conduct, which is defined very broadly, must be considered in application of the Guidelines.[6] This requirement has significant consequences in analyzing loss. If the iWorks plan is seen as encompassing all the accounts established in the time period, used for merchant processing in lieu of the old terminated iWorks accounts, the amounts are much larger than if the monetary amounts are limited to the accounts for which convictions were entered.

The "base offense level," and "specific offense characteristic" "shall be determined on the basis of the following:"

> (1)    (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendants; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
> (i) within the scope of the jointly undertaken criminal activity,
> (ii) in furtherance of that criminal activity, and
> (iii) reasonably foreseeable in connection with that criminal activity;
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

---

[4] June 30 2015 Status Conference Tr. 23:14-21 and 24:16-18, attached at exhibit C to Johnson Position, docket no. 1597-4.

[5] United States' Response to Motion to Dismiss (or for Mistrial) for Prosecutorial Misconduct During Closing Argument at 14-15, docket no. 1383, filed March 23, 2016.

[6] U.S.S.G. § 1B1.3(a).

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions;

### *Section 1B1.3(a)(1)(A)*

All merchant accounts used by iWorks until it was shut down by the FTC are within the "acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendants."[7] The plan to use multiple merchant accounts until they got in trouble, and then abandon them, was developed by Jeremy Johnson in early 2009; set out in Loyd Johnston's email of February 25, 2009;[8] clarified in detail by Riddle in his email of June 10;[9] and evidenced by the continual flow of accounts and movement of processing from one account to another.

### *Section 1B1.3(a)(2)*

These offenses would be grouped under § 3D1.2(d) had the defendants been convicted of multiple offenses and they were "part of the same course of conduct or common scheme or plan." That section provides for grouping:

> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

This is a clear reference back to 2B1.1 which relies heavily on loss.

---

[7] *Id*. at § 1B1.3(a)(1)(A).

[8] Exhibit 693.

[9] Exhibit 722.

### *Section 1B1.3(a)(3)*

Finally, the other merchant accounts gave rise to harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2), and that harm that was the "object of those acts and omissions."[10]

### *No Violation of Fifth and Sixth Amendment Rights*

Defendants claim that considering acquitted conduct violates their Fifth and Sixth Amendment rights. The guidelines provide expressly for consideration of acquitted conduct. Consideration of this conduct has been long regarded as proper under binding precedent.[11] Congress agrees. 18 USC §3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Defendants cite no authority that overrides *Watts*. *Watts* took into account the long history of consideration of acquitted conduct and many other facts at sentencing.

### **No Heightened Standard of Proof Applies**

Johnson urges that "principles of due process require proof by a clear and convincing standard 'when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction."[12] This rule applies "[p]articularly where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct . . . ."[13] This is Ninth Circuit law. While the Tenth Circuit has "left open the possibility that extraordinary

---

[10] U.S.S.G. § 1B1.3(a)(3).

[11] *United States v. Watts*, 519 U.S. 148 (1997) (per curiam); *United States v. Witte*, 515 U.S. 389 (1995); *United States v. Hendrickson*, 592 Fed. Appx. 699, 705 (10th Cir. 2014); *United States v. Alisuretove,* 788 F.3d 1247, 1254 (10th Cir. 2015) (quoting *United States v. Griffith,* 584 F.3d 1004, 1011 (10th Cir. 2009); *United States v. Williams,* 292 F.3d 681, 685 (10th Cir. 2002) (quoting *United States v. McClelland,* 141 F.3d 967, 973 (10th Cir. 1998)).

[12] Johnson Position at 30 n. 25. *United States v. Hymas,* 780 F.3d 1285, 1289 (9th Cir. 2015).

[13] *Hymas*, 780 F.3d at 1289.

circumstances might justify the use of a more demanding standard at sentencing than a preponderance of the evidence" it has "never applied such an enhanced standard of proof."[14] It will not be adopted in considering the loss enhancement.

**Loss Calculation**

*Chargebacks from 281 Wells Fargo Accounts*

Based on these facts, the most concrete measure of loss would appear to be the cost to the banks of chargebacks which never arose to the level of imposing fines or fees. As stated in the other orders entered regarding sentencing, fines or fees are not imposed if chargebacks do not exceed 100 per month or 1% of total sales numbers. Exhibits show that only $5,908.75 was assessed in fees[15] and none of the 281 accounts had three months of monitoring. However, the active accounts in this series which processed millions of dollars in sales incurred 29,842 chargebacks on a total number of 745,860 sales for a chargeback rate of 4.00%, far above the acceptable 1%.

These accounts were all instituted according to the plan devised in early 2009. They were not just foreseeable, but clearly intended. Rather than pay deserved fines for chargebacks, iWorks planned to force the cost on the banks by staying under fine thresholds. While Mr. Riddle resigned from iWorks on November 28, 2009, before all of these chargebacks occurred, he was present when many of the chargebacks were incurred.

---

[14] *United States v. Redifer*, 631 Fed. Appx. 548, 563 (10th Cir. 2015).

[15] Exhibits 605-607. Those exhibits are for MasterCard accounts. Exhibits 608-628 show no fees assessed on Visa accounts. These assessments were all in 2010.

The chargebacks on these 281 Wells Fargo accounts can be divided in time between the period before November 2009 and the period from November 2009 to iWorks' end.

|  | Transactions | Chargebacks |
|---|---|---|
| WFNB Pre November 2009 | 249,521 | 7,391 |
| WFNB November 2009 - end | 496,339 | 22,451 |
|  | 745,860 | 29,842 |

*Chargebacks from HSBC Accounts*

Though the 281 Wells Fargo accounts were more numerous, iWorks was also operating some higher volume accounts at another bank, HSBC. These accounts, in the name of Diamond J Media, Xcel Processing and Funding Search Success, processed more transactions and yielded more chargebacks.

|  | Transactions | Chargebacks |
|---|---|---|
| **Wells Fargo Accounts** | | |
| 281 Accounts | **745,860** | **29,842** |
| **HSBC Accounts** | | |
| Diamond J Media | 595,622 | 14,699 |
| Xcel Processing | 302,534 | 14,594 |
| Funding Search Success | 297,406 | 7,856 |
| TOTAL HSBC | **1,195,562** | **37,149** |

*Diamond J Media Chargebacks*

Ryan Riddle's entity Diamond J Media, incurred 14,669 chargebacks in its six month processing life that ended in August 2009.[16] While its accounts were at a different bank, and had a disclosed relationship with Jeremy Johnson, it was part of the planned "alias processing" scheme. These transactions all occurred before Riddle left iWorks in November 2009.

---

[16] Exhibit 272 and United States' Reply to Defendant Jeremy Johnson's Preliminary Sentencing Memorandum ("Reply") at Exhibit C, docket no. 1492, filed May 20, 2016.

| Ex. | Corporation | DBA | Month | Chargebacks | Sales | Bank | ISO |
|---|---|---|---|---|---|---|---|
| 292 | Diamond J Media | Merchant #: 342888 | Feb-09 | 110 | 90,205 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 357811 | Mar-09 | 2 | 11,826 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 342888 | Mar-09 | 2,687 | 101,452 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | Mar-09 | 45 | 28,140 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 342888 | Apr-09 | 4,044 | 79,473 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | Apr-09 | 192 | 14,042 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 357811 | Apr-09 | 104 | 16,699 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | May-09 | 214 | 20,236 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 357811 | May-09 | 483 | 118,623 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 342888 | Jun-09 | 4,550 | - | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 357811 | Jun-09 | 1,769 | 114,926 | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | Jun-09 | 244 | - | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | Jul-09 | 204 | - | Harris Bank | Pivotal |
| 292 | Diamond J Media | Merchant #: 349461 | Aug-09 | 51 | - | Harris Bank | Pivotal |
| | | | | 14,699 | 595,622 | | |

*Chargebacks for Xcel Processing and Funding Search Success*

Two other entities also processed iWorks' sales at HSBC in this time period. Funding Search Success was one of the entities that had accounts at Wells Fargo in the list of 281. Its accounts at HSBC operated from November 2009 through June 2010. Xcel Processing had no Wells Fargo account, but operated at HSBC from July 2009 to March 2010. 22,480 chargebacks were made through these entities' 69 accounts.[17] The chargebacks on these accounts can also be divided between the period before November 2009 and the period from November 2009 forward.

| Xcel Processing and Funding Search Success | | |
|---|---|---|
| | Transactions | Chargebacks |
| **Pre November 2009** | | |
| Xcel Processing | 291,932 | 10,089 |
| | | |
| **November 2009 to end** | | |
| Xcel Processing | 10,602 | 4,505 |
| Funding Search Success | 297,406 | 7,856 |
| Subtotal | 308,008 | 12,361 |
| | | |
| Total Xcel Processing and Funding Search Success | | |
| | **599,940** | **22,450** |

---

[17] Reply at Exhibit C.

9

### *The Chargeback Expense Was Reasonably Foreseeable*

With their experience in credit card processing, and after having suffered millions of dollars in fines and fees, Johnson and Riddle knew very well the consequence of violating card association standards. They knew fines were expensive. And they knew from their own extensive operation in handling customer complaints that avoiding chargebacks by operating a call center and making refunds was expensive. They understood from bank notices why the banks wanted to avoid chargebacks and the administrative burden that chargebacks placed on banks. Martin Elliott and Robin Leidenthal of Visa discussed with Johnson on September 24, 2009 the harm chargebacks were causing the payment system and told iWorks to get chargebacks below Visa thresholds and "provide a chargeback reduction plan with specific milestones and timeframes by October 9, 2009."[18]

But iWorks' scheme was to place the burden of chargebacks entirely on the banks by keeping under the monitoring and fine thresholds. By continually moving processing to new accounts, iWorks avoided responsibility for the burden of its high chargebacks.

### *Cost of Chargebacks*

The weakest point of chargebacks as a measure of loss is that this loss is a measure of costs *never assessed*. By design, the scheme prevented assessment of the most of the fees. But the expense to the banks was real.

The testimony at trial was clear that chargebacks, whether resulting in a fee or not, result in expense to the banks. In discussion of the fees and fines assessed early in iWorks' history, testimony Mr. Martin Elliot of Visa and Paul Paolucci from MasterCard established the reason for and magnitude of expense caused by chargebacks.

---

[18] Exhibit 629.

Q. Mr. Elliott, from the payment networks' perspective, from your perspective at Visa, are chargebacks a desirable thing?
….
A. Chargebacks are a large negative in the payment system. They cause a substantial drag on the payment system. . . . A chargeback essentially is a broken transaction. It's a situation where the merchant and the cardholder were not able to resolve their differences and their requests, and most merchants just simply have very few, if ever have chargebacks in the system.
. . . If it gets to the point where a chargeback has to occur, then there's a significant amount of cost that it imposes on the payment system. Probably the best example of that cost is, if you look at the back of your card when you want to call customer service, you have to call a call center. Those call centers are very expensive. All banks have them. They are staffed with hundreds of people, and they have processes and huge infrastructures to deal with their essentially broken transactions.[19]

Q. What's the purpose, Mr. Paolucci, of assessing the acquiring bank a fee?
A. There's a couple of reasons why. The first one is the negative impact that the chargebacks have impacted MasterCard and the cardholders. Financially it impacts the issuing banks because the issuer has to reissue those cards, and there's a cost associated with that, and it's anywhere – to manage a chargeback, issuers have advised us that it's anywhere between $25 and $35. That's their operating expense as well as reissuing the cards.
Q. And so do those assessments flow through MasterCard to the issuing banks?
A. They do.[20]

---

[19] Trial Tr., vol. I, 38:7 – 39:11, docket no. 1189, filed February 16, 2016.

[20] Trial Tr., vol. II, 46:4-16, docket no. 1261, filed March 1, 2016.

A reasonable estimate of the loss caused by chargebacks is shown in this chart applying an expense of $25 per chargeback:

| Loss from Chargebacks at $25 | Transactions | Chargebacks | Loss @ $25/cb |
|---|---|---|---|
| **Pre November 2009** | | | |
| WFNB | 249,521 | 7,391 | $184,775 |
| Xcel Processing | 291,932 | 10,089 | $252,225 |
| Diamond J Media | 595,622 | 14,699 | $367,475 |
| | | 32,179 | **$804,475** |
| **November 2009 and subs.** | | | |
| WFNB | 496,339 | 22,451 | $561,275 |
| Xcel Processing | 10,602 | 4,505 | $112,625 |
| Funding Search Success | 297,406 | 7,856 | $196,400 |
| | | 34,812 | $870,300 |
| Less fees assessed | | | -$5,909 |
| | | 66,991 | **$864,391** |
| **TOTAL LOSS FROM CHARGEBACKS** | | | **$1,668,866** |

As to Mr. Riddle, a reasonable estimate of the loss caused by 32,179 chargebacks through October 2009 would be $804,475.

As to Mr. Johnson, a reasonable estimate of the loss caused by the 66,691 chargebacks on all the accounts, through the time of operation of the plan would be $1,668,886.

*Cardholder Loss*

The prosecution has taken the position "that actual loss to consumers occurred that is not calculable."[21]

*Cardflex Loss*

Earlier, the prosecution claimed Cardflex should be regarded as a victim with losses.[22] That argument is no longer made.[23] Johnson raised the possibility that reserves were applied to mitigate Cardflex losses.[24]

---

[21] Reply at 34.

12

**Gain as Alternate Measure**

Under Application Note 3(B), "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." Loss can be determined by the expense of chargebacks suffered by the banks and not recovered (beyond $5,908.75) because the plan was so successful at avoiding chargebacks. Loss to consumers cannot be estimated. If the amount of loss were unavailable, the fact of loss to the banks is still established and the amount of gain could be used as an alternate measure.

The use of gain as a measure makes sense. The scheme allowed use of merchant accounts and continued credit card processing after iWorks and Johnson had been effectively blacklisted from the credit card processing system. Without the plan, iWorks income stream would have dried up. The revenue stream produced in these accounts is a direct result of a plan to use nominees who had no real interest in the credit card processing, as a front for iWorks.

The net gain to Johnson (after returns) from the 281 merchant accounts is $9,307,912.70.[25] The gross sales amounts for HSBC Bank accounts for Diamond J, Funding Success, and Xcel Processing was $18,670,979.28.[26] But that figure also needs to be reduced by returns. Applying the return rate from the 281 merchant accounts of 26%[27] or $4,872,297.99 leaves a net gain of $13,798,681.29 from the HSBC accounts. Thus the total net gain figure to Johnson is $23,106,593.99.

---

[22] *Id.* at 34-39

[23] United States' Sentencing Memorandum Regarding Jeremy Johnson ("Government Sentencing Memorandum 2") at 4-12, docket no. 1594, filed July 22, 2016.

[24] Johnson Position at 20; Johnson Position Exhibit G.

[25] Exhibit 934.

[26] Sentencing Memorandum Discussing Relevant Guideline Applications Exhibit 2, docket no. 1461, filed April 22, 2016.

[27] Exhibit 934.

This is income Jeremy Johnson received only by the scheme of establishing merchant accounts in nominee names and shifting processing when chargebacks reached penalty thresholds and monitoring. "It is the position of the United States that this [$23,106,593.99] is the correct specific offense characteristics figure that should be used under USSG § 2B1.1(b)(1), which would add 20 levels under subsection (b)(1)(K)."[28] The prosecution argues this figure should apply to Riddle[29] as well as Johnson.[30]

Johnson's argument that iWorks expenses should reduce this amount is without merit. In *United States v. Byors* the Second Circuit rejected the defendant's argument that money he spent for "legitimate business expenditures" should be offset against loss his scheme caused.[31] "The plain language of Application Note 3(E) readily disposes of defendant's argument. The Guidelines do not require a loss to be offset by any legitimate expenditures . . . but rather by 'value' that has been conferred on victims in the form of money or property returned or services rendered."[32]

*United States v. Dickler*[33] is not helpful to Johnson. *Dickler* involved a scheme where an auto repossession company would prepare false bids to allow it secretly to purchase vehicles from banks. To determine the bank's loss the trial court compared the eventual retail sale price of the vehicles to the artificially low bid price. But the repossession company would often repair vehicles before selling them at retail, so the trial court deducted some expenses incurred in managing and repairing repossessed cars before resale, because "expenses incurred by the

---

[28] Government Sentencing Memorandum 2 at 8.

[29] *Id*. at 2-3

[30] *Id*. at 8.

[31] *United States v. Byors*, 586 F.3d 222, 226 (2nd Cir.2009).

[32] *Id*.

[33] 64 F.3d 818 (3rd Cir. 1995).

defendants between the time they purchased the cars and resold them contributed to their resale value."[34] The appellate court held that the court was correct in this allowance, but had failed to include other allowable expenditures that contributed to resale value. The Third Circuit recognized this was a departure from its usual rule which "declined[s] to deduct the defendant's expenses from the amount of his gain."[35] The expenditures made to improve the cars were attributable to the repossession company, and were not part of the value of the cars when they were repossess. No comparable circumstance applies here.

No allowance for expense against revenue will be allowed.

**An Alternative Measure of Gain**

The presentence investigation reports conclude that loss occurred but is not determinable and use gain as a measure, but use a different method of determining gain,. The reports use the sales revenue generated on the *counts of conviction* for each defendant, less refunds and returns.

|  | Deposits | Returns | Net Deposits |
|---|---|---|---|
| Johnson[36] | $1,123,990.87 | $520,447.11 | **$603,543.76** |
| Riddle[37] | $ 971,329.81 | $484,017.27 | **$487,312.54** |

The method of deriving these figures is the same as used in the prosecution's motion for Order of Forfeiture.[38] Under the different considerations of the forfeiture statute, that measure makes sense. It may also be applicable here.

**Summary of Possible Application of 2B1.1(b)**

Loss and gain both are measures of gravity and magnitude. One yields a much greater enhancement, but both indicate severity beyond the norm. This is consistent with the size of the

---

[34] *Id.* at 829 n.13.

[35] *Id.*

[36] Presentence Investigation Report for Ryan Riddle ¶37, docket no. 1579, filed July 15, 2016.

[37] Presentence Investigation Report for Ryan Riddle ¶36, docket no. 1578, filed July 15, 2016.

[38] Docket no. 1499, filed May 31, 2016.

effort and enterprise. Millions of dollars passed through iWorks that could not have done so after credit card processing became unavailable to it.

Loss is the preferred measure if a reasonable estimate can be made. If a reasonable estimate of loss is not possible, then one of the measures of gain must be used. Revenue from all the accounts includes relevant conduct. Using a figure based on revenue from the counts of conviction would not include relevant conduct.

The argument of counsel on these points, now that the findings have been made, will be appreciated.

Dated July 28, 2016.

BY THE COURT:

_____
David Nuffer
United States District Judge

**Exhibit A**
**Sentencing Table**

# SENTENCING TABLE
## (in months of imprisonment)

| | | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|---|
| | Offense Level | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| Zone A | 1 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 |
| | 2 | 0-6 | 0-6 | 0-6 | 0-6 | 0-6 | 1-7 |
| | 3 | 0-6 | 0-6 | 0-6 | 0-6 | 2-8 | 3-9 |
| | 4 | 0-6 | 0-6 | 0-6 | 2-8 | 4-10 | 6-12 |
| | 5 | 0-6 | 0-6 | 1-7 | 4-10 | 6-12 | 9-15 |
| | 6 | 0-6 | 1-7 | 2-8 | 6-12 | 9-15 | 12-18 |
| Zone B | 7 | 0-6 | 2-8 | 4-10 | 8-14 | 12-18 | 15-21 |
| | 8 | 0-6 | 4-10 | 6-12 | 10-16 | 15-21 | 18-24 |
| | 9 | 4-10 | 6-12 | 8-14 | 12-18 | 18-24 | 21-27 |
| | 10 | 6-12 | 8-14 | 10-16 | 15-21 | 21-27 | 24-30 |
| | 11 | 8-14 | 10-16 | 12-18 | 18-24 | 24-30 | 27-33 |
| Zone C | 12 | 10-16 | 12-18 | 15-21 | 21-27 | 27-33 | 30-37 |
| | 13 | 12-18 | 15-21 | 18-24 | 24-30 | 30-37 | 33-41 |
| | 14 | 15-21 | 18-24 | 21-27 | 27-33 | 33-41 | 37-46 |
| | 15 | 18-24 | 21-27 | 24-30 | 30-37 | 37-46 | 41-51 |
| | 16 | 21-27 | 24-30 | 27-33 | 33-41 | 41-51 | 46-57 |
| | 17 | 24-30 | 27-33 | 30-37 | 37-46 | 46-57 | 51-63 |
| | 18 | 27-33 | 30-37 | 33-41 | 41-51 | 51-63 | 57-71 |
| | 19 | 30-37 | 33-41 | 37-46 | 46-57 | 57-71 | 63-78 |
| | 20 | 33-41 | 37-46 | 41-51 | 51-63 | 63-78 | 70-87 |
| | 21 | 37-46 | 41-51 | 46-57 | 57-71 | 70-87 | 77-96 |
| | 22 | 41-51 | 46-57 | 51-63 | 63-78 | 77-96 | 84-105 |
| | 23 | 46-57 | 51-63 | 57-71 | 70-87 | 84-105 | 92-115 |
| | 24 | 51-63 | 57-71 | 63-78 | 77-96 | 92-115 | 100-125 |
| | 25 | 57-71 | 63-78 | 70-87 | 84-105 | 100-125 | 110-137 |
| | 26 | 63-78 | 70-87 | 78-97 | 92-115 | 110-137 | 120-150 |
| | 27 | 70-87 | 78-97 | 87-108 | 100-125 | 120-150 | 130-162 |
| Zone D | 28 | 78-97 | 87-108 | 97-121 | 110-137 | 130-162 | 140-175 |
| | 29 | 87-108 | 97-121 | 108-135 | 121-151 | 140-175 | 151-188 |
| | 30 | 97-121 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 |
| | 31 | 108-135 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 |
| | 32 | 121-151 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 |
| | 33 | 135-168 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 |
| | 34 | 151-188 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 |
| | 35 | 168-210 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 |
| | 36 | 188-235 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 |
| | 37 | 210-262 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life |
| | 38 | 235-293 | 262-327 | 292-365 | 324-405 | 360-life | 360-life |
| | 39 | 262-327 | 292-365 | 324-405 | 360-life | 360-life | 360-life |
| | 40 | 292-365 | 324-405 | 360-life | 360-life | 360-life | 360-life |
| | 41 | 324-405 | 360-life | 360-life | 360-life | 360-life | 360-life |
| | 42 | 360-life | 360-life | 360-life | 360-life | 360-life | 360-life |
| | 43 | life | life | life | life | life | life |